# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 31528/41059

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERICK VIRGIL HALL, | ) | |
| | ) | **Boise, August 2017 Term** |
| Defendant-Appellant. | ) | |
| _____ | ) | **2018 Opinion No. 33** |
| | ) | |
| ERICK VIRGIL HALL, | ) | **Filed: April 11, 2018** |
| | ) | |
| Petitioner-Appellant, | ) | **Karel A. Lehrman, Clerk** |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF IDAHO, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ). | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Thomas F. Neville, District Judge.

The judgments of conviction and the order dismissing the post-conviction petition are <u>affirmed.</u>

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant. Ian H. Thomson argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. L. Lamont Anderson argued.

_____

BRODY, Justice

Erick Virgil Hall was convicted of first-degree murder, first-degree kidnapping, and rape. He was sentenced to death for murder and to consecutive, fixed life terms for first-degree kidnapping and rape. Hall petitioned for post-conviction relief, alleging numerous errors at trial.

1

Hall's petition for post-conviction relief was summarily dismissed. Hall's direct and post-conviction appeals are consolidated pursuant to Idaho Code section 19-2719(6). We affirm the judgments of conviction and the order dismissing the post-conviction petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 24, 2000, Lynn Henneman disappeared after going for an evening walk in Boise. Ms. Henneman, a flight attendant from New York, was laid over in Boise that day. She and the rest of the flight crew arrived in the early afternoon and checked into a hotel near the Boise River. That evening, Ms. Henneman went walking on the Greenbelt. She visited an art museum and a nearby restaurant. After dinner, Ms. Henneman was seen walking back to the hotel. However, she never re-entered her hotel room, nor did she answer her husband's phone calls that evening. After failing to meet the flight crew the next morning as planned, Ms. Henneman was reported missing and an extensive search was undertaken.

A few days later, her wallet and its contents were discovered eight miles from the hotel by some children playing in a field near a junior high school. Two weeks later, her body was discovered floating in the Boise River more than a mile downstream from her hotel. The black sweater she had been wearing was tied tightly around her neck and her shirt was tied around one of her wrists. Oral, vaginal, and anal swabs were collected from Ms. Henneman's body and sent for DNA testing. An autopsy was performed and due to marks on her head and neck, it was determined that Ms. Henneman's cause of death was likely strangulation. Several days after the discovery of her body, more items belonging to Ms. Henneman were found on the riverbank near the hotel.

Although the investigation continued, no suspect was identified until 2003, when police were investigating the murder of another woman in the Boise foothills. Erick Virgil Hall was questioned in connection with that murder and submitted a DNA sample. Hall's sample matched the DNA on the vaginal swabs collected from Ms. Henneman's body three years earlier.

Hall was subsequently charged with the kidnapping, murder, and rape of Ms. Henneman. A jury trial was conducted, and Hall was convicted of all three counts. He was sentenced to death for the murder charge, and received two fixed life sentences without the possibility of parole for the rape and first-degree kidnapping charges. Hall appealed to this Court, but his direct appeal was stayed pending completion of post-conviction proceedings.

Hall petitioned the district court for post-conviction relief. During post-conviction proceedings, Hall moved to depose his trial counsel's investigator and to contact jurors from trial. The district court denied both motions. Hall was permitted an interlocutory appeal to this Court to review the district court's decisions as to those motions. This Court affirmed the district court, and remanded the case for completion of post-conviction proceedings. Hall moved for partial summary disposition of the petition and the State moved for summary dismissal. In a lengthy decision, the district court granted the State's motion for summary dismissal. Hall timely appealed. His direct and post-conviction appeals are consolidated for review.

## II.  ANALYSIS

### A.  GUILT PHASE ISSUES ON DIRECT APPEAL

### 1.  The district court did not violate Hall's due process rights by holding incidental proceedings off the record.

Hall contends that he was denied equal protection and due process under the federal and state constitutions because incidental proceedings were held off the record. Where a defendant alleges that a constitutional error occurred at trial, we must first determine whether a contemporaneous objection was made. *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2008). "If the alleged error was followed by a contemporaneous objection at trial, appellate courts shall employ the harmless error test articulated in [*Chapman v. California*, 386 U.S. 18 (1967)]." *Id*. Here, no contemporaneous objection was made to any of the unrecorded proceedings which means that the alleged errors must be reviewed under our fundamental error doctrine:

> [I]n cases of unobjected to fundamental error: (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Id*. at 226, 245 P.3d at 978. The burden is on the defendant to prove "there is a reasonable possibility that the error affected the outcome of the trial." *Id.*; *see also State v. Dunlap*, 155 Idaho 345, 361–63, 313 P.3d 1, 17–19 (2013) (applying the harmless error and fundamental error standards from *Perry* to capital cases).

Here, Hall's claims are based upon Idaho Appellate Rules 25(d) and 28(b)(2)(O), the Fourteenth Amendment of the United States Constitution, and Article I, section 13 of the Idaho

3

Constitution. However, Idaho Appellate Rules 25(d) and 28(b)(2)(O) deal with providing transcripts on appeal from hearings that have been recorded. The rules do not dictate which proceedings should be recorded. Hall's reliance on these rules is misplaced.

Hall cites *Draper v. Washington*, 372 U.S. 487, 497–99 (1963), to argue that depriving a defendant of a verbatim transcript deprives him of adequate appellate review. However, *Draper* does not require every proceeding to be on the record, but rather requires that there be provided a "record of sufficient completeness." *Id.* at 499. Here, there is a record of sufficient completeness available, with transcripts of every relevant hearing, proceeding, and the trial. Hall also contends that *Entsminger v. Iowa*, 386 U.S. 748, 752 (1967), requires a "full record, briefs, and arguments." However, in *Entsminger*, the defendant was not provided with either the trial transcript or the parties' briefing. *Id.* at 750. Here, trial transcripts and all relevant briefing have been provided to Hall. Finally, Hall argues that *Hardy v. United States*, 375 U.S. 277 (1964), requires "the entire transcript" be provided under the United States Constitution. In *Hardy*, there was a complete absence of any transcript and the Supreme Court emphasized that its decision was based on federal statutory, not constitutional, grounds. *Id*. at 282.

Federal circuit courts have interpreted the *Hardy* holding narrowly. *See, e.g., Karabin v. Petsock*, 758 F.2d 966, 969 (3rd Cir. 1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 20 (1956)) ("The Supreme Court has never held that due process requires a verbatim transcript of the entire proceedings. To the contrary, it has specifically held that states may find 'other means of affording adequate and effective appellate review' of criminal convictions."). These cases do not require a verbatim transcript of every unrecorded proceeding; they only require "'adequate and effective appellate review' of criminal convictions." *Id*. (quoting *Griffin*, 351 U.S. at 20).

This Court has discussed the constitutional ramifications of an appellant not being provided with every transcript from his underlying criminal case. *See State v. Burnet*, 155 Idaho 724, 726−27, 316 P.3d 640, 642−43 (2013). It has held that "[t]he State is not required . . . to purchase a stenographer's transcript in every case in which a defendant cannot buy one, nor is the State required to provide a transcript of all proceedings held below." *Id.* "When an indigent defendant requests that transcripts be created and incorporated into a record on appeal, the grounds of the appeal must make out a colorable need for the additional transcripts." *Id*. at 727, 316 P.3d at 643. "Mere speculation or hope that something exists does not amount to the appearance or semblance of specific information necessary to establish a colorable need." *Id*. "It

is basic to appellate practice that error will not be presumed, but must be affirmatively shown by an appellant." *State v. Lovelace*, 140 Idaho 53, 65, 90 P.3d 278, 290 (2003) (citing *State v. Langley*, 110 Idaho 895, 897, 719 P.2d 1155, 1157 (1986)).

Here, Hall has failed to demonstrate specific prejudice he suffered because some proceedings were conducted off the record. "[E]rror in the abstract does not necessarily rise to the level of constitutional dimension unless and until a defendant properly presents a specific prejudice from such error." *Id*. Hall has failed to meet his burden to prove that "there is a reasonable possibility that the error affected the outcome of the trial," *Perry*, 150 Idaho at 226, 245 P.3d at 978, or that there exists "specific prejudice from such error," *Lovelace*, 140 Idaho at 65, 90 P.3d at 290. As such, Hall has failed to prove that there was any constitutional violation in the trial court's holding proceedings off record.

**2.     The district court properly denied Hall's motion to dismiss the indictment.**

Hall argues the district court erred by denying his motion to dismiss the indictment on jurisdictional grounds. On April 22, 2003, the evidence against Hall was presented to a grand jury in Ada County. A hearing was held after the grand jury deliberated. During the hearing, the foreman asked the court whether the indictment contained his signature. The court responded, "Yes, I think we got it." The court then asked the foreman whether it was a true bill and the foreman responded, "It is, Your Honor." The next day, Hall was arraigned and counsel was appointed. Later, however, it was discovered that the indictment had not been signed by the foreman. Hall moved to dismiss the indictment under Idaho Code section 19-1401. On April 25, 2003, the court held a hearing, in which the State explained that the foreman had properly dated the indictment, but had forgotten to sign it. After a discussion between the parties and the court, the court took Hall's motion under advisement and set the case over to permit the grand jury to reconvene on the same indictment. Neither of the parties objected to the court's resolution of the issue. On May 6, 2003, the same grand jury reconvened. The indictment was signed by the foreman at this time. When the parties reconvened before the assigned district court judge, Hall requested that the indictment be dismissed because the date on the indictment was still listed as April 22, 2003. The court denied the motion, explaining that it was the same grand jury that reconvened, that it was a clerical oversight that the indictment had not been initially signed and had the original date, and that the indictment now complied with section 19-1401. Hall argues the indictment should have been dismissed.

"This Court exercises free review over questions of jurisdiction." *State v. Lute*, 150 Idaho 837, 840, 252 P.3d 1255, 1258 (2011). "The information, indictment, or complaint alleging an offense was committed within the State of Idaho confers subject matter jurisdiction upon the court." *Id*. (quoting *State v. Rogers*, 140 Idaho 223, 228, 91 P.3d 1127, 1132 (2004)). "No person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury or on information of the public prosecutor." Idaho Const. art. I, § 8. "An indictment cannot be found without the concurrence of at least twelve (12) grand jurors. When so found it must be endorsed, a true bill, and the endorsement must be signed by the foreman of the grand jury." I.C. § 19-1401. "Since the indictment or information provides subject matter jurisdiction to the court, the court's jurisdictional power depends on the charging document being legally sufficient to survive challenge." *State v. Jones*, 140 Idaho 755, 758, 101 P.3d 699, 702 (2004). "To be legally sufficient, a charging document must meet two requirements: it must impart jurisdiction and satisfy due process." *State v. Severson*, 147 Idaho 694, 708, 215 P.3d 414, 428 (2009). The question is thus whether either the temporary absence of a signature or the presence of the original date deprived Hall of due process.

"No indictment is insufficient, nor can [it] be affected, by reason of any defect or imperfection in matter of form, which does not tend to the prejudice of a substantial right of the defendant upon its merits." I.C. § 19-1419. There are several express statutory grounds for setting aside an indictment. *See* I.C. § 19-1601. "The indictment must be set aside by the court in which the defendant is arraigned, upon his motion . . . when it is not found, endorsed and presented as prescribed in this code." I.C. § 19-1601. However, this Court has held that technical defects in an indictment do not defeat jurisdiction of the district court to proceed on the indictment. *See Gasper v. Dist. Ct. of Seventh Jud. Dist., in and for Canyon Cnty.*, 74 Idaho 388, 395, 264 P.2d 679, 683 (1953) ("The conclusion is that such defects [including the presence of unauthorized persons and certain defects in signature] do not involve the jurisdiction of the court, at least in such manner as to provide grounds for prohibition."); *see also State v. Schmierer*, 159 Idaho 768, 771, 367 P.3d 163, 166 (2016). In *Gasper*, the plaintiff argued that the indictment was not endorsed and presented as required by Idaho Code section 19-1401, because it was not signed by the foreman. *Id*. at 392, 264 P.2d at 681. The Court observed that below "the body of the indictment containing the name of the accused, the crime charged, the manner and date of its commission and the date of the indictment . . . appears the name of the foreman—presumably

6

his signature—followed by his title as foreman of the grand jury." *Id*. The Court held that the appearance of the name of the foreman on the bill was "sufficient and substantial compliance with the statute." *Id*.

With regard to the improper date, Hall objected to the incorrect date and the district court sent the indictment back to the grand jury for a correction pursuant to Idaho Criminal Rule 36. I.C.R. 36 (2003). Because Hall objected, we review using the harmless error standard. *Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). "Under the harmless error standard, the defendant has the initial burden of establishing an error, at which point the State has the burden of proving beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Abdullah*, 158 Idaho 386, 416, 348 P.3d 1, 31 (2014). Further, this Court has held that "[t]echnical defects are a "matter of form . . . [that] [do] not tend to prejudice any substantial right of the defendant." *Gasper*, 74 Idaho at 393, 264 P.2d at 681.

Here, the improper date was a clerical defect that did not prejudice any of Hall's substantial rights or contribute to the verdict obtained. The foreman believed the indictment to be signed, and once the defect was revealed, it was promptly remedied by reconvening the same grand jury less than one month after it was empowered. Thus, the technical defect in the indictment was cured by the same foreman and grand jury that originally approved the indictment. After the signature was obtained, Hall was re-arraigned. No substantial right of defendant Hall was prejudiced and because the errors were corrected promptly by the same grand jury and Hall was re-arraigned, it cannot be said that the errors affected the verdict obtained.

Further, Hall made a motion to dismiss the indictment, but he did not object to the court sending it back to the grand jury for a signature. Hall failed to object to the court's remedy, and as such, has waived the objection. *Jones*, 140 Idaho at 758, 101 P.3d at 702 ("Tardily raised objections based on defects in an indictment or information are waived unless they allege either (1) a failure to show jurisdiction, or (2) a failure to charge an offense."). For these reasons, we hold that the district court properly denied Hall's motion to dismiss the indictment.

### 3. The district court properly denied Hall's motions to strike two jurors for cause.

During *voir dire*, Hall moved to strike two jurors for cause. Hall first moved to strike Juror 1 for cause, arguing that the juror was biased. The court denied the motion, stating that Juror 1's answer indicated that he would not always vote for the death penalty, particularly since none of the jurors had been instructed on the law. After further *voir dire*, Hall again moved to

7

excuse Juror 1, contending that Juror 1 was biased in favor of the death penalty and would not consider mitigation evidence adequately. The court denied Hall's motion again. Later, Hall moved to strike Juror 60 for cause, arguing that she was "substantially mitigation impaired." The court denied Hall's motion. After the jury was selected, the parties agreed that each juror was seated as selected and offered no objection to the jury. Neither Juror 1 nor Juror 60 was seated on the jury. Further, none of the seated jurors were objected to during *voir dire*. On appeal, Hall contends that his constitutional rights were violated because the district court did not excuse Juror 1 or Juror 60 for cause, requiring him to use two peremptory challenges to remove them.

"The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 412 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). "[A] trial court does not abuse its discretion by refusing to excuse for cause jurors whose answers during voir dire initially give rise to challenges for cause but who later assure the court that they will be able to remain fair and impartial." *Nightengale v. Timmel*, 151 Idaho 347, 353, 256 P.3d 755, 761 (2011) (quoting *Morris v. Thomson*, 130 Idaho 138, 141, 937 P.2d 1212, 1215 (1997)).

"The decision to excuse potential jurors is within the discretion of the trial court." *State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999). "The Court determines whether the district court abused its discretion by examining: '(1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason.'" *Abdullah*, 158 Idaho at 416, 348 P.3d at 31 (quoting *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010)).

Juror 1 was asked by the court whether he would "weigh the aggravating and mitigating circumstances presented, [and] . . . fairly consider both voting for life in prison and voting to impose the death penalty," to which he answered, "Yes." During the State's questioning, counsel asked:

> Some of the [jury questionnaire] questions dealt with whether what [sic] you think about a person who has come from a difficult or chaotic background. Some people view that as being a reason not to hold them responsible for the choices that they make or to judge them less harshly for the choices they make. Other

people look at it a different way, feel sorry for them, sorry for the person but hold them responsible for the choices that they make, regardless of how bad their background has been. Where are you on that issue?

In response Juror 1 stated, "I would have to say that I'm more to the latter where someone, regardless of what their background is, is responsible for their actions." However, during defense questioning, Juror 1 then stated he would consider the defendant's upbringing as a mitigating factor. The State also asked:

> [Y]ou'll be asked to listen to [additional facts], to decide what weight to give each kind of thing that you hear, whether any weight or none or a bunch, and then to weigh those things in making a decision as to what the penalty will be.
> My question is, will you be able to do that kind of a job, that is, to listen to what the State says, listen to what the Defense says if they—I mean, the burden is still on us, not on them—and to make important decisions of that kind, based on mitigation and aggravation evidence as well?

Juror 1 responded in the affirmative. When questioned by the defense regarding the death penalty in view of a brutal factual situation, Juror 1 said, "I'd probably be leaning more toward the death penalty, if it was clearly very brutal and premeditated." However, in the questionnaire, Juror 1 circled the option, "I believe that the death penalty is appropriate in *some murder cases* and I could return a verdict in a proper case which assessed the death penalty." Juror 1 did not select the option stating, "It would be appropriate in all murder cases." Additionally, when asked if the defendant was found guilty whether Juror 1 would be able to be "open and fair and impartial as to what the sentence may be," and whether it "would be a difficult thing to do," Juror 1 stated "Yes. I think I likely would have formed an opinion already." However, he stated, "I think I would likely by leaning towards the former but certainly open to—to the [defense] presentation and try to be fair about it." Juror 1 consistently stated that, while he supported the death penalty and would be willing to apply it, he would analyze the circumstances—aggravating and mitigating—and try to make a fair determination.

Here, Juror 1's answers may have given rise to challenges for cause initially, but he subsequently assured the court that he would weigh the evidence and make a fair decision. "[T]he court is entitled to rely on assurances from venire persons concerning partiality or bias." *Nightengale*, 151 Idaho at 353, 256 P.3d at 761 (quoting *Hairston*, 133 Idaho at 506, 988 P.2d at 1180). Juror 1 repeatedly stated that he would consider the evidence presented and aim to be fair and impartial, and the court was entitled to rely upon these assertions. As such, the district court did not abuse its discretion by refusing to strike Juror 1.

9

Juror 60's response to the jury questionnaire admitted that she favored the death penalty in some kinds of cases, particularly in cases involving serial murders and others, depending on the severity of the crime. In her response, Juror 60 stated that she wanted to hold a person responsible for their crimes, and would not consider mitigating evidence. But at this point, Juror 60 had not been instructed on the law on mitigation. When later asked during *voir dire* if she could weigh mitigation against aggravation as instructed by the court, Juror 60 stated that she could. She initially stated that she would not fully weigh circumstances of birth, character, sympathy, or mercy, but went on to say that she would consider the facts of the crime and the circumstances surrounding the crime.

Similar to Juror 1, Juror 60 also assured the court that she would make a fair decision. The court is entitled to rely on these assurances. *Nightengale*, 151 Idaho at 353, 256 P.3d at 761. The district court did not abuse its discretion by denying the motion to strike Juror 60. The court reasoned that Juror 60 would consider both aggravating and mitigating circumstances, and that the weight she assigns to them was her choice. When the defense argued that the juror was "mitigation impaired" and had stated that she would not consider mitigating evidence to the full extent, the court stated that the juror had agreed to weigh all of the facts and had not yet been instructed on mitigation law. When the defense moved to strike Juror 60, the State argued that Juror 60 agreed to consider mitigation evidence, and had not "indicated the slightest hesitancy about listening to any kind of evidence properly presented." After considering these arguments, the court denied the motion.

As stated above, a juror may be excused for cause on a capital case if the juror's views would "prevent or substantially impair the performance of his duties." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). There is no indication that either Juror 1 or Juror 60 was impaired from performing their duties as jurors. Both articulated a willingness and ability to consider mitigating factors and fairly apply the law. Therefore, the court did not abuse its discretion by denying Hall's motion to strike the jurors.

Turning to Hall's constitutional argument, the United States Supreme Court has "long recognized that peremptory challenges are not of constitutional dimension." *Ross v. Oklahoma*, 487 U.S. 81, 83 (1988). "They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id*. "When a party uses one of its

10

peremptory challenges to remove a juror it argues should have been removed for cause, the party must show on appeal that 'he was prejudiced by being required to use a peremptory challenge to remove [the juror].'" *Nightengale*, 151 Idaho at 354, 256 P.3d at 762 (quoting *State v. Ramos*, 119 Idaho 568, 570, 808 P.2d 1313, 1315 (1991)). The appellant must demonstrate that "any of the other remaining jurors on the panel were . . . not impartial or were biased." *Id*. Here, as will be discussed below, no biased jurors were seated. The court did not abuse its discretion in denying Hall's motions to strike Juror 1 and Juror 60.

**4.      Hall has waived any objection to challenge allegedly bias jurors.**

Hall contends that nine of the jurors—Juror 6, 62, 63, 68, 83, 85, 102, 110, and 111— were biased. Hall claims that his right to an impartial jury under the Sixth, Eighth, and Fourteenth Amendments was violated, and he requests a new trial. Hall's claims include alleged juror biases resulting from: employment in law enforcement, spouses in law enforcement or working at the Attorney General's Office, family members or associates who were victims of violent crime, difficulty maintaining focus for long periods of time, hearing impediments, and indirect ties to witnesses. However, as Hall failed to object to these jurors, he has invited the error and waived the issue on appeal.

"The invited error doctrine precludes a criminal defendant from 'consciously' inviting district court action and then successfully claiming those actions are erroneous on appeal." *State v. Abdullah*, 158 Idaho 386, 420, 348 P.3d 1, 35 (2014) (quoting *State v. Owsley*, 105 Idaho 836, 837, 673 P.2d 436, 437 (1983)). "It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited. Errors consented to, acquiesced in, or invited are not reversible." *Id*. at 420–21, 348 P.3d at 35–36 (quoting *Owsley*, 105 Idaho at 838, 673 P.2d at 438); *see also State v. Dunlap*, 155 Idaho 345, 379, 313 P.3d 1, 35 (2013) (applying invited error to a capital case). Hall concedes that he did not object to seating any of the nine jurors, did not use a peremptory challenge for any of the nine jurors, and passed each for cause. In short, Hall failed to raise any objection to these jurors at any time, and allowed the jurors to be empaneled without reservation. Thus, any error was invited and is not reversible. Hall has waived this issue on direct appeal.

**5.      The district court did not err in allowing a police detective to testify about the investigative process.**

Hall argues that the district court abused its discretion in admitting the testimony of Detective Smith that included his opinion about whether Christian Johnson was a viable suspect.

He asserts that this testimony was irrelevant, consisted of an impermissible opinion about Johnson's guilt or innocence, and was improper vouching for the State's case.

Hall takes issue with the following testimony:

> THE STATE: And after you received the results back from the forensic testing and had spoken to those people, did you – well, did you also take ultimately a DNA sample – or did he give you a DNA sample from himself [referring to Johnson]?
> DET. SMITH: I did take a DNA sample from Chris Johnson, yes.
> THE STATE: And after you received the results back from all these things, did you continue to look for a suspect after you were done looking at him?
> DET. SMITH: I eliminated Chris Johnson as –
> DEFENSE: Objection –
> DET. SMITH: And continued, yes.
> DEFENSE: That is nonresponsive.
> THE STATE: I'll ask a direct question.
> THE COURT: All right. Thank you.
> THE STATE: Did you eliminate him as a suspect?
> DET. SMITH: I did.
> DEFENSE: Objection.
> THE COURT: Basis for the objection?
> DEFENSE: Can I make a motion outside the presence?
> . . . [The jury is excused]
> THE COURT: Take a seat please, [defense counsel]
> DEFENSE: Well, this officer can testify about facts, things he did. But what his conclusions are are irrelevant. And there's no foundation for his conclusions. Initially he's trying to get – well, he's making nonresponsive responses concerning hearsay information. And stopped that, and now he's making conclusions which I feel are irrelevant. It's the province of the jury to decide what the facts are not his, his province. So I – you know, object and I move to strike that.

After this objection, the court heard argument from both sides before ruling on the objection and motion on the grounds that there was not "anything inherently wrong with a conclusion" and that Detective Smith's actions were relevant, but not binding on a jury. Hall asserts that Smith's testimony was irrelevant, and that it constituted improper opinion testimony and vouching. The objections regarding relevance and improper opinion testimony were raised below.

> For an objection to be preserved for appellate review, either the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context. An objection to the admission of evidence on one basis does not preserve a separate and different basis for excluding the evidence.

12

*Slack v. Kelleher*, 140 Idaho 916, 921, 104 P.3d 958, 963 (2004) (internal citations omitted). "When an objection is made, the trial court is only asked to determine the validity of that objection; it is not asked to determine whether there is another objection that would have been sustained had it been made." *Id*. "On appeal, we review whether the trial court erred. If the objection is made on specific ground, the trial court is simply asked to decide whether that particular objection is a valid reason for excluding the evidence. If the trial court correctly overrules that objection, it has not erred." *Id*. at 105–06, 205 P.3d at 1241–42.

As outlined above,"[i]f the alleged error was followed by a contemporaneous objection at trial, appellate courts shall employ the harmless error test articulated in [*Chapman v. California*, 386 U.S. 18 (1967)]." *Perry*, 150 Idaho at 227, 245 P.3d at 979. Hall objected on relevancy and improper opinion grounds, so the harmless error test will be used. The harmless error test is as follows: "[w]here the defendant meets his initial burden of showing that a violation occurred, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *Id*. Hall must first meet the initial burden of showing that the evidence was improperly admitted.

While an objection to the improper opinion testimony was raised below, it was unquestionably muddled. The basis for finding that an improper opinion testimony objection was made rests in two sentences: "And there's no foundation for his conclusions," and "It's the province of the jury to decide what the facts are not his." While inartfully raised, there is some indication that Hall objected to Smith's conclusions as opinion. The court overruled the objection, stating, "[H]e's entitled to explain . . . what he did and why he did it and what conclusions he may have arrived at." Thus, the objection was raised and decided below.

The question is whether the improper opinion objection had merit. "When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *Edmunds v. Kraner*, 142 Idaho 867, 871, 136 P.3d 338, 342 (2006). "Error is disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party." *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 51, 995 P.2d 816, 821 (2000). "The decision to admit opinion testimony, whether lay opinion or expert opinion, rests within the discretion of the lower court, while the determination of its weight lies with the jury." *State v. Almaraz*, 154 Idaho 584, 602, 301 P.3d 242, 260 (2011) (quoting *State v. Cutler*, 94 Idaho 295, 299, 486 P.2d 1008, 1013 (1971)). "The trial court's broad discretion in admitting evidence 'will only be disturbed on

13

appeal when there has been a clear abuse of discretion.'" *Id*. (quoting *State v. Merwin*, 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1998)). "The Court determines whether the district court abused its discretion by examining: '(1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason.'" *State v. Abdullah*, 158 Idaho 386, 416, 348 P.3d 1, 31 (2014) (quoting *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010)).

Lay opinion testimony is governed by Idaho Rule of Evidence 701. Rule 701, as it read in 2004, stated:

> If the witness is not testifying as an expert, the testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

Thus, the crux of this issue lies in whether Smith's testimony—regarding Johnson's elimination as a suspect—was limited to opinions "rationally based" upon his perception, "helpful to a clear understanding of his testimony," and "not based on scientific, technical or other specialized knowledge." Here, it appears that Smith's testimony was limited to an explanation of the investigative process, which was rationally based upon his perception as an investigator. Smith was testifying about the process of the investigation, and the process of eliminating Johnson as a suspect, not about his personal opinion. While opinions that concern "an inference that could be drawn by the jurors utilizing their own common sense and normal experience" are prohibited under *State v. Ellington*, 151 Idaho 53, 66, 253 P.3d 727, 740 (2011), Smith was providing background information crucial to understanding the investigative process. Smith investigated Johnson's alibi, collected his DNA sample, scrutinized his story, and then moved on to other suspects, which is what Smith was explaining. Second, this testimony was helpful to a clear understanding of his testimony—the process of the investigation—as well as a determination of whether Hall committed the crimes. It was also helpful to a determination about whether Hall acted alone. Lastly, this testimony is not based upon scientific, technical, or other specialized knowledge as prohibited by Rule 701. Smith testified about what he did during the investigation, which was appropriate testimony from a detective. Therefore, the testimony was proper. The district court did not abuse its discretion in overruling the objection on this ground.

14

Additionally, the relevance issue was clearly raised below. Hall contends that the district court erred because "why Det. Smith behaved as he did is irrelevant." "[W]hether evidence is relevant is a matter of law that is subject to free review." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010). "'Relevant [e]vidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence." I.R.E. 401 (2004).

Here, Smith's testimony was relevant to refute Hall's contention that Johnson was involved in Ms. Henneman's murder, which was a fact of consequence that made Hall's guilt more probable than it would be without the evidence. The testimony provided the jury with a complete story. It explained why the police no longer considered Johnson a suspect after his DNA results were received. It provided the jury with details about how the investigation progressed, and may have been helpful to the jury in determining Hall's guilt. The evidence was relevant and was properly admitted. Hall has failed to show that a violation occurred under the harmless error test. We affirm the district court's admission of Detective Smith's testimony.

**6.      The prosecution did not engage in misconduct in discussing the DNA evidence.**

Hall claims that the State engaged in prosecutorial misconduct by discussing DNA evidence in its opening statement, by presenting evidence regarding the DNA exclusion of Johnson, and by "overstat[ing] the significance" of the DNA evidence in closing argument. At trial, Hall did not object to the opening statement, the admission of the expert's testimony regarding DNA, or the closing argument.

> When the alleged error was not followed by a contemporaneous objection, it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine. Under that doctrine, there must be an error that violates one or more of the defendant's unwaived constitutional rights; the error must plainly exist; and the error must not be harmless.

*State v. Hall*, 161 Idaho 413, 422–23, 387 P.3d 81, 90–91 (2016).

The first question is whether the alleged misconduct violated a constitutional right. "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as

to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

In its opening statement, the State declared that "[n]obody else on the planet has a match like that man's DNA. Nobody whose [sic] ever lived on this planet, nobody who ever will live on this planet has this man's DNA." It also declared that an expert witness "was able to make a [DNA] profile of the killer." A prosecutor is permitted to discuss the evidence and the inferences and the deductions arising therefrom. *State v. Sistrunk*, 98 Idaho 629, 630, 570 P.2d 866, 867 (1977). It is only misconduct when the statements made are "calculated to inflame the minds of jurors and arouse prejudice or passion against the accused by statements in his argument of facts not proved by evidence." *State v. LaMere*, 103 Idaho 839, 844, 655 P.2d 46, 51 (1982). Here, the opening statement was based upon a reasonable inference arising from the upcoming expert's testimony. These statements, taken in context, were not intended to arouse prejudice, but to discuss upcoming evidence. The expert did later testify that a DNA profile had been made of the killer and of the rarity of finding a DNA match. Thus, the State's statement did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181–82. It was made in the context of reasonable discussion of the evidence, which is permissible under the law. The prosecuting attorney's comment did not constitute misconduct.

During the presentation of the DNA evidence, two DNA experts testified. Dr. Carla Finis testified that humans share 99.7% of their DNA, but that there are still "9 million pieces of discrete information that can be different and variable from one individual to another." She explained that to develop a DNA profile for identity testing, experts examine 13 genetic regions or "loci." Dr. Finis testified that with "those 13 loci combined with gender locus, we get a complete profile and that matches an individual, yes, someone could say with a reasonable degree of scientific certainty that that sample came from that particular individual." She explained:

> Typically a DNA match is expressed in terms of the relative probability or the chance that one would go out into the population and happen to, at random, select an individual and type them and find that profile. With DQA1 polymarker testing, since it's less variable, the chance will be greater tha[t] you'll find somebody that has the profile you're looking at from the crime scene.
>
> . . . With the STR technology looking again at 13 more variable loci, the numbers that are generated from the analyses are typically in the 1's of trillions . . . . So it's much more rare that you'd find it in the general population.

Immediately thereafter, she was questioned by the prosecutor:

> Q. But there aren't a quadrillion people?
> A. No. Actually those numbers are a thousand times over what the current population is as estimated by the sensus [sic] in 2000 being about 6 billion, or 6 with nine zeroes following it.
> Q. . . . But once the numbers of—the probability numbers get greatly beyond the current population, does that help you to decide whether you have a match or not?
> A. It does. . . . [I]t's reasonable to ascertain that these sources are the same.

She continued, stating:

> Q. So when you get a probability that is in the trillions . . . does that tell you then that there could not be another person on the planet who would have the same DNA that would match at all 13 of those locations?
> A. Other than an identical twin, yes, that would be a reasonable conclusion.

The second DNA expert to testify was Kathryn Colombo. She testified that Hall's DNA profile matched the profile obtained from sperm in Ms. Henneman's vagina. She testified that the chance of obtaining this particular profile in the Caucasian population is 1 in 49 quadrillion, and the chances are even smaller in the African American and Hispanic populations. After examining the statements, the experts in this case did not conflate random match and source probability as Hall argues, but rather allowed the jury to see the evidence and infer what occurred based upon statistical probabilities. As such, there was no prosecutorial misconduct in the questioning of either of the expert witnesses.

> In the closing statement in this case, the State discussed the DNA evidence:

> We brought Dr. Finis in here to talk about probabilities. We bought her in here to tell you how this all works so that you could be confident that STR DNA testing is an identity test of a probability test. It's an identity test. You identify people with 13 loci STR DNA testing.

> . . . .

> And then, of course, you know whose DNA it turned out to be, Erick Hall.

> You know about all the big numbers. I didn't try and write out quadrillion for you. . . . I submit to you that this element has been proven.

Here, the State properly summarized the testimony of the experts. It reminded the jury of Dr. Finis' testimony regarding probabilities, how DNA testing works, and some of the science behind the findings. It then stated that the DNA found was a match to Erick Hall. This was an appropriate summary of the admitted expert testimony. The State did not misstate the evidence

17

or frame it in such a way as to "infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

Hall also claims that the presentation of the DNA evidence is "a classic case of the 'prosecutor's fallacy,'" and violated his due process rights by overstating the significance of the DNA match:

> The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. . . . In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy.

*McDaniel v. Brown*, 558 U.S. 120, 128 (2010). Specifically, Hall complains that the following exchange misled the jury:

> THE STATE: The reason I ask it is this: Say that you take a blood sample from a crime scene and a known blood sample from a suspect and you compare those two and it's a match. How do you know that somebody else doesn't match also? What I'm looking for is to see if there is some numerical way in which laboratories can express the strength or significance of the DNA match.

> DR. FINIS: Yes, there is. Typically, a DNA match is expressed in terms of the relative probability or the chance that one would go out into the population and happen to, at random, select an individual and type them and find that profile. With DQA1 polymarker testing, since it's less variable the chance will be greater than you'll find somebody tha[t] has the profile you're looking at from the crime scene.

> The numbers tend to run in 1 in tens of thousands to 1 in 100,000's with that type for probability of finding someone at random in the population that would have that profile. With the STR technology looking again at 13 more variable loci, the numbers that are generated from the analyses are typically in the 1's of trillions. So that's 1 with 12 zeros after it, kind of like our budget deficit, or quadrillions, 1 in – with 10 to the 15th or 1 with 15 zeroes after it. So it's much more rare that you'd find in the general population.

> THE STATE: But there aren't a quadrillion people?

> DR. FINIS: No. Actually those numbers are a thousand times over what the current population is estimated by the sensus [sic] in 2000 being about 6 billion, or 6 with nine zeroes following it.

> THE STATE: And so if – we're going to talk about this in a minute. But once the numbers of – the probability numbers get greatly beyond the current population, does that help you decide whether you have a match or not?

18

DR. FINIS: It does. Like I said, that's at the point where you've obtained a clean single source profile of 13 loci you get these numbers. And based on your knowledge of the variability and on population genetics, it's reasonable to ascertain that these sources are the same.

Review of the transcript reveals the Dr. Finis was careful to explain that random match probability was the probability that a person selected at random would match the profile, not the probability of a finding a match in a population of people. The differences between the two are subtle and easily confused. Random match probability postulates the probability of selecting a person off the street and having that person's DNA profile match a given sample. *See McDaniel v. Brown*, 558 U.S. 120, 124, 128–29 (2010). It is typically communicated—as was done here—in one of tens of thousands or hundreds of thousands. The probability of finding a match in a given population is a very different process and calculus, and requires information about the frequency of alleles at a particular loci across that population—information which has likely never been collected. Dr. Finis and the State further clarified random match probability by illustrating this data with bottles of marbles. Dr. Finis testified at length about DNA generally, about the testing conducted at her office, and about random match probability. Dr. Finis also testified at length about what the data she was referencing meant and how it was collected and analyzed. Taken in context, it is clear that Dr. Finis' testimony did not overstate the significance of the DNA evidence.

There was no prosecutorial misconduct in the opening statement, the expert witness testimony, or the closing statement. Hall has failed to establish that any due process violation occurred; therefore, no constitutional right was violated. There is no basis for Hall's claim of error.

**7.    Testimony from a DNA expert witness who supervised the DNA testing did not violate Hall's Sixth Amendment right to confrontation.**

Dr. Finis provided expert testimony regarding the DNA testing conducted prior to finding a match with Hall. Dr. Finis supervised Ann Bradley, the person who did all of the physical processing of the sample. Ms. Bradley and Dr. Finis each conducted independent data interpretations and arrived at individual conclusions. Dr. Finis testified that they "processed and reported on 94 different individuals . . . and all of them were eliminated as to the source of the DNA." In September 2001, another scientist, Cindy Hall, did the physical processing of samples utilizing another DNA method involving 35 additional individuals "who we eliminated as possible donors of the sperm fraction." There was no objection to Dr. Finis' testimony at trial.

19

On appeal, Hall contends that his Confrontation Clause rights were violated because Dr. Finis did not complete "hands-on testing" of all of the DNA samples and because he was unable to question the party who completed the "hands-on testing."

"Whether the admission of [evidence] violated [Hall's] right to confront witnesses under the Sixth Amendment is a question of law over which the Court exercises free review." *State v. Shackelford*, 150 Idaho 355, 372, 247 P.3d 582, 599 (2010). As noted above, unobjected-to evidence is reviewed under the fundamental error doctrine. *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court has held that the clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

> Various formulations of this core class of testimonial statements exist: ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Crawford*, 541 U.S. at 51–52 (internal quotations and citations omitted).

In determining whether a statement is testimonial in nature, the "inquiry should focus on whether the technician's statements were made with a primary objective of creating an evidentiary record to establish or prove a fact at trial." *State v. Stanfield*, 158 Idaho 327, 337, 347 P.3d 175, 185 (2014). When addressing expert testimony, "[a] defendant's right to confrontation is violated when 'an expert acts merely as a well-credentialed conduit,' and does not provide any independent expert opinion." *Id*. at 338, 347 P.3d at 186 (quoting *United States v. Ramos-Gonzalez*, 664 F.3d 1, 5–6 (1st Cir. 2011) (holding that testimony violated Confrontation Clause because the expert simply recounted results of another expert's testing)). "However, when an

20

expert independently evaluates objective raw data obtained from an analyst, and exercises his or her own judgment in reaching a conclusion, the expert is not a conduit for the analyst's conclusion. *Id.* (citing *United States v. Summers*, 666 F.3d 192, 201–02 (4th Cir. 2011)). "Rather, the testifying expert's opinion is an 'original product' that can be readily 'tested through cross-examination.'" *Id.* at 339, 347 P.3d at 187 (quoting *Summers*, 666 F.3d at 202) (internal quotations and citation omitted). "The testimony of an expert witness who arrives at an independent conclusion is permissible under the Confrontation Clause even where other non-testifying analysts have provided underlying data or conducted portions of the testing." *Id.* at 338, 347 P.3d at 186.

Here, Dr. Finis independently interpreted the data and arrived at her own conclusions based upon the raw evidence. Further, she supervised Ms. Bradley, who did all of the physical processing of the samples and conducted her own independent review of the data. With regard to the thirty-five additional individuals tested by Cindy Hall, Dr. Finis again explained that someone else did the physical processing of the samples, but Dr. Finis again independently reviewed and analyzed the data. Her opinions and data analyses were thus her original product, which were available to be tested on cross-examination. She was not a conduit for the opinions of another expert because she provided her own opinions on work she supervised and partly completed. Dr. Finis' testimony was permissible under the Sixth Amendment. Therefore, there was no fundamental error in the admission of Dr. Finis' testimony.

**8.     The State properly presented and the district court properly admitted Exhibits 118, 119, and 120.**

Dr. Glen Groben—the forensic pathologist who conducted the autopsy on Ms. Henneman's body—explained that fixed lividity involves the pooling of blood after death and that he observed a "specific livor pattern on [Ms. Henneman's] body." Based upon the lividity patterns, Dr. Groben affirmed that he had an opinion on "how [Ms. Henneman] was tied just after death," and that Exhibits 118, 119, and 120 would help illustrate his opinion. These exhibits show a reenactment of the body as it is postulated to have been hogtied either before or soon after Ms. Henneman's death. The State moved for admission of those exhibits, and Hall objected based on lack of foundation and unfair prejudice. Outside the jury's presence, the State made an offer of proof, and the district court concluded there was sufficient foundation to admit both Dr. Groben's testimony and Exhibits 118, 119, and 120. When the jury returned, Hall questioned Dr. Groben, who explained that Ms. Henneman was "strangled and then placed on her stomach when

21

this was done. . . . [o]r [it] could have been at or around the time of death." Hall objected again, contending that, because Ms. Henneman being tied was "not part of the cause of death or part of that portion of the examination[,] then it's not relevant." The district court reasoned, "this evidence is relevant because it explains the condition of the body, if not before death then perhaps—then it would seem almost certainly for the period of approximately 12 hours after death."

Hall also argued that, irrespective of Dr. Groben's opinion, Exhibits 118, 119, and 120 were unfairly prejudicial. The district court concluded that "Exhibit 120 is the one that's, perhaps, the most difficult for the jurors because it's a—it's top down. It shows the buttocks area and it—it is probably the most—if there's a shock factor, if you will, it probably has the most shock factor to a potential juror." Nevertheless, the court reaffirmed the relevancy of the photos and concluded, "Any good evidence is prejudicial. This evidence is very prejudicial, substantially prejudicial to the defendant, but I do not think that it is *unfairly prejudicial*." (emphasis added).

Dr. Groben then explained that he reenacted the positioning of Ms. Henneman's "body in a manner that would account for the marks, the lividity patterns" that he saw during the autopsy. Exhibits 118, 119, and 120 were illustrative of how Dr. Groben positioned Ms. Henneman's body based upon the lividity patterns. Hall contends the district court erred by admitting Dr. Groben's "reenactment" testimony and Exhibits 118, 119, and 120, because there was a lack of foundation, they were irrelevant, and unfairly prejudicial. Hall further contends that admission of the evidence constitutes prosecutorial misconduct rising to the level of fundamental error because the evidence is "speculative [and] extraordinarily prejudicial."

### a. The district court did not err in admitting the reenactment expert witness testimony or photos.

"Whether there is a proper foundation upon which to admit evidence is a matter within the trial court's discretion." *State v. Koch*, 157 Idaho 89, 96, 334 P.3d 280, 287 (2014). While the relevance of evidence is subject to free review, the lower court's "determination of whether the probative value of the evidence outweighs its prejudicial effect is reviewed for an abuse of discretion." *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008) (internal citations omitted). "If the alleged error was followed by a contemporaneous objection at trial, appellate courts shall employ the harmless error test articulated in [*Chapman v. California*, 386 U.S. 18 (1967)]." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). Here, Hall objected on

22

the grounds of lack of foundation for the testimony and the reenactment photos, relevancy of the testimony, and unfair prejudice of the reenactment photos, so the harmless error test applies to these issues. The harmless error test is as follows: "Where the defendant meets his initial burden of showing that a violation occurred, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *Id*. The first question is whether the evidence was properly admitted.

**(1)** ***There was adequate foundation for the expert opinion on lividity patterns.***

Hall argues that there was inadequate foundation for the expert opinion on the lividity patterns. Idaho Rule of Evidence 702 (2004) governs the admissibility of expert testimony. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"The inquiry under I.R.E. 702 is whether the expert will testify to scientific knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue, 'not whether the information upon which the expert's opinion is based is commonly agreed upon.'" *State v. Perry*, 139 Idaho 520, 522, 81 P.3d 1230, 1232 (2003) (quoting *State v. Merwin*, 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1999)).

"Expert opinion must be based upon a proper factual foundation." *Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (1998). "If, based on an expert's training, one possible cause is observed with greater frequency than others, this information would be useful to the trier of fact." *Merwin*, 131 Idaho at 646, 962 P.2d at 1031; *see also Lanham v. Idaho Power Co.*, 130 Idaho 486, 492, 943 P.2d 912, 918 (1997) (holding it was not error to permit an expert to "testify about possible causes of the fire. All reasonably likely causes of the fire were relevant because the fire's cause was a central element of the [] causes of action."). "[E]xpert medical opinion testimony must be based upon a 'reasonable degree of medical probability' in order to be admissible." *Bloching v. Albertson's, Inc.*, 129 Idaho 844, 846, 934 P.2d 17, 19 (1997) (quoting *Roberts v. Kit Mfg. Co.*, 124 Idaho 946, 948, 866 P.2d 969, 971 (1993)).

Here, Dr. Groben's opinion regarding Ms. Henneman's position was based upon a proper factual foundation of lividity patterns found on the body. Dr. Groben's opinion regarding how Ms. Henneman was tied was not based upon mere "speculation" or "possibilities," but was based

upon the lividity patterns observed on the body. Hall did not object to Dr. Groben's testimony about these observations. Dr. Groben testified that after Ms. Henneman's body was recovered from the river he observed a "ligature around the neck on a single overhand knot tight around her neck, a piece of clothing. Around the left wrist was tied in a double overhand knot was another piece of dark clothing tied tightly around the left wrist." Without objection, Dr. Groben used Exhibits 113 through 117 to render opinions regarding the lividity patterns on Ms. Henneman's body. When Dr. Groben was asked, "based on the lividity patterns that you've established, Doctor, did you form a medical opinion on how the victim was tied just after death," he responded, "Yes." He determined that hogtied positioning was the most likely cause. This was evidence from which the jury could potentially determine the nature and circumstances of Ms. Henneman's death, which was a key inquiry in the case. Further, Dr. Groben explained at length the basis for his opinions, and admitted their limitations. The district court did not abuse its discretion in concluding that Dr. Groben's expert witness testimony regarding the lividity patterns was supported by a sufficient factual foundation.

### (2) *There was adequate foundation for the reenactment photos.*

Hall argues that there was inadequate foundation for the reenactment photos because "Dr. Groben did not observe [Ms. Henneman's] body around the time of her death, and her body was not hogtied when it was recovered from the Boise River." However, Exhibits 118, 119, and 120 were admitted for illustrative purposes to explain the reenactment done by Dr. Groben, which reflected his observations of the lividity patterns on Ms. Henneman's body.

The trial court's decision to admit the reenactment photos is reviewed for an abuse of discretion. *Vendelin v. Costco Wholesale Corp.*, 140 Idaho 416, 429, 95 P.3d 34, 47 (2004).

> This Court has adopted a three part test for determining whether the district court abused its discretion: (1) whether the court correctly perceived that the issue was one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether it reached its decision by an exercise of reason.

*Stevens*, 146 Idaho at 143, 191 P.3d at 221.

As explained in *Zolbert v. Winters*, 109 Idaho 824, 828, 712 P.2d 525, 529 (1985), "It is established that the use of exhibits by a testifying witness in order to supplement or illustrate events is proper insofar as the differences between the events depicted and the events observed

24

are explained by the witness and the exhibit is not deceptive." Moreover, "[e]xperiments based upon reasonably similar circumstances are admissible to show the existence or nonexistence of a fact, and the circumstances do not need to be exactly the same as those surrounding the event." *State v. Cypher*, 92 Idaho 159, 171, 438 P.2d 904, 916 (1968). Finally, "[a]ccuracy . . . is not the standard governing relevance of illustrative evidence; rather, the illustrative evidence must only be relevant to the witness's testimony," which is "particularly true when the events surrounding a death are in dispute." *Stevens*, 146 Idaho at 143, 191 P.3d at 221.

When the State asked Dr. Groben if he had formed a medical opinion on how Ms. Henneman was tied just after death, the State specifically asked Dr. Groben if he had "create[d] some images that would illustrate" his opinion and then offered Exhibits 118, 119, and 120. The State explained, "these exhibits are simply illustrative of the position that the Doctor believes the victim's arms and legs were tied in for 10 to 12 hours after death. . . . It explains the marks on the body and in illustrating the Doctor's testimony so that the jury could understand it." Because the Exhibits were offered to illustrate the events described, their admission was proper. Experiments based upon reasonably similar circumstances—as here—do not need to exactly depict the event. Exhibits 118, 119, and 120 were offered to explain and illustrate Dr. Groben's testimony, and as such were appropriately admitted.

### (3) *The expert opinion regarding the lividity patterns was relevant.*

Hall argues that the expert opinion regarding the lividity patterns was irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401 (2004). "All relevant evidence is admissible except as otherwise provided by these rules or by other rules applicable in the court of this state." I.R.E. 402 (2004). "The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Shutz*, 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006).

Dr. Groben's expert opinion was admitted to support the State's theory regarding "the method in which [Hall] has used the piece of clothing [which] explains the livor patterns on the legs, arms and torso." Moreover, the State explained, "It demonstrates, first off, the continued confinement of the person, whether or not the assailant knew she was dead or not. I think it's part of the course of the crime, and it's the sort of thing that courts traditionally permit so that the jury

25

has an opportunity to see the flow of the crime." The condition of the victim's body, including the condition after death, is relevant. *See State v. Leavitt*, 116 Idaho 285, 290–91, 775 P.2d 599, 604–05 (1989) (holding that the defendant having removed the sexual organs of animals was relevant because of the mutilation of the victim's body). Here, the district court perceived the matter as discretionary and acted in accordance with applicable legal standards in admitting the evidence. Dr. Groben's testimony was relevant in determining the severity of the crime and the manner in which it was committed. The district court did not abuse its discretion by allowing its admission.

### (4) *The reenactment photos were not unfairly prejudicial.*

Hall argues that the reenactment photos were unfairly prejudicial. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." I.R.E. 403 (2004). "[W]here allegedly inflammatory evidence is relevant and material as to an issue of fact, the trial court must determine whether the probative value is substantially outweighed by the danger of unfair prejudice." *Winn*, 121 Idaho at 853, 828 P.2d at 882. "The district court's ruling that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice may be overturned only for an abuse of discretion." *State v. Labelle*, 126 Idaho 564, 567, 887 P.2d 1071, 1074 (1995).

As stated above, photographs of a murder victim may be admitted to aid the jury in arriving at a "fair understanding of the evidence." *Winn*, 121 Idaho at 853, 828 P.2d at 882. "The fact that the photographs depict the actual body of the victim and the wounds inflicted on the victim and may tend to excite the emotions of the jury is not a basis for excluding them." *Id*. Additionally, "[t]he fact that certain evidence is horrifying and gruesome, is not in and of itself sufficient reason for exclusion." *Leavitt*, 116 Idaho at 290, 775 P.2d at 604.

Exhibits 118, 119 and 120 were necessary to fully explain Dr. Groben's testimony regarding his theory about the lividity patterns on Ms. Henneman's body. As discussed above, the evidence is relevant and probative because it illustrates the position of Ms. Henneman's body at or around the time of her death. The three photographs depicting different views of Ms. Henneman's body did not "depict the same scene" as Hall argues, but showed the lividity patterns on the top and on each side of her body. "The jury is entitled to have an accurate picture

26

of all the circumstances, and although such information may be gruesome in nature it is necessary to make an intelligent fact finding decision." *Id*. Here, the three reenactment photos illustrated Dr. Groben's testimony, and were not unfairly prejudicial. The district court perceived the matter as discretionary, acted in accordance with applicable legal standards, and reached its conclusion through an exercise of reason. While the evidence is prejudicial, it was not unfairly prejudicial because the jury was entitled to a complete picture of the evidence related to the crime. The prejudice produced by the pictures, while not insubstantial, did not *substantially outweigh* the probative value of illustrating the position of Ms. Henneman's body at or around the time of her death, as this position may have been important in determining the time and cause of death and the degree of depravity involved in the commission of the crime. Thus, the district court did not abuse its discretion in determining that the reenactment photos were not unfairly prejudicial. The district court did not err in admitting Exhibits 118, 119, and 120, or in allowing Dr. Groben to testify about them. Hall's claims regarding these exhibits fail the harmless error test.

### b. The prosecuting attorney did not engage in misconduct by presenting the testimony of Dr. Groben and the reenactment photos.

Hall argues that it was misconduct for the State to present Dr. Groben's testimony regarding the lividity patterns and the positioning of the body, and to seek admission of the reenactment photos. However, no objection was made at trial. "Where prosecutorial misconduct was not objected to at trial, Idaho appellate courts may only order a reversal when the defendant demonstrates that the violation in question qualifies as fundamental error." *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2008). Fundamental error requires that there be an "error that violates one or more of the defendant's constitutional rights; the error must plainly exist; and the error must not be harmless." *State v. Hall*, 161 Idaho 413, 423, 387 P.3d 81, 91 (2016). "[E]very defendant has a Fourteenth Amendment right to due process and it is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process." *Perry*, 150 Idaho at 224, 245 P.3d at 976 (internal quotations omitted). However, the existence of properly admitted evidence does not violate that constitutional right. The expert witness testimony and the reenactment photos were properly admitted and Hall's constitutional right to a fair trial was not violated.

## 9.      Hall did not object to the jury instructions on the elements of first-degree murder.

Hall contends that jury instructions 13 and 13A impermissibly reduced the State's burden of proof. Hall did not object to the jury instructions.

"Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Shackelford*, 150 Idaho 355, 373, 247 P.3d 582, 600 (2009) (quoting *State v. Humpherys*, 134 Idaho 657, 659, 8 P.3d 652, 654 (2000)). "The invited error doctrine precludes a criminal defendant from 'consciously' inviting district court action and then successfully claiming those actions are erroneous on appeal." *State v. Abdullah*, 158 Idaho 386, 420, 348 P.3d 1, 35 (2014). "It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited. Errors consented to, acquiesced in, or invited are not reversible." *Id*. at 420–21, 348 P.3d at 35–36 (quoting *State v. Owsley*, 105 Idaho 836, 838, 673, P.2d 436, 438 (1983)); *see also State v. Dunlap*, 155 Idaho 345, 379, 313 P.3d 1, 35 (2013) (applying invited error to a capital case).

Here, at the jury instruction conference, the State suggested that changes be made to Instruction 12 because it was not clear on first-degree murder elements. After a brief delay, the court adopted some modifications. The court removed Instruction 12 and added 13A to give "the elements of first degree murder and [to give the jury] instructions about what to do if they do not find the elements of first degree murder have been proven beyond a reasonable doubt." After discussing the remaining instructions, the court provided the updated versions of Instructions 13 and 13A to counsel. At this point, Hall's counsel stated there was no objection to the "instructions as constituted." Hall participated in the discussions and alterations of the instructions and ultimately approved both. Thus, any error was invited error, and is not the proper basis for challenging the jury's verdict on appeal.

**10.    There was sufficient evidence to prove forcible rape as it was charged in this case.**

Hall contends there was insufficient evidence to support his conviction for rape because the State failed to prove beyond a reasonable doubt that Ms. Henneman resisted.

"The only inquiry for this Court is whether there is substantial evidence upon which a reasonable jury could have found that the State met its burden of proving the essential elements of [the crime] beyond a reasonable doubt." *State v. Adamcik,* 152 Idaho 445, 460, 272 P.3d 417, 432 (2012). "The relevant inquiry is not whether this Court would find the defendant to be guilty beyond a reasonable doubt, but whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 316 (1979)). "In

28

conducting this analysis, the Court is required to consider the evidence in the light most favorable to the State, and we do not substitute our judgment for that of the jury on issues of witness credibility, weight of the evidence, or reasonable inferences to be drawn from the evidence." *Id.*; *see also State v. Porter*, 130 Idaho 772, 787, 948 P.2d 127, 142 (1997) (applying the rule when the evidence is conflicting), and *State v. Sheahan*, 139 Idaho 267, 286, 77 P.3d 956, 975 (2003) (applying the rule when the evidence is circumstantial).

Hall was charged with rape under Idaho Code section 18-6101(3), which required the State to prove beyond a reasonable doubt that he caused his penis to penetrate, however slight, Ms. Henneman's vaginal opening "[w]here she resists but her resistance [was] overcome by force or violence." Resistance "does not require that rape victims resist to their utmost physical ability" and "verbal resistance is sufficient." *State v. Jones*, 154 Idaho 412, 420, 299 P.3d 219, 420 (2013). "The importance of resistance by the woman is simply to show two elements of the crime—the assailant's intent to use force in order to have carnal knowledge, and the woman's nonconsent." *Id.* at 420, 299 P.3d at 227 (quoting *State v. Andreason*, 44 Idaho 396, 397, 257 P. 370, 371 (1927)). Additionally, Instruction 25 explained to the jury that "the amount of resistance need only be such as would show the victim's lack of consent to the act."

At trial, Hall's counsel conceded that Ms. Henneman "absolutely" did not consent. This concession was supported by the evidence. Dr. Groben acknowledged that Ms. Henneman's body showed no defensive wounds and there were no medical findings indicating trauma or other evidence of forcible rape, which is generally not found in rape cases involving adult women. However, not only was Hall's DNA found in Ms. Henneman's vagina, but when asked whether she was still alive at the time of intercourse, Hall responded, "Um, I think so. . . . Cause I ain't gonna go have sex with no dead person that's for damn sure." Additionally, Ms. Henneman's body was found unclothed, suggesting that the rape and murder were contemporaneous. Ms. Henneman's sister later testified that Ms. Henneman was "very" cautious and "careful," being "especially leery of men" particularly as a flight attendant. Subsequently, Hall's counsel conceded that Ms. Henneman "was a careful woman, she was a cautious woman. She was leery of men. She was friendly, but she wasn't a fool."

Considering the brutal manner in which Ms. Henneman was murdered by strangulation, Hall's DNA being retrieved from her vagina, the condition of her unclothed body, and Hall's concession that he would not have had intercourse with her after the murder, it was reasonable

29

for Hall's counsel to concede that this was not consensual intercourse and for the jury to infer from all of the evidence that Hall forcibly raped Ms. Henneman. Other jurisdictions have held, "the circumstance that defendant strangled [victim] to death strongly evidences lack of consent to sexual intercourse." *People v. Story*, 204 P.3d 306, 318 (Cal. 2009). While other scenarios are possible, "the jury was not compelled to so find. The strangulation strongly suggests absence of consent." *Id*.

When all of the evidence—particularly the condition of Ms. Henneman's body and the manner in which she was murdered—is considered in a light most favorable to the State, Hall has failed to establish that no rational jury would have found all of the essential elements of rape. There was sufficient evidence to prove forcible rape as it was charged in this case.

**11.     The alleged errors in the aggregate did not result in cumulative error at trial.**

Hall argues that the accumulation of errors deprived him of his constitutional rights to due process and a fair trial before an impartial jury. Because Hall has failed to demonstrate any error, this Court will not reverse based upon the cumulative error doctrine. "[A] necessary predicate to the application of the doctrine is a finding of more than one error." *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010).

**B.     SENTENCING PHASE ISSUES ON DIRECT APPEAL**

**12.     *Dunlap* and *Abdullah* are controlling precedent.**

Hall argues that the plain language of Idaho Code section 19-2827 requires that the Supreme Court consider all errors at sentencing, including those that were not objected to by defendant and have not been raised by defendant on appeal. Hall further argues that fundamental error review of unpreserved errors in capital cases violates separation of powers principles, denies meaningful appellate review of death sentences required by the Eighth and Fourteenth Amendments of the United States Constitution, and violates his due process rights.

Section 19-2827 provides, in pertinent part:

(a)     Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho . . . .

(b)     The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.

In addressing the review required by section 19-2827, this Court has declared that "section 19-2827 requires us to review not only issues preserved by way of objection, but all claims of error the defendant raises on appeal. . . . However, our review is not unlimited; nothing

in the text of the statute requires us to consider errors not presented by the appellant." *State v. Dunlap*, 155 Idaho 345, 362, 313 P.3d 1, 18 (2013). Accordingly, this Court will "address all of the errors a defendant raises, whether preserved by objection or not, but we will not scour the record in an effort to find errors not identified by the defendant." *Id.*

The issues raised by Hall are similar to those raised in *Dunlap*, 155 Idaho at 362, 313 P.3d at 18, and identical to those raised in *State v. Abdullah*, 158 Idaho 386, 450, 348 P.3d 1, 65 (2015). In *Abdullah*, this Court unequivocally reaffirmed the standard elucidated in *Dunlap*:

> Abdullah raises nearly identical arguments as the defendant in *Dunlap* regarding the standard of review for unpreserved errors in capital cases. He argues that the application of the fundamental error standard in capital cases (1) disregards the plain language of Idaho Code section 19-2827, which requires the Court to review "all claims of error the defendant raises on appeal" in a capital case . . . (2) violates separation of powers principles; (3) violates Eighth Amendment and Fourteenth Amendment principles of meaningful appellate review of death sentences; and (4) violates his due process rights. These arguments are similar or identical to those raised by Dunlap . . . . Thus, this Court has considered the[] arguments raised by Abdullah numerous times throughout the *Dunlap* case. Upon our reconsideration—again—of these arguments in favor of revisiting the Dunlap decision, *we are unpersuaded. This Court reaffirms that the standard of review for unpreserved errors in capital cases is the fundamental error standard and the standard of review for preserved errors in capital cases is the harmless error standard.*

*Abdullah*, 158 Idaho at 450, 348 P.3d at 65 (emphasis added). By raising identical issues as those previously raised, Hall invites this Court to revisit prior decisions and second-guess established reasoning. "[S]tare decisis dictates that we follow [controlling precedent], unless it is manifestly wrong, unless it has proven over time to be unjust or unwise, or unless overruling it is necessary to vindicate plain, obvious principles of law and remedy continued injustice." *State v. Grant*, 154 Idaho 281, 287, 297 P.3d 244, 250 (2013). We decline to do so. The standards of review elucidated in *Dunlap* and *Abdullah* remain controlling law.

**13.  The statutory aggravating circumstances in Idaho Code sections (9)(e), (9)(f), and (9)(h) are not unconstitutionally vague and section 19-2515(9)(g) was properly submitted to the jury.**

Hall attacks each of the four aggravating circumstances the jury concluded were present in the commission of the murder. He contends that three of the statutory aggravators, set forth in Idaho Code sections 19-2515(9)(e), (9)(f), and (9)(h), are unconstitutionally vague because they fail to provide the sentencing authority with sufficient guidance to avoid the arbitrary and capricious application of capital punishment in violation of the Eighth Amendment. Hall further

31

contends that the district court erred in submitting the other aggravator, found in Idaho Code section 19-2515(9)(g), to the jury because it was the basis for his first-degree murder conviction. These contentions will be addressed in turn.

"Constitutional questions are reviewed de novo." *Dunlap*, 155 Idaho at 377, 313 P.3d at 33. The Eighth Amendment, as interpreted in *Furman v. Georgia*, 408 U.S. 238 (1972), "mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). Thus, "[a]n Eighth Amendment claim based upon vagueness examines whether the challenged aggravating circumstance, together with any limiting instruction, adequately channels the discretion of the sentencing body in order to prevent the imposition of an arbitrary and capricious sentence." *State v. Leavitt*, 121 Idaho 4, 5, 822 P.2d 523, 524 (1991).

Hall complains that the following aggravating circumstances in section 19-2515(9) are unconstitutionally vague:

> (e) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.
> (f) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life. . . .
>           . . . .
> (h) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

This Court has adopted the following definition for "heinous, atrocious and cruel":

> It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*State v. Osborn*, 102 Idaho 405, 418, 631 P.2d 187, 200 (1981) (internal quotations and citations omitted). "Exceptional depravity" has been defined as confined to situations where "depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence." *Id.*

32

In *Maynard v. Cartwright*, 486 U.S. 356, 363–64 (1988), the United States Supreme Court held that an Oklahoma aggravating circumstance—that the murder be "especially heinous, atrocious, or cruel"—did not give sufficient guidance to the jury in capital sentencing. Accordingly, the Supreme Court held the aggravator was unconstitutionally vague under the Eighth Amendment. *Id.* However, if the statutory language defining the aggravating circumstance is vague, it can still pass constitutional muster if the statute contains a limiting construction that gives sufficient guidance to the sentencing authority. *State v. Pizzuto*, 119 Idaho 742, 772, 810 P.2d 680, 710 (1991) (discussing *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)).

Section 19-2515(9)(e)'s language tracks some of the language in the Oklahoma statute condemned by *Maynard*, but it also includes a limiting construction: "manifesting exceptional depravity." This limiting construction and the aggravating circumstance as a whole have repeatedly been interpreted by this Court as constitutionally sufficient. *Osborn*, 102 Idaho at 418, 631 P.2d at 200; *see also Leavitt*, 121 Idaho at 6, 822 P.2d at 525; *State v. Lankford*, 116 Idaho 860, 877, 781 P.2d 197, 214 (1989).

Hall argues that the "exceptional depravity" language is not a meaningful limiting construction, and was determined to be unconstitutionally vague by the Eighth Circuit Court of Appeals in *Moore v. Clarke*, 904 F.2d 1226 (8th Cir.1990). *Moore* dealt with whether the phrase "manifested exceptional depravity by ordinary standards of morality and intelligence" in a Nebraska statutory aggravating circumstance violated the Eighth Amendment. *Id.* at 1228. The Eighth Circuit concluded that this phrase was facially unconstitutional and that the Nebraska Supreme Court had not provided adequate direction in the construction of the phrase to limit the discretion of the sentencing body and minimize the risk of arbitrary application of the death sentence. *Id.* at 1229.

The aggravating circumstance in section 19-2515(9)(e)—that the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity"—was determined constitutional by this Court *after Moore* was decided. *Leavitt*, 121 Idaho at 6, 822 P.2d at 525. Additionally, in 2004, the Ninth Circuit determined that the limiting construction provided by this Court for Section 19-2515(9)(e) passed constitutional muster. *Leavitt v. Arave*, 383 F.3d 809, 835–37 (9th Cir. 2004) [hereinafter *Arave* for the Ninth Circuit case *Leavitt v. Arave*, *Leavitt* for the Idaho Supreme Court case *State v. Leavitt*].

Hall argues that section 19-2515(9)(e) was determined constitutional by this Court when judges were involved in capital sentencing, but the analysis changes when juries are involved, because they are less sophisticated and experienced. Admittedly, this Court's determinations in *Leavitt* and *Lankford* relied on the capacity of judges to understand the law and interpret that language in a consistent way. *Leavitt*, 121 Idaho at 6, 822 P.2d at 525; *Lankford*, 116 Idaho at 877, 781 P.2d at 214. However, the identity of the sentencing authority was not an issue in *Osborn*, when the terms of section 19-2515(9)(e) were defined and the limiting construction was adopted, nor was it mentioned when the Ninth Circuit approved this Court's construction in *Arave*. *Osborn*, 102 Idaho at 417–18, 631 P.2d at 199; *Arave*, 383 F.3d at 835–37. As indicated above, the statutory aggravating circumstance in section 19-2515(9)(e) has been determined constitutional time and time again. Hall has provided no basis, principled or otherwise, to challenge this authority. There was no error in the use of this aggravator.

Hall also challenges the language in Idaho Code section 19-2515(9)(f) as unconstitutionally vague. The aggravating circumstance in section 19-2515(9)(f), as indicated above, is that "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." This circumstance has also been repeatedly determined constitutional—most notably by the United States Supreme Court in *Arave v. Creech*, 507 U.S. 463, 471–77 (1993). Hall contends that the shift from judge to jury sentencing requires revisiting this issue, even in light of this Court's rejection of this argument in *Dunlap* and *Abdullah*. *Dunlap*, 155 Idaho at 377, 313 P.3d at 33 ("We hold that the utter disregard aggravator is not rendered unconstitutional by the change from judge to jury sentencing."); *Abdullah*, 158 Idaho at 463, 348 P.3d at 78 ("We reaffirm *Dunlap*'s holding that the utter disregard aggravator with a limiting construction is not void for vagueness under the Eighth Amendment."). We disagree. We decline to revisit these issues, as they were properly resolved in *Dunlap* and *Abdullah*.

Hall also challenges the constitutionality of the aggravating circumstance found in section 19-2515(h), that "the defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." He argues that this aggravator overlaps with section 19-2515(9)(e)'s heinous, atrocious and cruel language such that a jury would have difficulty separating them in sentencing. Accordingly, he argues that this Court's approval of the

propensity aggravator in *State v. Creech*, 105 Idaho 362, 370, 670 P.2d 463, 471 (1983), should be revisited because juries are now involved in sentencing.

In *Creech*, this Court declared:

it cannot be asserted that the "propensity" circumstance could conceivably be applied to every murderer coming before a court in this state. We would construe "propensity" to exclude, for example, a person who has no inclination to kill but in an episode of rage, such as during an emotional family or lover's quarrel, commits the offense of murder. We would doubt that most of those convicted of murder would again commit murder, and rather we construe the "propensity" language to specify that person who is a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation. We would hold that propensity assumes a proclivity, a susceptibility, and even an affinity toward committing the act of murder.

105 Idaho at 370–71, 670 P.2d at 471–72. In 2015, this Court noted: "we have upheld the propensity aggravator, when combined with [the *Creech*] limiting construction, against challenges that it is vague or that it unconstitutionally lowers the burden of proof." *Dunlap v. State*, 159 Idaho 280, 299, 360 P.3d 289, 308 (2015). Similarly, the federal district court for the District of Idaho has repeatedly determined that the propensity aggravator with the *Creech* limiting construction is sufficiently narrow to channel the sentencer's discretion and avoid arbitrary application of the death sentence. *Beam v. Paskett*, 744 F. Supp. 958, 964 (D. Idaho 1990) *aff'd in part, rev'd in part on other grounds*, 966 F.2d 1563 (9th Cir. 1992); *see also Creech v. Hardison*, 2010 WL 1338126 *21 (D. Idaho 2010) (explaining that the federal district court has repeatedly affirmed the constitutionality of Idaho's propensity aggravator with the limiting construction). The advent of jury sentencing does not alter the constitutional vagueness analysis because of the clarity of the limiting construction in *Creech* and the strength of the subsequent pronouncements by this Court and the federal district court that the propensity aggravator is not unconstitutionally vague. Indeed, in *Beam*, the federal district court noted that the propensity aggravator is "less susceptible to an arbitrary and capricious application than the other challenged sentencing factors" because of the limiting construction in *Creech*. *Beam*, 744 F. Supp. at 964. Juries are capable of differentiating a person predisposed to killing from a person who happens to kill in a fit of passion. We reaffirm that the propensity aggravator in section 19-2515(9)(h) is not unconstitutionally vague.

Finally, Hall argues that the felony-murder aggravator in section 19-2515(g) violates the Eighth and Fourteenth Amendments because it does not meaningfully narrow the class of

35

persons eligible for the death penalty in cases where the defendant is convicted on a felony-murder theory.

In *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1998), the United States Supreme Court declared that "[t]o pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (internal quotations omitted). But the Supreme Court also noted that this narrowing function could be accomplished by jury findings in either the sentencing phase or the guilt phase. *Id.* at 244–45.

This Court addressed this argument in *State v. Wood*, 132 Idaho 88, 102–03, 967 P.2d 702, 716–17 (1998) and concluded that "[t]he Idaho Legislature has narrowed the class of murders that may be punished by death in I.C. §§ 18-4003 and 18-4004. The fact that the . . . aggravator in I.C. § 19-2515 duplicates an element of first degree murder in I.C. § 18-4003 does not violate any constitutional standard." Essentially, this Court determined in *Wood* that the "narrowing function" required by the U.S. Constitution was performed by the legislature in limiting the class of murderers eligible for the death penalty in Idaho Code sections 18-4003 and 18-4004. *Wood*, 132 Idaho at 103, 967 P.2d at 717. Hall argues that *Wood* was wrongly decided. He points to the United States Supreme Court's characterization of Idaho law as broadly defining the class of murderers eligible for capital punishment in *Arave v. Creech*, 507 U.S. 463, 475 (1993), and a Nevada Supreme Court case, *McConnell v. State*, 102 P.3d 606, 624 (Nev. 2004), that held that a felony-murder aggravator could not be used to qualify a murderer for the death sentence where the murderer had been convicted on a felony murder theory because it "fail[ed] to genuinely narrow the death eligibility of felony murderers and reasonably justify imposing death on all defendants to whom it applies." This argument is unavailing.

The United States Supreme Court has proclaimed:

To render a defendant eligible for the death penalty in a homicide case . . . the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. *The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).* . . . [T]he aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.

36

*Tuilaepa v. California*, 512 U.S. 967, 971–72 (1994) (internal citations omitted) (emphasis added). Regardless of the United States Supreme Court's observation that first-degree murder in Idaho was broadly defined, the felony murder aggravating circumstance in section 19-2515(9)(g) fulfills the test pronounced in *Tuilaepa*. *Tuilaepa* allows the aggravating circumstance to be contained in the definition of the crime, or the aggravating circumstance (or both)—as it was in this case for Hall. It also requires that the aggravating circumstance perform a narrowing function, or in other words, apply only to a subclass of murderers. This is the prong Hall contends is violated in Idaho by section 19-2515(9)(g). However, the felony murder aggravator in section 19-2515(9)(g) does meet this requirement—it applies only to those murders which are committed in the perpetration of "arson, rape, robbery, burglary, kidnapping or mayhem." This language may apply to many murders, but it certainly does not apply to *every* first-degree murder—which is all the narrowing required by *Tuilaepa*. Hall may disagree with this Court's interpretation in *Wood*, but it was and is constitutional. We reaffirm our decision in *Wood*.

**14.    The grand jury's consideration of aggravating circumstances did not violate Hall's constitutional rights.**

The initial indictment charging Hall with the murder of Ms. Henneman did not contain any aggravating circumstances. Later, when the same grand jury reconvened to hear evidence connecting Hall to the murder of a woman in the foothills (Cheryl Hanlon), the State also asked them to approve an Indictment Part II in this case, which included the four alleged aggravating circumstances. After deliberating, the grand jury returned an indictment charging Hall with the foothills murder and finding the presence of several aggravating circumstances in that murder. They also approved the Indictment Part II in this case.

Hall argues that the grand jury's consideration of the two cases concurrently, which included very similar aggravating circumstances, violated his constitutional right to an individualized determination of the presence of the aggravators in each case. To make this argument, Hall conflates and entangles several constitutional rights. He argues that the notice requirement in Article I, Section 8 of the Idaho Constitution, the notice and jury trial requirements of the Sixth Amendment as interpreted in *Ring v. Arizona*, 536 U.S. 584, 609 (2002), and the Eighth Amendment prohibition of the infliction of cruel and unusual punishment were all violated by the grand jury's concurrent consideration of the aggravating circumstances in this case and in the foothills murder case. He also argues that because the aggravating

37

circumstances must be heard by the jury, they are essentially elements of the crime and must be proven beyond a reasonable doubt.

"The requirements of the Idaho and U.S. Constitutions are questions of law, over which this Court has free review." *State v. Draper*, 151 Idaho 576, 598, 261 P.3d 853, 875 (2011). Article I, Section 8 of the Idaho Constitution provides, in pertinent part: "[n]o person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury or on information of the public prosecutor . . . ." The Sixth Amendment to the United States Constitution provides, in part: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State wherein the crime shall be been committed . . . and to be informed of the nature and cause of the accusation . . ."

In *Ring*, the United States Supreme Court determined that in capital cases, when the finding of one aggravator has the potential to increase the penalty for the crimes, the Sixth Amendment right to a jury trial dictates that the jury be involved in determining the aggravators applicable to the defendant—and thus which sentence should be imposed. 536 U.S. at 609. The Eighth Amendment prohibition against cruel and unusual punishment, made applicable to the states through the Fourteenth Amendment, has been interpreted to require "particularized consideration of relevant aspects of the character and record of *each* convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (emphasis added).

Hall argues that some combination of these rights—or all of them in aggregate—were violated by the grand jury's concurrent consideration of the aggravating factors in each case because the grand jury did not conduct an individualized determination of whether the aggravating circumstances were established by the evidence presented in this case only.

With regard to whether Hall was given constitutionally adequate notice of the four aggravators alleged in this case, *Abdullah* provides guidance. This Court determined in *Abdullah* that statutory aggravators in capital cases do not need to be listed in the indictment, nor does the state need to provide the defendant with the factual basis underlying the aggravators. *Abdullah*, 158 Idaho at 460–61, 348 P.3d at 75–76. Rather, the Court determined that Idaho Code section 18-4004A, which requires notification of intent to seek the death penalty within 60 days after entry of a plea and a listing of the statutory aggravating circumstances relied upon in seeking the

38

death penalty, provided defendants with constitutionally adequate notice of the intent to seek the death penalty and the aggravating circumstances alleged, under both the Idaho and United States Constitutions. *Id*. Here, although the initial indictment did not contain the alleged aggravating circumstances, the State's notice of intent to seek the death penalty, filed just two weeks after approval of the initial indictment, did enumerate the four aggravating circumstances upon which the State would rely in seeking the death penalty. Under *Abdullah*, this was constitutionally adequate notice of the aggravating circumstances in this case. Hall asks this Court to revisit and overrule *Abdullah* on this point, but provides no reasoned basis for doing so. We reaffirm our holding in *Abdullah* regarding the constitutionally-required notice of aggravating circumstances in capital cases.

Hall correctly notes that the Eighth Amendment requires a particularized inquiry at sentencing in capital cases. He points to *Woodson* for this proposition. In *Woodson*, the United States Supreme Court declared:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemmed from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
>
> This Court has previously recognized that "(f)or the determination of sentences, justice generally requires consideration of more than the particular acts by which a crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S. Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, *see Trop v. Dulles*, 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Woodson*, 428 U.S. at 303–04. The import of *Woodson* is that the character of the offender and the circumstances of the offense be considered in imposing the death penalty. *Woodson* thus refers to procedure and evidence in the sentencing phase, not to grand jury deliberations. For after the indictment containing aggravating circumstances is returned by the grand jury—if the defendant is convicted—the *jury* would hear evidence and determine the appropriate sentence. *Woodson* primarily concerns these jury deliberations, not those of the grand jury prior to trial. The grand jury does not decide whether the death penalty is imposed. It only decides whether the evidence supports the aggravating circumstances alleged. Thus, it is immaterial—for Eighth Amendment purposes—that the grand jury considered aggravating circumstances in the Hanlon murder in the same session in which it considered aggravating circumstances in this case.

The Supreme Court's interpretation of the Sixth Amendment's jury-trial requirement in *Ring* does not mandate a contrary result. *Ring* pertains to jury sentencing after conviction—it has little application to grand jury deliberations. Additionally, Hall's claim that statutory aggravators alleged in the indictment must be proven beyond a reasonable doubt has been raised and resolved in previous cases. *Dunlap*, 155 Idaho at 375, 313 P.3d at 31 ("*Ring* did not elevate those statutory aggravating circumstances into elements of a crime . . . . Only our state legislature has that authority, and it did not make aggravating circumstances elements of the crime.") (quoting *Porter v. State*, 140 Idaho 780, 784, 102 P.3d 1099, 1103 (2004)).

Thus, the grand jury deliberations and the Indictment Part II returned in this case did not violate Hall's notice or due process rights under the Idaho or United States Constitutions. Nor were they violative of his Sixth, Eighth, or Fourteenth Amendment rights.

**15.    Admission of the photograph of Hall (Exhibit 149) was harmless error.**

Hall argues that the district court erred in admitting a photograph of him in the sentencing phase because the photo is prejudicial and looks like a mugshot. When the State moved to have the photo admitted, Hall objected. Outside the presence of the jury, defense counsel discussed his objection in detail:

> DEFENSE COUNSEL: Judge, it portrays him in a jail outfit and it's a demeaning type of picture.
> THE COURT: May I please see the – bailiff, can I see the photo?
> DEFENSE COUNSEL: I don't think there is any reason for it other than to show him in that kind of pose and the witness has already identified him. I don't see what the purpose of this is.
> THE COURT: There's no – just to describe, this is a, what, 8 and a half by 11 color photo of the front of his face showing short hair and a goatee of sorts and a

– at least the beginnings of a mustache. And then it shows some orange collar, if you will, of a shirt of some sort. It does not show any booking data underneath – under – a template underneath his face or anything. Do you want to be heard further, sir?

DEFENSE COUNSEL: Well, I mean your description makes it sound benign but –

THE COURT: Well, you tell me what's not benign about it? Well, I'm trying to describe it for the record because I think it's important for the ruling.

DEFENSE COUNSEL: The problem is he's dressed in jail clothing. I don't think it takes a whole lot to put that together by jurors. And the whole purpose of it is to show him in this demeaning position. It's a mug shot.

Thereafter, there was discussion between counsel and the court. The prosecutor argued that the photo was illustrative of the witness' testimony and showed Hall as he looked when she knew him. The defense argued that the witness had already identified Hall in the presence of the jury and that identity was not an issue in the case so its admission would serve no purpose and would introduce unfair prejudice against Hall. The court further described the photo for the record, and observed that "there's nothing in the Court's observation of this picture that makes this demeaning, or makes it appear like a mug shot." The court also noted that Hall had already been convicted of murder, so it was "not sure" what prejudice Hall would suffer if the jurors identified the clothing in the picture as jail garb. Shortly thereafter, the Court overruled the objection and allowed admission of the photo, which was identified as Exhibit 149.

On appeal, Hall argues the district court admitted the photo in error because it was irrelevant, and even if relevant, its probative value was outweighed by the danger of unfair prejudice. Hall bases his arguments on Idaho Rules of Evidence 401, 402, and 403. The State argues that the Rules of Evidence do not apply to sentencing hearings, and that even if they did, the photo was relevant and not unfairly prejudicial. If there was error, the State argues that it was harmless. Hall argues that the Rules of Evidence should apply to sentencing hearings, and that the error in admitting the photo was not harmless, because it was shown to the jury six times in the State's closing argument slideshow presentation.

"The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Sheldon*, 145 Idaho 225, 228, 178 P.3d 28, 31 (2008). "This Court determines whether the district court abused its discretion by examining: (1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of

reason." *State v. Parker*, 157 Idaho 132, 138, 334 P.3d 806, 812 (2014) (internal quotations omitted).

"The Idaho Rules of Evidence, except those relating to privileges, do not apply to sentencing hearings." *State v. Jeppesen*, 138 Idaho 71, 75, 57 P.3d 782, 786 (2002). "Instead, the admission of evidence in capital sentencing proceedings is governed by Idaho Code § 19-2515(6), which provides that 'the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation.'" *State v. Dunlap*, 155 Idaho 345, 375, 313 P.3d 1, 31 (2013). "Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable that it would be without the evidence." *Sheldon*, 145 Idaho at 228, 178 P.3d at 31 (internal quotations omitted).

Here, except for defense counsel's objection questioning the purpose of the photograph, the discussion relating to the admission of the photograph primarily focused on its potential prejudicial effect rather than its relevance. Because the Rules of Evidence do not apply to sentencing hearings, which are governed by Idaho Code section 19-2515(6), only the relevance analysis has any place here. Defense counsel was right to question the admission of the photograph. The State argued that the photo showed Hall when the witness knew him (which was different than he looked at the time of her testimony) and that the photo was illustrative of her testimony. But, as defense counsel correctly noted, identity was not an issue in the case and the witness identified Hall for the court prior to the State moving for the admission of the photograph. The photo thus did not make any fact issue more or less probable by its admission, and as such, it was not relevant to the sentencing determination. Because the court's analysis focused on the potential prejudice of the photo, and did not adequately address defense counsel's relevance objection—which is the key inquiry under section 19-2515(6)—it abused its discretion. Admission of the photograph was error. The question then becomes whether the error was harmless.

"To hold error harmless, the Court must declare their belief, beyond a reasonable doubt, that there was no reasonable possibility that [the] evidence complained of contributed to the conviction [or the sentence of death]." *State v. Payne*, 146 Idaho 548, 574, 199 P.3d 123, 149 (2008) (internal quotations omitted).

Because Hall had been convicted of first-degree murder, the jury was empowered to determine whether he would receive life in prison or the death sentence. I.C. §§ 19-2515, 18-

4004. The question is thus whether the admission of the unflattering picture contributed to the jury's decision to sentence Hall to death. Hall correctly notes that the picture was presented to the jury six times in the State's closing argument at the end of the sentencing hearing. However, even in light of its repetitive presentation to the jury, it is unlikely that one photo, depicting Hall's blank face, his neck, and the tops of his shoulders contributed to his being sentenced to death. The trial and the sentencing hearing contained evidence of the many gruesome details of this case, including: the sweater tied tightly around Ms. Henneman's neck, the pathologist's determination that she died by strangulation, the presence of semen in her vaginal cavity, Hall's history of drug use and violence against women, and his DNA connection to the semen found in Ms. Henneman's body. These details, in concert with many others, were most likely the facts that pushed the jury to impose the death sentence, not the admission of one unflattering photograph. For these reasons, we hold that the court's admission of the photograph was error, but it was harmless error.

**16. Hall's Sixth Amendment right to effective, conflict-free counsel was not violated.**

At the sentencing hearing, the State sought to call April Sebastian as a witness. Prior to her being called as a witness, Hall's counsel indicated that he also represented Ms. Sebastian and that there was a potential conflict. When asked specifically about the nature of the conflict, defense counsel responded, "I mean I know things about [Ms. Sebastian]." A discussion ensued in which it was noted that defense co-counsel had also represented Ms. Sebastian (so he could not question her without similar conflict) and that delay in questioning the witness could damage her participation in a rider program. When the court was seeking a solution to this problem defense counsel said, "I don't want to delay this. No, I'm just going to go ahead and question her myself and if I'm creating ethical problems for myself then I'm creating them. But I'm just telling you for the record that she's my current client." The State then indicated the facts it wished to elicit from Ms. Sebastian and indicated its opinion that very little would need to be elicited on cross-examination, so defense counsel could likely proceed. The court then said, "I'm willing to consider all options. I know you want to go ahead, [defense counsel], you said that. But – there's always the appearance of a potential conflict. But in terms of an actual conflict I really don't know if there is one unless you tell me there is one." After more discussion, the court said, "I will do this any way you want, [defense counsel]." After a little more discussion, defense

43

counsel said, "Let's just do it." Shortly thereafter, the jury was brought back in, Ms. Sebastian was called as a witness, and defense counsel cross-examined her.

Hall argues that his counsel's performance was affected by the perceived conflict in that his counsel was not as vigorous or thorough in cross-examination as he would have otherwise been. Hall also argues that the court erred by failing to inquire further into the nature of defense counsel's conflict.

The Sixth Amendment to the United States Constitution provides that each defendant is entitled to the assistance of counsel for his defense. U.S. Const. amend. VI. This right is violated when defendant's counsel is ineffective. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). Generally, to successfully allege ineffective assistance of counsel, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Only in very limited circumstances is it appropriate to "forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict." *Mickens*, 535 U.S. at 166. These limited circumstances include when "counsel is denied entirely or during a critical stage of the proceeding" or "may also arise when the defendant's attorney actively represent[s] conflicting interests." *Id.* Thus, when a conflict of interest situation arises, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[I]n determining whether a conflict exists, trial courts are entitled to rely on the representations made by counsel." *State v. Severson*, 147 Idaho 694, 704, 215 P.3d 414, 424 (2009).

"[A] trial court has an affirmative duty to inquire into a potential conflict whenever it knows or reasonably should know that a particular conflict may exist," *Id.* at 703, 215 P.3d at 423 (internal quotations omitted). "[A] trial court's examination of the potential conflict must be thorough and searching and should be conducted on the record." *Id.* at 704, 215 P.3d at 424. "The adequacy of the trial court's inquiry is a constitutional issue over which we exercise free review." *Id.*

Here, the first question is whether there was an actual conflict of interest in defense counsel's concurrent representation of Hall and Ms. Sebastian. That determination rests in large part on analysis that only defense counsel can conduct. *See Cuyler*, 446 U.S. at 346 ("[T]rial

44

courts necessarily rely in large measure upon the good faith and good judgment of defense counsel" in determining the presence of a conflict.). Indeed, at one point in the colloquy, the district court noted, "there's always the appearance of a potential conflict. But in terms of an actual conflict I really don't know if there is one unless you tell me there is one." Although this Court has noted that "Idaho Courts look to the standards set forth in the Idaho Rules of Professional Conduct" to determine whether an actual conflict of interest exists, many of the analyses appropriate under the rules require specific and complete information about the nature and depth of each client's representation by counsel, which is information only counsel would have. Here, when asked directly if there was an actual conflict in his representation of Hall and Ms. Sebastian, defense counsel answered, "No. I think it's more the nature of – I mean I'm very familiar with [Ms. Sebastian's] background." Soon thereafter, defense counsel indicated to the court—twice—that it wished to move forward with questioning and cross-examination of Ms. Sebastian. Defense counsel—the party in the best position to make the call—did not view the concurrent representation as an actual conflict of interest. Based on these representations by defense counsel, the district court decided to move forward with questioning Ms. Sebastian. The district court's reliance on defense counsel's assessment of the presence of actual conflict was not error, nor was its connected decision to proceed with the examination of Ms. Sebastian. *Severson*, 147 Idaho at 705, 215 P.2d at 425.

Further, if an actual conflict did exist, there is little evidence that defense counsel's performance was adversely affected by the conflict. Hall argues that defense counsel treated Ms. Sebastian kindly which boosted her credibility and failed to elicit an unfavorable Department of Corrections disciplinary report (Ms. Sebastian was in custody) or refer to the possibility that Ms. Sebastian may receive a benefit from the State in exchange for her testimony. It is true that defense counsel was polite and deferential to Ms. Sebastian, but this was defense counsel's style generally. The State presented three other witnesses that testified about their interactions with Hall and his behavior toward women in the years preceding Ms. Henneman's death. Defense counsel's cross-examination of these witnesses was not especially vigorous or unkind. Rather, it was patient and polite, but did not fail to elicit facts unfavorable to the witness or her story. The same is true of his examination of Ms. Sebastian. Counsel was deferential, but drew out unfavorable facts—such as her history of theft and conviction for forgery. He did not raise the disciplinary report, but there is no evidence he had knowledge of that report. He did not discuss a

potential deal between the State and Ms. Sebastian, but Ms. Sebastian appeared in her orange jail jumpsuit and discussed in direct examination the reason she was incarcerated. She also discussed the circumstances of her case with defense counsel on cross-examination—including that she was serving on a rider and wanted to change her life. This is testimony from which the jury could infer the potential for bias. Thus, there was no actual conflict nor was defense counsel's performance adversely affected by the presence of conflict; Hall's Sixth Amendment right to effective assistance of counsel was not violated.

Hall also argues that the court's inquiry into the nature of the conflict was insufficient under the Sixth Amendment. Specifically, he argues that the court should have asked defense counsel whether the things he "knew" about Ms. Sebastian were admissible facts that could undermine her credibility. This argument is unavailing. As indicated above, the Sixth Amendment requires the court's inquiry to be "thorough and searching," so the question is whether the court's inquiry met that bar. When the court was notified of the potential for conflict, it inquired at length into the nature of defense counsel's relationship with Ms. Sebastian. Then it asked defense counsel point blank about whether there was an actual conflict in defense counsel's representation of both Hall and Ms. Sebastian, to which defense counsel answered, "I mean I know things about [Ms. Sebastian]." The court then explored other options, including defense co-counsel questioning the witness (he also had a conflict), asking another member of the public defender's office to come and cross-examine her or delaying the witness. During this exchange, the court asked defense counsel repeatedly what he would have the court do. After some hesitation, defense counsel indicated that he wished to proceed and cross-examine Ms. Sebastian himself, regardless of whether he was creating "ethical problems for [him]self." The court then asked defense counsel again whether there was an actual conflict and provided several alternative methods of questioning the witness. But defense counsel persisted, denying the presence of an actual conflict and telling the court, "Let's just do it." Thereafter, the jury was brought back in, Ms. Sebastian took the stand and defense counsel cross-examined her. This entire exchange was conducted on the record. Although the court did not press defense counsel for details about the nature of information he knew about Ms. Sebastian, it did inquire— repeatedly—about whether there was an actual conflict in defense counsel's concurrent representation and repeatedly offered various options for handling the conflict, if it did exist. This inquiry was constitutionally sufficient. It was thorough and searching and designed to "ease

46

[a] defendant's dissatisfaction, distrust, or concern" as our precedents require. *Severson*, 147 Idaho at 704, 215 P.3d at 424 (internal quotations omitted). For the foregoing reasons, we hold that Hall's Sixth Amendment right to conflict-free counsel was not abrogated.

**17.    The court did not err in admitting evidence of Hall's prior convictions or in admitting post-crime character evidence.**

At sentencing, the State presented the testimony of N.O., the statutory rape victim; the detective assigned to the statutory rape case; and the attorney who prosecuted the statutory rape case. The State also presented testimony from witnesses who interacted with Hall after the commission of Ms. Henneman's murder, including two of Hall's former girlfriends (Ms. Deen and Ms. Dunaway) whom he dated in 2001 and 2002, Hall's former neighbor (Ms. McCusker) who lived next to him in 2002, Hall's acquaintance (Ms. Sebastian) whom he knew in 2001 and 2002 who had mutual friends, and a department of corrections employee who provided summary evidence of Hall's charges and how "points" are determined in the correctional system.

Hall contends that much of the pre-crime evidence offered in the sentencing hearing was not relevant to the propensity aggravator and was admitted in violation of his constitutional rights. He also argues that testimony from the post-crime witnesses was irrelevant to the propensity aggravator and any "non-statutory" aggravators, inadmissible under Idaho Rules of Evidence 403 and 404, and admitted in violation of Hall's Eighth and Fourteenth Amendments rights. He further argues the testimony of the rape victim violated his Sixth and Fourteenth Amendment rights. Each contention will be addressed in turn.

**a.    Relevancy of pre-crime evidence.**

First, Hall contends that the pre-crime evidence offered by the state was not relevant to the "propensity to commit murder" required by the propensity aggravator in Idaho Code section 19-2515(9)(h). He contends that his prior convictions for grand theft, escape, and statutory rape are not relevant to proving that he had the propensity to murder because they do not show a proclivity to kill or a tendency toward violence. We disagree.

The Idaho Rules of Evidence are not applicable in sentencing; instead, Idaho Code section 19-2515(6)'s relevance standard governs. *State v. Dunlap*, 155 Idaho 345, 375, 313 P.3d 1, 31 (2012); I.C. § 19-2515(6) (2004) ("At the special sentencing proceeding, the state and the defendant shall be entitled to present *all relevant evidence* in aggravation and mitigation." (emphasis added)). This Court reviews relevancy determinations de novo. *State v. Sheldon*, 145 Idaho 225, 228, 178 P.3d 28, 31 (2008). The "propensity aggravator" as contained in Idaho Code

19-2515 in 2000 (the year of the crime) and in 2004 (the year of the trial) read: "The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." I.C. 19-2515(h)(8) (2000); I.C. 19-2515(9)(h) (2004).

Hall's prior convictions evinced an escalation in criminal behavior, that when combined with the egregious circumstances of the statutory rape of N.O. provide a sufficient basis for concluding that Hall had a propensity to commit murder that would "probably constitute a continuing threat to society." I.C. § 1902515(9)(h) (2003). Hall was first convicted of grand theft in 1991 for possession of stolen property. In 1992, he was convicted of the statutory rape of N.O. Many of the circumstances of that rape were strikingly similar to the evidence in this case. N.O. testified that after only knowing Hall for a few hours, he removed her from a chair by her neck, choked her into unconsciousness, tore her clothes off, tied her up with them, raped her both orally and anally, and threatened to kill her by beating her with a hammer. She only escaped by running away from him at an opportune time. Hall was initially charged with the forcible rape of N.O. The charges were only reduced to statutory rape because N.O. was too fragile and vulnerable to testify. In 1995, while serving his sentence for rape, Hall was convicted of escape. Thereafter, his sentence for rape was increased. He was released in December of 1999, only about 10 months before Ms. Henneman's death.

In *State v. Porter*, 130 Idaho 772, 790, 948 P.2d 127, 145 (1997), this Court recognized that "physically abusive tendencies" may be the basis for finding the presence of the propensity aggravator. In *Porter*, the defendant was charged with brutally beating and murdering his girlfriend. *Id.* at 780, 948 P.2d at 135. Because he had not previously attempted to murder someone or been charged with or committed murder, the defendant argued that there was not sufficient evidence to support the propensity aggravator. *Id.* at 790, 948 P.2d at 145. The Court however, determined that evidence that he had severely beaten several former girlfriends demonstrated that "he was not able to control his actions and may have beaten to death any one of [the former girlfriends]" and supported the finding of the propensity aggravator. *Id.*

Here, the violence exhibited by Hall in the perpetration of the rape of N.O. and its striking similarity to the evidence surrounding Ms. Henneman's death, taken together with the escalation in general lawlessness of his prior convictions—particularly that of escape—was sufficient for the jury to determine that Hall "had the propensity to commit murder that would

48

probably constitute a continuing threat to society." I.C. § 19-2515(9)(h). Hall's prior convictions were relevant to determination of the propensity aggravator because they provided a complete picture of his tendencies and the pattern that emerged over time. As such, the district court did not err in admitting Hall's prior convictions.

### b. Admissibility of post-crime evidence.

Next, Hall contends that because the testimony from his former girlfriends, neighbor, and acquaintance presented at sentencing concerned events occurring *after* commission of the crime, their testimony was irrelevant to the propensity aggravator and admitted in error. He also argues that admission of this evidence renders his death sentence unconstitutional on the basis of *Brown v. Sanders*, 546 U.S. 212, 220–21 (2006).

As indicated above, the propensity aggravator in effect at the time of Hall's trial considered only "prior conduct or conduct in the commission of the crime at hand" in determining whether a capital defendant exhibited the requisite propensity. I.C. § 19-2515(9)(h) (2003). This Court exercises "free review over statutory interpretation because it is a question of law." *State v. Owens*, 158 Idaho 1, 3, 343 P.3d 30, 32 (2015). Constitutional issues are also freely reviewed. *State v. Abdullah*, 158 Idaho 386, 417, 348 P.3d 1, 32 (2015).

Here, the district court excluded evidence of the Hanlon murder from sentencing because it was not "prior conduct or conduct in the commission of the murder at hand" and was thus irrelevant to prove the propensity aggravator. But it allowed the testimony of two of Hall's former girlfriends, his former neighbor and his acquaintance, which concerned events and interactions the witnesses had with Hall in 2001 and 2002—one or two years after the commission of the crime at issue. The plain language of section 19-2515 as it was then written provided only for evidence of conduct prior to or concurrent with the crime. I.C. § 19-2515(9)(h) (2004). Thus, any evidence of conduct occurring after the crime at issue was not probative of propensity and was irrelevant and inadmissible for that purpose. However, admission of the post-crime evidence was not constitutional error.

The Supreme Court of the United States made it clear in *Zant v. Stephens*, 462 U.S. 862, 878 (1983) that it is not unconstitutional for a jury to consider non-statutory aggravating circumstances when deciding whether to impose the death penalty. The *Zant* Court explained that the Constitution does not require the jury to ignore aggravating evidence that will help them

49

make an individualized determination of whether the death penalty is appropriate based on the character of the defendant:

> Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

*Zant*, 462 U.S. 878-79 (emphasis in original) (citations omitted). The Supreme Court has explained that the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the defendant's character when deciding whether to inflict the death penalty:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemmed from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
>
>    This Court has previously recognized that "(f)or the determination of sentences, justice generally requires consideration of more than the particular acts by which a crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S. Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, *see Trop v. Dulles*, 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Woodson*, 428 U.S. at 303–04.*Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).

The more difficult argument to unpack is whether Idaho's death penalty statute allowed the jury to consider non-statutory aggravating evidence. We hold that it does.

Beginning in *State v. Creech*, 105 Idaho 362, 369–70, 670 P.2d 463, 470–71 (1983), this Court recognized the admissibility of non-statutory aggravating circumstances in death penalty cases. We held:

> The court is not limited as to the circumstances it may find in aggravation to those listed [as statutory aggravators]. Thus, that section of the court's findings denominated "5. Facts and Arguments Found in Aggravation," although including circumstances not statutorily listed and not expressly found beyond a reasonable doubt, is not error. I.C. § 19-2515(a) permits the court, upon the suggestion of either party that there are circumstances which might properly be considered in aggravation or mitigation, to hear those circumstances. That language strongly suggests that a judge should hear all relevant evidence which either party desires to set forth. Such an interpretation is not contradicted by I.C. § 19-2515(f), which merely lists the statutory aggravating circumstances, at least one of which must exist beyond a reasonable doubt if the ultimate sanction of death is to be imposed.

*Creech*, 105 Idaho at 369, 670 P.2d at 470.

Justice Horton correctly points out in his dissent that Idaho's death penalty statute has been amended since *Creech* and that the language identified in Idaho Code section 19-2515(a) no longer exists. Section 19-2515(a) at the time *Creech* was decided stated:

> After a plea or verdict of guilt, where a discretion is conferred upon the court as to the extent of the punishment, the court, upon the oral or written suggestion of either party that there are *circumstances which may be properly taken into view either in aggravation or mitigation of the punishment,* may, in its discretion, hear the same summarily, at a specified time, and upon such notice to the adverse party as it may direct.

I.C. § 19-2515(a) (1977) (emphasis added). While this particular provision no longer exists, the language emphasized is still part of Idaho's death penalty statute. At the time Hall was sentenced, Idaho Code section 19-2515(2) mandated that a special sentencing proceeding be held "for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense":

> If a person is adjudicated guilty of murder in the first degree, whether by acceptance of a plea of guilty, by verdict of a jury, or by decision of the trial court sitting without a jury, and a notice of intent to seek the death penalty was filed and served as provided in section 18-4004A, Idaho Code, *a special sentencing proceeding shall be held promptly for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense.* Information concerning the victim and the impact that the death of the victim has had on the victim's family is relevant and admissible. Such information shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community by the victim's death. Characterizations

51

and opinions about the crime, the defendant and the appropriate sentence shall not be permitted as part of any victim impact information. The special sentencing proceeding shall be conducted before a jury unless a jury is waived by the defendant with the consent of the prosecuting attorney.

I.C. § 19-2515(5)(a) (2004) (emphasis added). Subsection (6) provided that the state and the defendant *shall* be entitled to present all relevant evidence in aggravation and mitigation:

> At the special proceeding, *the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation*. Disclosure of evidence to be relied on in the sentencing proceeding shall be made in accordance with Idaho criminal rule 16. Evidence admitted at trial shall be considered and need not be repeated at the sentencing hearing.

I.C. § 19-2515(6) (2004) (emphasis added). The issue to be decided here is whether "relevant evidence in aggravation" is limited to the aggravating factors identified in section 19-2515(8).

The plain language of the statute does not limit the aggravation evidence that could be presented to the jury to the statutory aggravators identified in section 19-2515(9). Idaho's death penalty statute repeatedly refers to the aggravating circumstances which must be found to impose the death penalty as "statutory" aggravators. *See* I.C. §§ 19-2515(3)(b), (4), (7)(a), (7)(b), (7)(c), (8)(a), (8)(b), (9) (2003); *see also* I.C. §§ 19-2515(c), (f), (h) (2000). The use of the term "statutory" is significant because it implicitly recognizes that there are other, non-statutory considerations that the Legislature understands must be considered when determining an individualized sentence. *See, e.g.,* I.C. §§ 19-2515(3)(b), (4), (7)(a), (7)(b), (7)(c), (8)(a), (8)(b), (9) (2003); *see also* I.C. §§ 19-2515(c), (f), (h) (2000). To put it plainly, if it wanted to restrict the evidence presented to that which is relevant only to the statutory aggravators, the Legislature could have said something like "all relevant evidence in support of the statutory aggravators and mitigation," but it did not. In fact, there are other provisions in the death penalty statute which make it clear that the Legislature intended the special sentencing proceeding to be the forum where the jury could consider a wide array of information about the defendant and the crime to determine whether the imposition of the death penalty would be just in each particular case. For example, in section 19-2515(5)(a), immediately following the sentence which states that the purpose of the special sentencing proceedings is to hear "all relevant evidence in aggravation and mitigation of the offense," the statute provides that victim impact statements are relevant and admissible:

> If a person is adjudicated guilty of murder in the first degree, whether by acceptance of a plea of guilty, by verdict of a jury, or by decision of the trial court sitting without a jury, and a notice of intent to seek the death penalty was filed and served as provided in section 18-4004A, Idaho Code, *a special sentencing proceeding shall be held promptly for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. Information concerning the victim and the impact that the death of the victim has had on the victim's family is relevant and admissible.*

I.C. § 19-2515(5)(a) (emphasis added). There is also a provision which provides that the evidence presented during the guilt phase of the trial shall be considered by the jury and does not need to be repeated during the sentencing proceeding. *See* I.C. § 19-2515(6).

Hall also argues that the post-crime character evidence offered by the State at sentencing was unfairly prejudicial in violation of Idaho Rules of Evidence 403 and 404. This argument based on *Ring* was raised in *Dunlap*, to which the Court responded:

> This argument is not persuasive. . . . "*Ring* did not elevate those statutory aggravating circumstances into elements of a crime, nor did it create a new crime. . . . *Ring* merely held that a state cannot impose the death penalty unless its sentencing procedures have the jury, not the judge, determine the existence of a statutory aggravator."

*Dunlap*, 155 Idaho at 375, 313 P.3d at 31 (quoting *Porter v. State*, 140 Idaho 780, 784, 102 P.3d 1099, 1103 (2004)). Hall has not raised new issues of fact, nor has he made any new legal arguments. Unsupported claims are not sufficient to overcome controlling precedent. *State v. Delling*, 152 Idaho 122, 131, 267 P.3d 709, 719 (2011) ("Having previously decided this question, and being presented with no new basis upon which to consider the issue, we are guided by the principle of stare decisis to adhere to the law as expressed in our earlier opinions."). The State's sentencing evidence was not subject to the rules of evidence; thus, it could not have been excluded on the basis of reference to the rules. There was no error on this basis.

Hall also argues that the State's character evidence violated his Eighth and Fourteenth Amendment rights because it deviated from a capital sentencing scheme meant to narrow the class of defendants eligible for the death penalty. This argument has no merit. As indicated in section 13, this Court determined in *Wood* that the constitutionally required narrowing function is provided in the definition of first-degree murder in Idaho, not necessarily in capital sentencing procedures. *State v. Wood*, 132 Idaho 88, 103, 967 P.2d 702, 717 (1996). Thus, evidentiary issues in sentencing do not interfere with this narrowing function.

### c. Testimony of the statutory rape victim.

Finally, Hall argues that admission of testimony relating to the statutory rape case violated his due process rights to a fair trial under the Sixth and Fourteenth Amendments. For various reasons, including the passage of time, misplaced evidence, unavailable witnesses, and inadequate discovery, Hall alleges he was denied a full and fair opportunity to defend against this testimony. However, no constitutional violation occurred. Hall received timely discovery relating to N.O.'s testimony and had the opportunity to interview N.O. prior to her testimony. Defense counsel acknowledged receipt of discovery prior to the hearing and did not complain about discovery timeliness at the hearing. Neither party had access to the presentence report in the N.O. case, as both erroneously believed it had been destroyed. Further, defense counsel indicated that he had an opportunity to speak with N.O. prior to her testimony, that "she was too distraught to talk to" but that he was prepared to cross-examine her. The Sixth Amendment does not require that receipt of discovery and the opportunity to interview unfavorable witnesses occur under the best possible circumstances. Rather, it requires that defendants receive a fair trial. *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). "The right of an accused in a criminal trial is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The State presented N.O.'s testimony at sentencing to provide evidence of the propensity aggravator—as the brutal manner in which N.O. was raped contained facts strikingly similar to the facts of this case and could be used to show a pattern or build-up of depraved behavior leading to Ms. Henneman's murder. Hall had already been convicted of the statutory rape of N.O.—Hall's guilt on that charge was not at issue here. The issue is whether Hall had a fair opportunity to defend against the State's allegation that the facts of the N.O. rape provided a basis from which the propensity aggravator could be found. He did. As indicated above, he received the appropriate discovery, he had the opportunity to speak with N.O. prior to her testimony and he indicated at the sentencing that he was ready to proceed with the examination of N.O. Hall's right to a fair trial was not abrogated on this basis.

**18.    The court did not err by warning Hall that presenting evidence or argument on future dangerousness would open the door to the Hanlon murder evidence.**

Hall argues that the court erred in ruling that any discussion by defense counsel in opening, closing, or with witnesses of Hall's future dangerousness, even when incarcerated,

54

would open the door to admission of the Hanlon murder evidence. Hall contends that this ruling impermissibly limited his ability to present mitigation evidence and argument.

As indicated above, evidentiary determinations in capital sentencing are governed by Idaho Code section 19-2515(6), which allows the admission of "all relevant evidence in aggravation and mitigation." Relevant evidence is "[e]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Pepcorn*, 152 Idaho 678, 688, 273 P.3d 1271, 1281 (2012). Relevancy determinations are reviewed by this Court de novo. *State v. Shutz*, 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006).

Throughout the trial and the sentencing phase, the district court diligently excluded all evidence relating to the subsequent murder of Cheryl Hanlon. Consistent with this stance, the court also repeatedly warned defense counsel that any reference to Hall's dangerousness or future risk to the public would open the door to admission of the Hanlon evidence. When called upon, the court also specified that its ruling included references to Hall's dangerousness while incarcerated. The court thus determined that the Hanlon murder evidence was not relevant, but would become relevant if the defense made Hall's dangerousness an issue. This ruling was not erroneous. The Hanlon murder evidence, if admitted, would have been devastatingly prejudicial to Hall and would have significantly interfered with his ability to receive a fair trial. But it was very applicable to determining what kind of future risk he posed to the general public. In short, if any evidence or argument was presented on the issue of Hall's dangerousness, the Hanlon murder evidence would be relevant and admissible. The district court was correct in its ruling and appropriately cautious in its repeated warnings to defense counsel. The fact that Hall had to choose between opening the door to very prejudicial evidence and presenting certain kinds of mitigating evidence does not create error. *See McGautha v. California*, 402 U.S. 183, 213 (1971) ("The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.") (internal quotations and citations omitted), *overruled on other grounds sub nom. Crampton v. Ohio*, 408 U.S. 941 (1972); *see also Bonin v. Calderon*, 59 F.3d 815, 840 (9th Cir. 1995) (determining that requiring a defendant to choose between testifying in mitigation or staying silent when his testimony could be used in

subsequent cases did not violate his Fifth or Eighth Amendment rights). We affirm the ruling of the district court.

**19.     The court did not err in admitting Detective Hess' testimony.**

Hall asserts that the court erred in allowing the admission of hearsay evidence in the examination of Detective Hess, the detective who investigated the statutory rape case, at the sentencing hearing. He contends that Hess testified about what N.O. told him, and that these statements were offered for the truth of the matter asserted.

Again, Hall contends that the Rules of Evidence should apply to sentencing hearings. But they do not. In addition to the above-cited case authority for this rule, the Rules of Evidence themselves indicate that they do not apply to sentencing proceedings. I.R.E. 101(e)(3) ("These rules, other than those with respect to privileges, do not apply in the following situations: . . . sentencing . . . ."). Instead, as indicated above, relevancy is the sole inquiry in admissibility determinations. I.C. § 19-2515(6). The testimony at issue was not objected to below, so the fundamental error standard applies on appeal. *State v. Perry*, 150 Idaho 209, 225, 245 P.3d 961, 977 (2008).

The evidence relating to the statutory rape was presented to prove the propensity aggravator. Thus, Detective Hess' observations and conversations with the victim, N.O., were important in providing evidence as to the circumstances and nature of the crime and to determining whether on the basis of those (and other) facts, Hall had a "propensity to commit murder that would probably constitute a continuing threat to society." I.C. § 19-2515(9)(h). Detective Hess' testimony was relevant and thus admissible under the applicable standard in Idaho Code section 19-2515(6). Hall's rights were not violated in the admission of Detective Hess' testimony, nor was there any error.

**20.     The court did not err in applying the notice of requirements of Idaho Code section 18-207(4) to sentencing proceedings.**

Prior to trial the State sought discovery of the opinions of any mental condition experts that Hall intended to call at trial or sentencing. The State also filed a motion seeking access to Hall so that the State's mental condition experts could conduct their own psychological testing. The State based its motions on Idaho Code section 18-207(4) which sets forth various notice and access requirements that must be complied with in order for a defendant to introduce mental condition evidence. The district court granted the State's motions, ruling that if Hall intended to present mental condition evidence at sentencing, he had to comply with the requirements of 18-

207(4). Hall contends this was error and that the application of section 18-207(4) to capital sentencing proceedings violates the Eighth and Fourteenth Amendments because it deprives him of the right to present mitigation evidence.

Section 18-207(4) reads, in pertinent part:

> (4) No court shall, over the objection of any party, receive the evidence of any expert witness on any issue of mental condition, or permit such evidence to be placed before a jury, unless such evidence is fully subject to the adversarial process in at least the following particulars:
>
> (a) Notice must be given at least ninety (90) days in advance of trial, or such other period as justice may require, that a party intends to raise any issue of mental condition and to call expert witnesses concerning such issue . . . .
>
> (b) A party who expects to call an expert witness to testify on an issue of mental condition must, on a schedule to be set by the court, furnish to the opposing party a written synopsis of the findings of such expert, or a copy of a written report. . . .
>
> (c) Raising an issue of mental condition in a criminal proceeding shall constitute a waiver of any privilege that might otherwise be interposed to bar the production of evidence on the subject and, upon request, the court shall order that the state's experts shall have access to the defendant in such cases for the purpose of having its own experts conduct an examination in preparation for any legal proceeding at which the defendant's mental condition may be in issue. . . .

The plain text of section 18-207(4) does not limit its application to trial. It begins with a statement that "*[n]o court* . . .," which is taken to mean no sentencing court as much as it means no trial court (emphasis added). The lack of specificity grants the statute broad application; by its plain language it is applicable to all courts, unless stated otherwise. Additionally, the requirement in subsection (a) that notice be given "ninety (90) days in advance of trial, or other such period as justice may require" refers to trial, but not to the exclusion of sentencing. *Id*. It merely sets a deadline for disclosure, it does not indicate which proceeding that disclosure is applicable to. Subsection (a) provides that the deadline could also be "such other period as justice may require," which further underlines that the reference to trial is solely for the purpose of establishing a timeline, not for limiting the application of the section. *Id.* Similarly, the language in subsection (c) "[r]aising an issue of mental condition *in a criminal proceeding*" does not limit the application of the requirements to trial. I.C. § 18-207(4)(c) (emphasis added). Thus, by its plain language, Idaho Code section 18-207(4) does not have limited application; it is as applicable to sentencing as it is to trial. The district court did not err in concluding that Idaho Code section 18-207(4) applies to sentencing proceedings.

57

Turning to Hall's contention that 18-207(4)'s application to capital sentencing proceedings violated his constitutional rights, the Eighth and Fourteenth Amendments require that defendants have the opportunity to present, and the sentencing authority has the opportunity to consider, all relevant mitigating evidence at sentencing. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also State v. Payne*, 146 Idaho 548, 570, 199 P.3d 123 (2008). Hall argues that his Eighth Amendment right to present mitigating evidence is burdened by the requirements of section 18-207(4), because presenting mitigating mental health evidence would waive privileges and expose him to examination by the State's mental health experts. We addressed this same argument in *Payne*. 146 Idaho at 570–72, 199 P.3d at 145–47. There, this Court determined that requiring the defendant to make a choice between waiving privileges or presenting mitigating evidence did not violate the Eighth or Fourteenth Amendments because it did not bar the mitigating evidence or prevent the defendant from presenting it, it merely required him to make a choice. *Id.* at 571, 199 P.3d at 146. With reference to *Bonin*, this Court noted that requiring defendants to make choices, even about rights of a "constitutional dimension," does not always violate the Constitution. *Id.* (quoting *Bonin*, 59 F.3d at 839). Instead, "the threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Id.* This Court ultimately determined that Idaho Code section 18-207(4) did not appreciably impair the policies underlying the Eighth and Fourteenth Amendments because it did not burden those rights more than other situations that require a defendant to choose a course of proceeding, such as where a defendant must choose between remaining silent at sentencing regarding charged but untried criminal acts or testify and run the risk of his statements being used against him in subsequent proceedings. *Id.*

Here, the district court determined that section 18-207(4) was constitutional because it did not prevent or prohibit the presentation of mitigating evidence; instead it required the defendant to choose his preferred course of proceeding. This ruling was not in error. As we held in *Payne*, "I.C. § 18-207(4) is constitutional when applied to capital sentencing proceedings." 146 Idaho at 571, 199 P.2d at 146.

**21.    Any error by the district court in instructing the jury at sentencing was harmless.**

    **a. The court erred in failing to instruct the jury that the same evidence could not be used to support more than one aggravator, but such error was harmless.**

Hall argues that the district court erred in failing to instruct the jury that the same facts could not support more than one aggravator. This Court addressed this argument in *Dunlap*:

58

> Dunlap argues that the district court should have instructed the jury that some independent evidence must exist for each aggravator, i.e., that the exact same evidence could not be relied upon to find more than one statutory aggravating circumstance. Dunlap is correct that this Court has consistently held that precisely the same facts cannot support more than one aggravator because we presume that the legislature did not intend to duplicate aggravating circumstances. Thus, we hold that the trial court erred by failing to instruct the jurors that they were required to find independent evidence existed for each aggravator.

> We do not, however, find Dunlap's corollary assertion to be persuasive. . . . Although as a matter of law, the jury could not consider all of the evidence in aggravation as supporting each of the aggravators, this simply means that the verdict cannot stand as to all three aggravators, not that all three aggravators are unsupported by the evidence. Because each of the three aggravators was supported by the entirety of the evidence, at least one remains unaffected by the failure to give the required instruction. Thus, we find the error to be harmless.

*Dunlap*, 155 Idaho at 365, 313 P.3d at 21 (citations omitted).

"Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Abdullah*, 158 Idaho 386, 430, 348 P.3d 1, 45 (2015) (internal quotations omitted). "When a defendant has objected to an instruction, we will apply the harmless error test articulated in *State v. Perry*, 150 Idaho 209, 277, 245 P.3d 961, 979 (2010)." *State v. Adamcik*, 152 Idaho 445, 472, 272 P.3d 417, 444 (2012). "When a defendant fails to object to a jury instruction, we will . . . review the jury instruction for fundamental error." *Id.*

Hall argues that because the district court failed to give the required instruction in his case, "the only way [this] error can be deemed harmless is if all but one of the aggravators are stricken and this Court identifies which aggravator remains." Hall's argument is only partly right. This Court is not required to identify which aggravator remains, only to determine if the error by the district court requires reversal. The failure to give an instruction stating that the same evidence cannot be relied upon to find separate aggravators is error and means that the verdict cannot stand on the basis of all four aggravators. *Dunlap*, 155 Idaho at 365, 313 P.3d at 21. But one aggravator was unaffected by the failure to give the required instruction. *Id.* Because Idaho Code section 19-2515 only requires that one statutory aggravating factor be found by the jury for the imposition of the death sentence, this error was harmless.

**b. The court did not err in giving Instruction 48.**

Hall argues that the district court erred in instructing the jury that a finding that mitigating circumstances would render the death penalty unjust had to be unanimous. Hall's contention relates to Jury Instruction 48, which provides, in pertinent part:

> You must each decide for yourself whether all mitigating circumstances presented, when weighed against each statutory aggravating circumstance proven by the State, are sufficiently compelling to make the imposition of the death penalty unjust. Any finding by you that the mitigating circumstances do or do not make the imposition of the death penalty unjust must be unanimous, but you do not have to unanimously agree upon what mitigating circumstances exist. The existence of mitigating circumstances need not be proven beyond a reasonable doubt. You must each decide for yourself whether mitigating circumstances exist and, if so, then consider them in your individual weighing process.
>
> Once you have reached a unanimous decision on whether or not all mitigating circumstances, when weighed against each aggravating circumstance, make the imposition of the death penalty unjust, or have concluded that you are unable to reach a unanimous decision on that issue, so indicate on the verdict form and notify the bailiff that you are done.

This Court reviews "jury instructions as a whole because it is well established that an instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Adamcik*, 152 Idaho at 472, 272 P.3d at 444 (citing *Estelle v. McGuire*, 502 U.S. 62, 72, (1991)) (internal quotations omitted).

Review of the jury instructions as a whole indicates that Instruction 48 was not given in error. Similar to *Abdullah*, which rejected a similar argument, the instructions given in this case when viewed in totality, "clearly inform the jurors that they do not have to unanimously agree on the mitigating evidence and their decision does not have to be unanimous." *Abdullah*, 158 Idaho at 472, 348 P.3d 87. The end of Instruction 48 indicated to jurors that "*once you have reached a unanimous decision* on whether or not all mitigating circumstances, when weighed against each aggravating circumstance, make the imposition of the death penalty unjust, *or have concluded that you are unable to reach a unanimous decision on that issue*, so indicate on the verdict form and notify the bailiff that you are done" (emphasis added). Additionally, part two of the special verdict form included an area in which the jury could indicate that it was "unable to unanimously decide whether or not all mitigating circumstances are sufficiently compelling that the death penalty would be unjust" for each statutory aggravating circumstance that it found. Finally, Jury Instruction 51 instructed jurors that they should "deliberate with the objective of reaching an

agreement, if you can do so without disturbing your individual judgments." It further instructed jurors that they could re-examine their own views and opinions but should only do so if "convinced by fair and honest discussion" that their original opinion was incorrect "based upon the evidence and the law." It also instructed that none of the jurors should "surrender [their] honest opinion" "merely because the majority of the jury feels otherwise or for the purpose of returning a verdict." These instructions, taken together, correctly instruct the jury on the status of the law as contained in Idaho Code section 19-2515(7)(b). There was no error.

### c. The district court did not err in giving Instruction 49 to the jury.

Hall complains that Jury Instruction 49 was given in error because it included the maximum penalties that could be imposed for rape and kidnapping. He alleges that this allusion prejudiced the jury by potentially allowing them to believe that (1) he would receive no punishment for the rape and kidnapping or (2) that he would essentially receive no punishment for murder if life in prison was imposed, because the jury was instructed that life in prison was the maximum penalty for both rape and kidnapping. This was error, Hall argues, particularly in light of the State's comments in closing argument that imposing life in prison would amount to giving Hall "nothing" for murdering Ms. Henneman.

As indicated above, jury instructions are freely reviewed by this Court for whether they "fairly and adequately present the issues and state the applicable law." *Abdullah*, 158 Idaho at 467, 348 P.3d 82. Hall did not object to Instruction 49, so this contention is reviewed for fundamental error. *Id.* "The *Perry* fundamental error test requires the defendant to show three things: (1) the alleged error violated an unwaived constitutional right; (2) the alleged error plainly exists; and (3) the alleged error was not harmless." *State v. Adamcik*, 152 Idaho 445, 473, 272 P.3d 417, 445 (2012).

Hall alleges that Instruction 49 interfered with his due process right to a fair trial and his Eighth Amendment right against cruel and unusual punishment. But this instruction did not violate his constitutional rights. Instruction 49 stated that Hall would be sentenced for rape and kidnapping "at a later date." There was no reason for the jury to disbelieve this statement of the court or to believe that he would receive no punishment for these offenses, as Hall alleges. Additionally, Instruction 49 indicates that "the sentences for kidnapping and rape may be imposed *concurrently with each other* or with any other sentence, *or consecutively to each other or to any other sentence. These decisions are all left to the court*" (emphasis added). This portion

61

indicates that the sentences may interact, but that these decisions will be left to the court, meaning that the jury's focus should be determining the penalty for first-degree murder. This was a correct statement of the law. The district court did not err in giving Instruction 49 to the jury.

### d. The jury instructions regarding the charged aggravators were proper.

Hall acknowledges that the jury instructions given in his case regarding the alleged statutory aggravators were consistent with Idaho case law, but to the extent he challenges the aggravators as unconstitutionally vague, he challenges the respective jury instructions. As discussed above, the statutory aggravators alleged in this case: 19-2515(e), (f), (g), and (h) are not unconstitutionally vague and were properly submitted to the jury.

### e. The court did not err in instructing the jury regarding the potential for the governor to grant a pardon or commutation.

Hall argues that it was error for Instruction 49 to mention that his sentence could later be commuted or pardoned by the governor. Hall argues that this is an inaccurate statement of the law in Idaho and it violated Hall's Sixth and Eighth Amendment rights to a qualified jury by minimizing the responsibility conferred on the jury in sentencing. Hall did not object to this instruction, so his contention is reviewed for fundamental error. *State v. Dunlap*, 155 Idaho 345, 363, 313 P.3d 1, 19 (2013).

Hall was involved in modifying Instruction 49 prior to its presentation to the jury. "Errors consented to, acquiesced in, or invited are not reversible." *State v. Owsley*, 105 Idaho 836, 838, 673 P.2d 436, 438 (1983). To the extent that there was error in the presentation of Instruction 49 to the jury, it was invited. *Id.* ("It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited"). However, Hall has failed to establish the district court erred in presenting Instruction 49 to the jury.

The relevant portion of that instruction provided: "the governor of the State has the authority to grant a commutation or pardon for any crime except treason, based on a recommendation from the Idaho Department of Pardons and Parole. Such a commutation or pardon could apply to either a life or death sentence."

Hall argues that this instruction was unlike that approved in *California v. Ramos*, 463 U.S. 992, 998–1009 (1983). He contends it was an inaccurate statement of the law more akin to the prosecuting attorney's comments to a jury disapproved in *Caldwell v. Mississippi*, 472 U.S 320, 328–29 (1985). In *Ramos*, the United States Supreme Court approved a jury instruction

(called the Briggs instruction) notifying the jury that the governor of California was empowered to grant a pardon or commute the defendant's sentence. *Ramos*, 463 U.S. at 1013. The Supreme Court determined that this information was "simply one of the countless considerations weighed by the jury in seeking to judge the punishment appropriate to the individual defendant" and did not violate the Constitution. *Id.* at 1008 (internal quotations omitted). By contrast, in *Caldwell*, the Supreme Court disapproved of a prosecuting attorney's statement to a jury that indicated that any decision the jury made would be reviewable by appellate courts, which implied that any error made by the jury would be corrected on appeal. *Caldwell*, 472 U.S. at 328–29. The Court characterized the statement in *Caldwell* as neither accurate nor relevant to a valid state penological interest, whereas *Ramos* was both. *Caldwell*, 472 U.S. at 335. Here, Instruction 49 was very similar to the Briggs Instruction approved in *Ramos*. Instruction 49 was relevant to the same penological interest expressed in *Ramos*—"the concern for the future dangerousness of the defendant should he ever return to society." *Id.* Instruction 49 was also an accurate statement of Idaho law.

Idaho Code section 20-240 provides that for "murder, voluntary manslaughter, rape, kidnapping, lewd and lascivious conduct with a minor child" commutations and pardon proceedings shall be conducted by the commission of pardons and parole, and that the commission's determinations "shall constitute a recommendation subject to approval or disapproval by the governor." Instruction 49 indicated that the governor may commute a sentence or pardon an individual based on a recommendation from the commission of pardons and parole, which is precisely the procedure indicated in section 20-240. Thus, there was no error in the court's presentation of Instruction 49 to the jury.

**22.     There is no merit to Hall's prosecutorial misconduct claims.**

Hall raises a number of claims of prosecutorial misconduct in the sentencing phase. "On appeal, the standard of review governing claims of prosecutorial misconduct depends on whether the defendant objected to the misconduct at trial." *State v. Severson*, 147 Idaho 694, 715, 215 P.3d 414, 435 (2009). "[W]hen an objection to prosecutorial misconduct is not raised at trial, the misconduct will serve as a basis for setting aside a conviction only when the conduct is sufficiently egregious to result in fundamental error." *Id.* at 716, 215 P.3d at 436 (internal quotations omitted).

> Misconduct will be regarded as fundamental error when it goes to the foundation
> or basis of a defendant's rights or . . . to the foundation of the case or takes from

the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. However, even when prosecutorial misconduct has resulted in fundamental error, the conviction will not be reversed when that error is harmless. Under the harmless error doctrine, a conviction will stand if the Court is convinced beyond a reasonable doubt that the same result would have been reached by the jury had the prosecutorial misconduct not occurred.

*Id.* (internal quotations and citations omitted).

When there is an objection at trial, appellate review of prosecutorial misconduct claims is subject to a two-step review. *Id.* "The first step . . . is to determine whether the alleged conduct actually rises to the level of prosecutorial misconduct." *State v. Lankford*, 162 Idaho 477, 494, 399 P.3d 804, 821 (2017). "While our system of justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he is nevertheless expected and required to be fair." *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007) (quoting *State v. Estes*, 111 Idaho 423, 427–28, 725 P.2d 128, 132–33 (1986)). "[I]n reviewing allegations of prosecutorial misconduct we must keep in mind the realities of trial. A fair trial is not necessarily a perfect trial." *Id.*

If the prosecuting attorney's conduct was improper, we consider whether the impropriety prejudiced the defendant's right to a fair trial or whether it was harmless." *Severson*, 147 Idaho at 716, 215 P.3d at 436. "When a defendant is unable to demonstrate prejudice, the misconduct will be regarded as harmless error." *Id.*

### a. The prosecuting attorney's mischaracterization of mitigation and mitigating evidence in closing arguments was harmless.

Hall alleges that several comments made by the State during closing argument misled jurors as to the definition of mitigation. First, he takes issue with the State's statement that: "the law is only as strong as the weakest part on this jury which is heart," which he alleges implied that any choice by the jury to show mercy would be weakness. Second, he contends that the State mischaracterized the mitigation evidence by arguing that the only relevant issue was choice and that there was no difference between moral culpability and criminal responsibility as long as the defendant had a choice and chose to kill.

"Both sides have traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom." *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003). Hall made no objection to the comments he alleges were error on appeal. Accordingly,

64

his contentions are reviewed for fundamental error. *Id.*; *Severson*, 147 Idaho at 716, 215 P.3d at 436.

Neither of the statements challenged by Hall rose to the level of fundamental error. In the first, the State declared that "the law is only as strong as the weakest part on this jury which is heart." By this the State—perhaps inartfully—sought to communicate to jurors their role as decision makers and that the decision as to appropriate punishment rested with them. Further, the context of this statement strongly suggests that the statement was alluding to the unanimity requirement. The State's statement was not calculated to arouse passion; it was designed to remind jurors of their duties under the law. It was not an unbiased statement, but prosecuting attorneys are not required to be neutral, they are only required to be fair. As such, the prosecuting attorney's statement did not constitute fundamental error.

The second statement Hall contends was misconduct occurred on rebuttal and concerned the State's theme of choice. In discussing its theory that Hall was able to make choices at the time of the murder and was thus morally responsible and criminally culpable, the State also discussed mitigation. Hall takes issue with the following:

> We told you to begin with that the business here is the question of whether or not the aggravation outweighs the mitigation. And to understand that you have to understand whether it's really mitigation or not. And that's why I wanted to spend the time with you to help you understand that the defendant could make choices. Because if he can make a choice then the things you heard about his background is not mitigating. [sic] It's sad but it's not mitigating. And there's nothing about that that somehow indicates that he couldn't choose to kill.

Hall argues that these statements misled jurors about the definition of mitigation evidence and impeded the jury's consideration of his mitigating evidence, in violation of his Eighth and Fourteenth Amendment rights. In support of these arguments he cites *Penry v. Lynaugh*, 492 U.S. 302, 326–28 (1989), and *Hitchcock v. Dugger*, 481 U.S. 393, 398–99 (1987).

*Penry* concerned statements by a prosecutor that could have been misconstrued to mean that the jury did not have to consider mitigating evidence relating to the defendant's mild retardation. *Penry*, 492 U.S. at 326, *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). The Supreme Court determined that these statements violated the defendant's Eighth Amendment rights because the jury was not given corrective instructions informing them that they could consider mitigating evidence in determining whether to give the defendant the death penalty. *Id.* at 328. Similarly, in *Hitchcock* the Supreme Court determined that the jury was

instructed not to consider evidence of non-statutory mitigating circumstances, and as such the defendant's Eighth Amendment right was violated. *Hitchcock*, 481 U.S. 393 at 389–99. Here, there is no contention that the court misinstructed or failed to instruct the jury; Hall only contends that the State's mischaracterization of mitigation impeded the jury's consideration, so *Penry* and *Hitchcock* are inapposite.

These statements were likely error, but that error was harmless. The jury was given the full, legal definition of mitigation in Jury Instruction 47. The jury was instructed that it was to be guided only by the law as contained in the instructions given by the court, not by what the lawyers may have said. Juries are presumed to follow the instructions given by the court. *State v. Carson*, 151 Idaho 713, 718, 264 P.3d 54, 59 (2011). Thus, the State's statements mischaracterized the definition of mitigation, there is no indication that the jury relied on these statements in making their determination.

**b.  The prosecuting attorney's cross-examination of a defense expert witness did not constitute misconduct.**

Hall next contends that misconduct occurred in the questioning of a defense expert witness. In the State's cross-examination of this witness, it elicited that Hall was sane, aware, able to make choices, and competent to stand trial. Hall contends that this line of questioning was misconduct because it "laid the groundwork" for the State's choice argument at closing that impeded the jury's consideration of mitigating evidence. Hall did not object to this line of questioning at trial.

We note that "misconduct" in the context of prosecutorial misconduct has been used traditionally by this and other courts to denote constitutional or other error by prosecuting attorneys. *E.g.*, *State v. Perry*, 150 Idaho 209, 228–30, 245 P.3d 961, 980–982 (2008); *Donnelly v. DeChristoforo*, 416 U.S. 637, 638–40, 647 (1974). Our usage of that term here therefore reflects our understanding of its use as a legal term of art, and we label prosecutor error this way to conform with long-standing legal norms, not to condemn the prosecuting attorney's actions as misconduct in the colloquial sense. Put plainly, labeling prosecutor error "misconduct" does not necessarily suggest bad faith or sinister motives by the prosecutor; it merely denotes a particular type of legal error that may require reversal.

This Court has determined that prosecutorial misconduct occurs when the State elicits or seeks to elicit prejudicial or otherwise inadmissible evidence in examination or cross examination. *Lankford*, 162 Idaho at 493–94, 399 P.3d at 820–21. Misconduct has also been

found when the State has allowed a witness to comment on another witness' credibility. *State v. Parker*, 157 Idaho 132, 148–49, 334 P.3d 806, 822–23 (2014); *State v. Herrera*, 152 Idaho 24, 33–34, 266 P.3d 499, 508–09 (2011). But there is no authority suggesting that a prosecutor is prohibited from asking a mental health expert about whether the defendant was capable of making choices, was not having hallucinations or psychotic episodes at the time of the crime, and is competent to stand trial. Such inquiries in this case—particularly in the context of the sentencing hearing, which included substantial evidence about the abuse Hall suffered as a child, his mental capacity and his extensive drug use—elicited important information about Hall's mental state at the time of the crime, irrespective of counsel's use of these responses in his closing argument. The State's examination of this witness did not constitute misconduct, nor did it violate any of Hall's constitutional rights. Hall has failed to establish that the prosecuting attorney's cross-examination constituted error, fundamental or otherwise.

### c. The prosecuting attorney's closing argument comments on Hall's past and ability to choose did not amount to misconduct.

Hall contends that the State's comments in its closing argument mischaracterized his mitigation theory in a "grotesque distortion of the evidence and arguments actually presented." These contentions are without merit. As stated previously "Both sides have traditionally been afforded considerable latitude in closing argument to the jury and entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom." *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003). None of the statements Hall complains of falls outside the realm of permissible discussion. The State was permitted to discuss the import of the mitigating evidence and attempt to minimize it, which is precisely what it did. There was no misconduct in these statements and thus no error.

### d. The prosecuting attorney's closing argument slideshow presentation misstated the statutorily-required weighing process, but the error was harmless.

Hall next contends that several slides in the State's closing argument Power Point presentation mischaracterized the statutorily-required weighing of mitigation evidence and aggravating factors. Instead of weighing all the mitigating evidence against each aggravating circumstance individually as Idaho Code section 19-2515 directs, Hall argues that the slides indicated that all the mitigating evidence should be weighed against all the aggravators collectively. Hall did not object to the presentation of these slides, so his contention is reviewed for fundamental error.

The subparts of section 19-2515 cited by Hall, particularly section 19-2515(8)(a)(ii), indicate that each aggravator should be weighed against all the mitigating evidence in determining whether imposing the death penalty would be unjust. The first slide shows the scales of justice, with the labels "mitigation" on one side with "aggravation" on the other. The next slide shows "defendant's childhood" on the mitigation side, with all of the aggravators piled up on the aggravation side. The slides mischaracterized the statutory scheme because they strongly suggested that all the aggravators should be considered collectively against all the mitigation evidence—in direct conflict with the weighing directed by section 19-2515. However, this error was harmless. As indicated above, the jury was correctly instructed as to how to weigh mitigating and aggravating evidence by the court. There is no evidence that the jury did not follow the correct instructions of the court, or that it relied on the mischaracterization of the statutory scheme in the prosecuting attorney's closing argument. Thus, the error was not fundamental and does not require reversal.

**e. The prosecuting attorney's comments about defense experts' testimony did not constitute misconduct.**

Hall argues that the prosecuting attorney's comments about defense experts in closing argument "crossed the line into misconduct numerous times." He points to the prosecuting attorney's comments that the experts were "men from San Francisco and Dallas" who were in the "business of supplying criminal defendants with excuses." He also alleges that the State's allusions to the payment defense experts were receiving and the number of hours they had spent working on the case was impermissible disparagement of defense witnesses.

As indicated above, a prosecutor is permitted to argue the evidence presented at trial as well as any inferences that can be reasonably drawn from that evidence. *Sheahan*, 139 Idaho at 280, 77 P.3d at 969. The prosecuting attorney is also permitted to elicit information on cross-examination about the potential bias of the witness. *See State v. Araiza*, 124 Idaho 82, 91, 856 P.2d 872, 881 (1993). While the prosecuting attorney repeatedly referred to the fact that defense experts were compensated and that they regularly testified in similar cases, this amounted to little more than providing the jury with information about their potential bias, which is not misconduct. *State v. Guinn*, 114 Idaho 30, 38, 752 P.2d 632, 640 (Ct. App. 1988) ("The exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination."). Hall did not object to these questions of his experts, nor did he object to the prosecuting attorney's comments afterward. Hall has failed to allege a clear

violation of his constitutional rights. There was no error in the admission of these comments by the prosecutor.

> **f.** **The prosecuting attorney's statements regarding deterrence, retribution and future victims did not constitute fundamental error.**

In its initial closing argument, the State argued at length that the evidence supported each of the aggravators in the case. Then, right before concluding, the State used a variety of methods to ask the jury to give Hall death for his crime:

> A few last thoughts: if your verdict for death, saves just one person in the future your sacrifice and your time will not have been in vain.

> The defendant brought us together in this courtroom. He did, the Judge didn't bring you here, and I didn't bring you here. He brought you here. It's been a long journey from September 24th to October 27th. By my count it's almost 1500 days Dave Smith and Cory Stambaugh carried the ball for most of those 1500 days. . . .

> [T]hey carried the baton. They did their job. For the last year and a half Mr. Bourne and I have done our job. And now its time to end this and hand the baton to you. How many times have you sat at the breakfast table reading the newspaper and read about a horrible crime and said to your suppose [sic], "Why don't they do something about this? This is our town. Why don't they do something about this? Well the reversal of that is, now you are they. You are they. There [sic] is in your hands.

After defense counsel offered his closing arguments, the State's rebuttal included the following:

> You know that Judge Neville can give the defendant life on the rape, life on the kidnapping. You know he's got one and he's going to go to prison for life. . . . And so when [defense] Counsel says "give the defendant life." And what he's really saying is give him nothing because he's already been – going to get life so don't do anything else to him. Let's just let that go. Give him nothing.

> I think you ought to know that because that's the point of this. Is Lynn's life worth nothing? Is a loss worth nothing? Did we go through all this for nothing? What about retribution to her family? What about the protection of society? What about the deterrence of others? What about the punishment for the defendant that he knows he deserves, that he earned, that he worked on, that he knew he had coming when he talked to the detectives back in March of 2003. What about those goals of society? Are we just going to give him nothing?

Hall argues that these comments were misconduct that violated his Eighth Amendment right to individualized sentencing because they contained impermissible arguments for general deterrence, allusions to future victims and pleas for retribution for the victim's family. Hall did not object to these arguments at trial so they are reviewed for fundamental error.

Prosecutorial misconduct in closing argument rises to the level of fundamental error only when the prosecuting attorney's comments are so egregious or inflammatory that any prejudice arising from them could not be remedied by a timely objection and a ruling from the trial court instructing the jury that the comments should be disregarded. *State v. Smith*, 117 Idaho 891, 898, 792 P.2d 916, 923 (1990); *State v. Priest*, 128 Idaho 6, 13, 909 P.2d 624, 631 (Ct. App. 1995).

Taken in context, the prosecuting attorney's allusion to jurors sitting at the breakfast table and his comments about passing 'the baton' were meant to emphasize jurors role as decision makers—that the final decision as to Hall's punishment for this crime rested with them. The comments did appeal to jurors' sense of morality, but they cannot be said to be 'so egregious' that if an objection had been made that they would not have been able to disregard the comments if so instructed. Thus, the comments cannot be said to constitute fundamental error. Similarly, the prosecuting attorney's comments about future victims could reasonably be construed to be limited to the defendant himself—that he was an extremely dangerous individual that would harm others if given the chance. This was an inference supported by the evidence and as such is permissible under the law. Finally, the prosecuting attorney's comments about retribution for the victim's family amounted to only a passing reference in the midst of a greater point about what punishment Hall should receive for his crime. If a timely objection had been raised, these comments could have been easily disregarded by the jury. There was no fundamental error in the admission of these comments.

### g. The prosecuting attorney's implied characterization of the jury as a link in the law enforcement chain was not fundamental error.

Hall contends that the portion of the State's closing argument quoted above urging the jury to 'take the baton' from prosecuting attorneys was impermissible because it cast the jury as a link in the chain of law enforcement, which he contends was a violation of his Eighth and Fourteenth Amendment rights. Hall cites several federal circuit court cases for this proposition, including *Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir. 2004), and *Coleman v. Brown*, 802 F.2d 1227, 1238 (10th Cir. 1986). In *Arave*, the prosecutor explicitly told the jury that they were a "part of a very important chain called the chain of law enforcement", and then mentioned each part of this chain—police, prosecuting attorneys, and the jury. 383 F.3d at 834. The Ninth Circuit condemned this characterization of the jury as part of a law enforcement chain as just "plain wrong" but further concluded that the argument did not rise to the level of fundamental error, because it did not "so infect[] [the trial] with unfairness as to be a denial of due process." *Id.* In

*Coleman*, the Tenth Circuit similarly condemned this type of argument, finding that the argument "misstate[d] the role of the jury, [by] placing it in an adversarial position with respect to the defendant." 802 F.2d at 1238. But even though the Tenth Circuit viewed the argument as improper, it concluded that it did not rise to the level of constitutional (or fundamental) error. *Id.*

Here, the prosecuting attorney's argument involving the baton was less explicit than those condemned in *Arave* and *Coleman*. The prosecutor did not say anything about the jury as a "link" or about any "chain of law enforcement", but it did imply that police, prosecuting attorneys and the jury were on the same team—because the baton could be passed between them. Regardless of whether this comment constituted misconduct, it did not rise to the level of fundamental error. The comments in *Arave* and *Coleman* were much more egregious, and they were determined to be harmless error. Similarly, we hold that there was no fundamental error in the admission of these arguments by counsel.

### h. There was no misconduct in the prosecuting attorney's reference to the civic duty of jurors.

Hall also contends that the prosecuting attorney's statement analogizing jurors to soldiers was inappropriate. He takes issue with the following:

> Well, for generations the citizens of this country have been asked to do hard things; *whether it is a hard thing on the beach of a foreign country* [or] a hard thing in the courthouse in your own town.

> You've been asked to do difficulty [sic] things because we're citizens *and certainly things are expected of citizens and this is one of them.* And as Mr. Bower said to you earlier, we know you could all figure out a way to get it out of it and you didn't. Bless your hearts, because if you did, if everybody did then we wouldn't get the job done would we? All right.

> Well, you'll weep over this, but you know what needs to be done so go and do it. We'll wait for you.

(emphasis added). Hall cites several circuit court decisions for his contention, including *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987) (holding that "conceiving of the jurors as soldiers undermines the crucial discretionary element required by the Eighth Amendment"), and *Weaver v. Bowersox*, 438 F.3d 832, 840 (11th Cir. 2006) (declaring that "[d]escribing jurors as soldiers with a duty eviscerates the concept of discretion afforded to a jury as required by the Eighth Amendment"). However, the arguments in both *Brooks* and *Weaver* were much more explicit and egregious than that given by prosecuting attorneys in this case. In *Brooks*, prosecuting

71

attorneys directly compared the jurors with soldiers and told them that "[w]hen [the soldiers] did a good job of killing . . . , we decorated them and gave them citations" and asking rhetorically, "if we can send a 17-year old man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case[?]" 762 F.2d at 1412. In *Weaver*, prosecuting attorneys analogized jurors to soldiers who were required to do their duty and have the courage to kill, using a graphic story from a movie to emphasize that point. 438 F.3d at 840.

Here, the prosecuting attorney's references to soldiers were of a much different type than those condemned in *Brooks* and *Weaver*. Far from being graphic or directly referring to a duty to kill, they referred to the civic duty to serve in the military if drafted, much like the duty to serve as a juror if called. These allusions were implied and inferences were required for the message to be fully communicated. Furthermore, they constituted only about two sentences in the context of more than twenty pages of rebuttal argument. We find no error in the admission of these statements.

### i. The prosecuting attorney's comments about the appropriate punishment were permissible inferences from the evidence.

Hall next contends that the prosecuting attorney improperly expressed his opinions about the case in closing arguments, and that these statements were misconduct. Hall takes issue with the following:

> You know the effort that you've put into this case. You know the effort that we've put into this case during voir dire when we were questioning each one of you individually, it's amazing how closely you all lined up on the subject of the death penalty. You said "I could do this, but I have to be sure. I have to be sure." You said you could impose the death penalty in the right case. *And I think that this is the right case*. And I think that you know this is the right case.

(emphasis added). Hall did not object to the State's closing argument, so these claims are reviewed for fundamental error.

Here, the prosecuting attorney's statements were not improper. The above-quoted comment was a reference to the level of proof in the case—including the State's view that the evidence in the case supported the imposition of the death penalty. As indicated above, "both sides are entitled to discuss fully, from their respective viewpoints, the evidence and the inferences that should be drawn from it" in closing argument. *State v. Dunlap*, 155 Idaho 345, 369, 313 P.3d 1, 25 (2013) (internal quotations omitted). The prosecuting attorney's comment

72

was nothing more than this. Because there was no misconduct, there was no fundamental error in the admission of these comments by the prosecuting attorney in closing argument.

### j. The prosecuting attorney's comment about lethal injection was a reasonable inference from evidence.

Hall contends that the prosecuting attorney's comment that dying by means of lethal injection is like "going into surgery and getting put to sleep and not waking up" was misconduct because there was no evidence in the record regarding what death by lethal injection feels like. He contends that this misconduct impermissibly impacted his ability to receive a fair trial. Hall did not object to these comments in closing argument, so they are reviewed for fundamental error.

This comment was not improper. Jury Instruction 49 informed the jury that the death penalty is administered in Idaho by lethal injection, and counsel was within the "wide latitude" permitted for closing arguments in stating that lethal injection was not as painful as what the victim suffered. This was a reasonable inference based on the evidence of the manner of the victim's death and the general assumption that death by lethal injection is not painful. Even if the prosecuting attorney's comments were improper, they certainly were not sufficiently egregious to amount to constitutional error. "Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). There was no such error in this instance.

### k. The prosecuting attorney's allusions to the condition of Ms. Henneman's body and to post-mortem acts performed on the body by Hall were relevant to the sentencing determination and supported by the evidence.

Hall alleges that the prosecuting attorney's allusions to the condition of the body at the time it was discovered and to post-mortem acts performed on the body by Hall were misconduct because they were irrelevant to consideration of the heinous, atrocious and cruel aggravator in Idaho Code section 19-2515(9)(e). He argues that because section 19-2515(9)(e) by its language refers only to the murder, consideration of post-crime acts is irrelevant and improper.

This Court has determined that post-crime conduct is appropriately considered in determining the presence of statutory aggravators. *State v. Wood*, 132 Idaho 88, 104, 967 P.2d 702, 718 (1998). Accordingly, there was no misconduct in the discussion of post-crime acts in

73

this case. Because there was no misconduct, there was no fundamental error in the making of these references.

**23. Hall's sentence does not violate the double jeopardy clauses of the Idaho or United States Constitutions.**

Hall complains that his convictions for rape and kidnapping in addition to his felony-murder conviction subjected him to double jeopardy in violation of the Fifth Amendment of the United States Constitution and Article 1, Section 13 of the Idaho Constitution.

The Double Jeopardy clauses of both the Idaho and United States Constitutions provide that no person shall twice be put in jeopardy for the same offense. Idaho Const. art. 1, § 13; U.S. Const. amend. V. This has long been held to mean that a defendant may not be convicted of both a greater and a lesser included offense. *Brown v. Ohio*, 432 U.S. 161, 168–170 (1977); *State v. McCormick*, 100 Idaho 111, 114, 594 P.2d 149, 152 (1979). This Court freely reviews constitutional issues. *State v. Abdullah*, 158 Idaho 386, 455, 348 P.3d 1, 70 (2015).

For Fifth Amendment purposes, determining whether the alleged conduct violates multiple statutory provisions requires application of the *Blockburger* test found in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The *Blockburger* test asks "whether each provision requires proof of a fact which the other does not." *Id.* "Idaho, however, seems to have adopted the broader indictment or pleading theory. This theory holds that an offense is an included offense if it is alleged in the information as a means or element of the commission of the higher offense." *Sivak v. State*, 112 Idaho 197, 211, 731 P.2d 192, 206 (1986) (internal quotations omitted). "[T]he issue of whether a charged offense is a lesser included offense of another charged offense is analyzed in reference to the facts of each case." *State v. Pizzuto*, 119 Idaho 742, 757, 810 P.2d 680, 695 (1991), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991).

Here, Hall was charged and convicted of first-degree murder, on both premeditated and felony murder theories. For those convictions, the jury sentenced him to death. He was also charged with and convicted of first degree kidnapping and rape. The district court sentenced him to life in prison for the kidnapping and life in prison for the rape. Hall argues that the kidnapping and rape convictions should merge into his felony murder conviction because they are lesser included offenses of felony murder. He made this argument in post-conviction proceedings, in the context of an ineffective assistance of counsel claim. He alleged that trial counsel were ineffective for failing to raise this double jeopardy claim. The district court concluded that rape

74

was a lesser included offense of felony murder and merged with the felony murder conviction, but that first-degree kidnapping was not and did not. Notwithstanding this analysis, the court concluded that Hall was not prejudiced by the outcome of the trial because merging rape with felony murder would reduce Hall's overall sentence, but it would not reduce his actual jail time—because his death sentence had to be served first.

In addition to *Sivak* and *Pizzuto*, which were in place at the time the district court issued its post-conviction decision, this Court recently addressed this argument in *State v. McKinney*, 153 Idaho 837, 291 P.3d 1036 (2013). In *McKinney*, the defendant was convicted of first-degree murder on both premeditated and felony murder theories and was sentenced to death. *Id.* at 839, 291 P.3d at 1038. He was also convicted of conspiracy to commit murder, robbery, and conspiracy to commit robbery and received prison sentences for those crimes. *Id.* In reviewing the defendant's claims that his sentence for robbery violated double jeopardy, this Court concluded that his robbery charge did not merge with his felony first-degree murder charge because "[t]he crimes of premeditated murder and robbery each require proof of separate elements." *Id.* at 841, 291 P.3d at 1040.

Here, only Hall's rape conviction is a candidate for merger since, indicated by the district court, Hall's first-degree kidnapping conviction, required proof of an additional purpose element that kidnapping does not require. *Compare* Idaho Code § 18-4501, *with* Idaho Code § 18-4502. Consequently, Idaho Code section 18-4003(d)'s inclusion of "kidnapping" as an underlying felony does not refer to first-degree kidnapping in Idaho Code section 18-4502 but to kidnapping in Idaho Code section 18-4501. Thus, Hall's first-degree kidnapping charge does not merge with felony murder because it cannot be the felony underlying such a charge.

Hall's merger claim with regard to the rape charge fails for the same reason it failed in *McKinney*. Hall was charged in the indictment with first-degree murder on both theories of premeditated murder and felony murder and was convicted of the same. Rape and premeditated murder each require proof of separate elements. Thus, the rape conviction does not merge with the murder conviction, and Hall's sentence does not contravene double jeopardy principles.

## 24. The death penalty does not categorically violate the Eighth Amendment when applied to mentally ill defendants.

Hall argues that *Atkins v. Virginia*, 536 U.S. 304 (2002), should be extended to mentally ill defendants. In *Atkins*, the United States Supreme Court declared that imposing the death penalty on mentally retarded individuals violated the Eighth Amendment. *Id.* at 320.

This Court has recently upheld the constitutionality of Idaho's death penalty scheme in *State v. Dunlap*, 155 Idaho 345, 380, 313 P.3d 1, 36 (2013) and in *Abdullah*, 158 Idaho at 386, 348 P.3d at 70. The argument advanced in *Dunlap* is identical to Hall's: "Dunlap contends that the rationale underlying *Atkins* and *Ford* [prohibiting the capital punishment of the mentally insane] compels the same conclusion for mentally ill defendants." *Dunlap*, 155 Idaho at 380, 313 P.3d at 36. In addressing this contention, this Court observed:

> It appears that every court that has considered this issue [has] refused to extend *Atkins* and hold that the Eighth Amendment categorically prohibits the execution of the mentally ill. . . . We join these courts in holding that a defendant's mental illness does not prevent imposition of a capital sentence.

*Id.* Hall urges this Court to revisit prior decisions in light of recent "botched executions" and argues that societal standards of decency have evolved such that the death penalty is no longer widely accepted for mentally ill defendants.

This contention is without merit. Hall claims there have been recent "botched executions," but does not support this claim with specifics or citation to any source or authority. Unsupported claims are an insufficient basis for revisiting controlling precedent. *State v. Owens*, 158 Idaho 1, 4–5, 343 P.3d 30, 33–34 (2015) ("Stare decisis requires that this Court follow[] controlling precedent unless that precedent is manifestly wrong, has proven over time to be unjust or unwise, or overruling that precedent is necessary to vindicate plain, obvious principles of law and remedy continued injustice."). Hall has failed to show that *Dunlap* and *Abdullah* are manifestly wrong or that they have proven unjust or unwise.

With regard to his claims about evolving societal standards, in addition to the extensive case law cited in *Dunlap*, review of cases decided since *Dunlap* reveals that the consensus against the extension of *Atkins* to mentally ill defendants has not changed. *See e.g.*, *Johnson v. Stephens*, 617 Fed. Appx. 293, 303 (5th Cir. 2015); *Dickerson v. State*, 175 So. 3d 8, 18 (Miss. 2015); *State ex. rel. Clayton v. Griffith*, 457 S.W.3d 735, 752–54 (Mo. 2015); *People v. Hajek*, 324 P.3d 88, 174 (Cal. 2014), *overruled on other grounds by People v. Rangel*, 367 P.3d 649 (2016); *Com v. Robinson*, 82 A.3d 998, 1021 (Pa. 2013). For these reasons, we again decline to extend *Atkins* to mentally ill defendants.

**25.  Error at sentencing did not amount to cumulative error.**

Hall argues that even if this Court holds that no individual error requires resentencing, the accumulation of the sentencing errors violates his rights to due process and a fair trial. "[T]he

cumulative error doctrine requires reversal of a conviction when there is an accumulation of irregularities, each of which might by itself be harmless, but when aggregated, the errors show the absence of a fair trial, in contravention of the defendant's constitutional right to due process." *State v. Field*, 144 Idaho 559, 572–73, 165 P.3d 273, 286–87 (2007) (internal quotations omitted).

Here, of the more than fifteen errors alleged to have occurred during sentencing, only three were determined to be error and all of these were determined to be harmless. These errors, even when considered cumulatively, did not so infect the sentencing phase that Hall was deprived of due process or a fair trial.

## C. ISSUES ON POST-CONVICTION APPEAL

### 26. Hall has failed to establish his trial attorneys' performance was objectively unreasonable and that any alleged deficiency would have changed the outcome.

Hall raises a number of ineffective assistance of counsel claims involving the guilt and sentencing phases of the trial, and contends that the district court erred by summarily dismissing these claims in post-conviction proceedings. The standard of review in post-conviction cases when summary dismissal is granted is as follows:

> In determining whether a motion for summary disposition is properly granted, a court must review the facts in a light most favorable to the petitioner, and determine whether they would entitle petitioner to relief if accepted as true. A court is required to accept the petitioner's unrebutted allegations as true, but need not accept the petitioner's conclusions. The standard to be applied to a trial court's determination that no material issue of fact exists is the same type of determination as in a summary judgment proceeding.

*Saykhamchone v. State*, 127 Idaho 319, 321, 900 P.2d 795, 797 (1995) (internal citations omitted).

The standard in determining whether counsel has provided effective assistance remains the test articulated in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), which has been adopted in Idaho. *See State v. Dunlap*, 155 Idaho 345, 383, 313 P.3d 1, 39 (2013). "To prevail on such a claim, the applicant for post-conviction relief must demonstrate (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different." *State v. Yakovac*, 145 Idaho 437, 444, 180 P.3d 476, 483 (2008) (citing *Strickland*, 466 U.S. at 687–88). To survive summary dismissal of an ineffective assistance of counsel claim, Hall must show a material issue of fact

77

exists with respect to both deficient performance and prejudice. *Schroger v. State*, 148 Idaho 622, 624, 226 P.3d 1269, 1271 (2010).

The first element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "There is a strong presumption that counsel's performance fell within the wide range of professional assistance." *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999). Hall has the burden of showing that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The effectiveness of counsel's performance must be evaluated from the perspective at the time of the alleged error. *Id*. at 689. "There are countless ways to provide effective assistance of counsel in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* Strategic and tactical choices are "virtually unchallengeable" if made after thorough investigation of the law and fact, and even if made after less than complete investigation are virtually unchallengeable if "reasonable professional judgments support the limitations on investigation." *Id*. at 690–91.

The second element requires Hall show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. This requires Hall to demonstrate "a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. It "requires a substantial, not just conceivable, likelihood of a different result." *Pinholster*, 563 U.S. at 189 (internal quotations and citations omitted).

Overcoming *Strickland*'s "high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Because ineffective assistance of counsel claims provide a means to raise issues not presented at trial, the *Strickland* standard "must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotations omitted). The reviewing court need not address both prongs of *Strickland* if an insufficient showing is made under only one prong. 466 U.S. at 697.

### a. *Voir dire* and jury selection were proper.

In his petition for post-conviction relief, Hall claimed that his trial counsel's performance during *voir dire* was deficient in failing to challenge Jurors 83, 102, 6, and 51 for cause, and failing to adequately challenge Juror 60. The district court made several factual findings—that are not disputed on appeal—concluding that trial counsel's strategic decisions regarding *voir dire* were objectively reasonable. The district court also found that counsel's decisions were not objectively unreasonable and that Hall failed to establish that any prejudice resulted from those decisions.

On appeal, Hall claims that his trial counsel failed to adequately prepare for and conduct *voir dire*. He contends that counsel was not prepared to use the Colorado Method of jury selection and admitted to learning the method as they went. Hall points to the fact that trial counsel retained another spectating attorney, Rolf Kehne, in the middle of the jury selection to consult on the Colorado Method. Hall also complains that counsel was unable to explain basic legal principles surrounding jury selection in capital cases. Hall asserts that counsel's inadequate preparation and lack of understanding of the law governing capital jury selection resulted in wholly ineffective *voir dire*, and ultimately the empanelment of a jury that included biased jurors.

A defendant in a criminal proceeding is entitled to an impartial jury. U.S. Const. amend. VI. "This guarantee is applicable to the states through the Fourteenth Amendment." *State v. Moses*, 156 Idaho 855, 862, 332 P.3d 767, 774 (2014). Additionally, the Idaho Constitution provides that "[t]he right of trial by jury shall remain inviolate." Idaho Const. art. I § 7. While a defendant has a right to an unbiased jury, there are many methods by which jury selection can be conducted to achieve such a result. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("The Constitution, after all, does not dictate a catechism for *voir dire* . . . ."). This Court has held that it "is not persuaded that the Colorado Method is the only mechanism for counsel to evaluate prospective jurors." *State v. Abdullah*, 158 Idaho 386, 525, 348 P.3d 1, 140 (2015). Consequently, counsel's performance during *voir dire* is examined based upon "the objective reasonableness of their actions at the time of voir dire." *Id.*

Here, trial counsel initially employed a strict Colorado Method and ended up using a blended method for jury selection, relying upon his own experience and research. While the Colorado Method focuses solely on prospective jurors' views on the death penalty, trial counsel

focused on establishing a rapport with potential jurors before exploring general areas outside of the scope of the Colorado Method. Hall incorrectly equates a constitutionally sufficient *voir dire* with strict adherence to a particular methodology, such as the Colorado Method.

An examination of *voir dire* demonstrates that trial counsel spent considerable time exploring the viewpoints of each juror. In addition to the 174 question juror questionnaire, trial counsel extensively questioned each juror on their views of the death penalty and mitigation, as well as their various backgrounds and personal beliefs. As discussed in *Abdullah*, jury selection may be based upon certain intangibles, like "the tone of their voice," "how they carry themselves," "their attitude," and "the feeling you get from them." *Id.* at 526, 348 P.3d at 141. In *Abdullah*, the Court found that counsel's performance was not deficient because "in addition to the questions and answers revealed in the *voir dire* transcripts and questionnaires, [trial counsel] based their decisions on intangibles as well—a commonly recognized approach to jury selection." *Id.* at 525–26, 348 P.3d at 140–41; s*ee also Miller v. Francis*, 269 F.3d 609, 620 (6th Cir. 2001) ("Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors."); *State v. Mammone*, 13 N.E.3d 1051, 1085 (Ohio 2014) ("Decisions about voir dire are highly subjective and prone to individual attorney strategy because they are often based on intangible factors."). The same is true here. The techniques employed by trial counsel and the decision to utilize the Colorado Method as part of the overall strategy in conducting *voir dire* was an objectively reasonable approach.

Hall also claims that trial counsel was unable to explain basic legal principles. He argues that "the court made it clear that it did not grasp the relevant standards initially stating, 'I don't know what "substantially mitigation impaired" means.'" It should be noted that the phrase "substantially mitigation impaired" appears nowhere in the controlling case of *Wainwright v. Witt*, 469 U.S. 412 (1985). That phrase comes from the Colorado Method terminology, not from caselaw. As explained above, the question is not whether a potential juror is "substantially mitigation impaired," but whether a juror is impartial and must be removed for cause because "in no case would [the juror] vote for [or against] capital punishment, regardless of his or her instructions." *Dunlap v. State*, 159 Idaho 280, 295, 360 P.3d 289, 314 (2015) (quoting *Morgan v. Illinois*, 504 U.S. 719, 728 (1992)).

80

Hall challenges the district court's understanding of *Witt* when it stated, "I don't know anything about [*Witt*]." Kehne offered to provide supplemental briefing to explain the phrase "substantially mitigation impaired" and the *Witt* case, but the district court indicated that Kehne was not counsel of record and he would not be allowed to submit the brief. Hall claims that trial counsel was ineffective because counsel did not provide a brief in Kehne's stead. However, the district court demonstrated an understanding of the relevant legal standards, determining whether each juror could be impartial, whether or not he knew the originating case. The court fully understood the relevant legal standards and did not require a brief to explain terminology originating from one method of jury selection. Consequently, counsel was not ineffective for failing to submit a brief or otherwise instruct the court. We hold that trial counsel provided competent legal counsel during *voir dire*.

Turning to Hall's challenges regarding the individual jurors, the question of whether Hall has established a constitutional violation due to allegedly biased jurors was addressed previously in this opinion and fails. As none of the four challenged jurors could have been successfully removed for cause, Hall cannot establish prejudice, particularly in light of the district court's conclusions that a motion to remove for cause would not have been granted with respect to the challenged jurors. We affirm the district court's dismissal of these ineffective assistance of counsel claims.

Hall asserts that the district court did not use the correct standard in summarily dismissing his sub-claims relating to the individual jurors, because the court failed to "accord [his] pleadings the factual deference required at the summary disposition stage." This argument is without merit. Although the Court is required to treat the applicant's uncontroverted allegations as true, we are not required to accept his legal and factual conclusions. *Phillips v. State*, 108 Idaho 405, 407, 700 P.2d 27, 29 (1985). The trial court properly considered Hall's allegations, but recognized that the conclusions and opinions of his post-conviction expert regarding trial counsel's *voir dire* were not binding in determining whether counsel's performance was deficient. Thus, the court used the correct standard in summarily dismissing Hall's sub-claims relating to individual jurors.

### b. Cross-examination of the State's DNA expert was proper.

During Hall's trial, the State presented the testimony of DNA expert witness Rachel Cutler to link Hall to the rape and murder of Ms. Henneman. Cutler discussed the chain of

custody associated with Exhibit 138—an evidence envelope that contained two boxes of oral swabs taken from Hall. On cross-examination, Hall's trial counsel questioned Cutler:

Q: What did you do with the other box?
A: I left it in the evidence envelope it arrived in.
Q: And what happened after that?
A: It was analyzed in a separate case.
Q: And stored then in the lab?
A: For a time.

On appeal, Hall contends that this questioning was ineffective assistance of counsel because Cutler's statement regarding "a separate case" constituted a logical inference that he was a suspect in another serious case. We disagree.

We have explained "counsel's choice of witnesses [and] manner of cross-examination . . . fall within the area of tactical, or strategic, decisions." *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994). "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000). Hall has not established that his counsel's cross-examination of Cutler was based upon inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. The jury was unaware that Hall had been charged in the Hanlon murder case. In addition, before this exchange took place, the jury had already been advised that during the course of an investigation, law enforcement tests many people who may ultimately be excluded as DNA donors. It was reasonable for trial counsel to establish the chain of custody of the evidence and to search for any potential problems or gaps in that chain. Consequently, this exchange was a tactical decision of Hall's trial counsel and did not constitute ineffective assistance of counsel. We affirm the district court's summary dismissal of this claim.

### c. Consulting a forensic pathologist was not required.

During the guilt phase of the trial, the State offered the testimony of Dr. Groben, the forensic pathologist who performed the autopsy on Ms. Henneman's body. Dr. Groben was cross-examined by trial counsel. Trial counsel did not consult a forensic pathologist until after the trial was completed. However, he did consult Pam Marcum who had previously worked for the state lab "to review the stuff" and listen to Dr. Groben and some of the other witnesses, to see if the samples were collected appropriately. After the trial, counsel sent all of the reports to

forensic pathologist Dr. Sally Aiken. While counsel testified he wished he had consulted Dr. Aiken prior to trial, he recognized that his retention of Dr. Aiken may have been the result of hindsight stemming from the effectiveness of Dr. Groben's testimony.

The decision not to consult a forensic pathologist prior to or during trial was not the result of inadequate preparation or ignorance of the relevant law. Counsel only realized that having his own forensic pathologist may have been helpful after Dr. Groben testified and he could see the effect of the reenactment evidence on the jury. In other words, this realization only came with the benefit of hindsight. "Counsel [is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 106 (2011). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.* at 109. Additionally, *Strickland* does not require "for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* at 110–11.

As recognized by the district court, trial counsel cross-examined Dr. Groben extensively, eliciting that Dr. Groben could not be exact on how long Ms. Henneman's body was in the river, that only five of the head injuries were definitely the result of blunt force trauma and it was unknown whether they occurred prior to or after Ms. Henneman's death, that it was possible that the knot around Ms. Henneman's neck was tightened as a result of the river current, and that death by drowning could not be ruled out. Counsel also established that it was unknown how many people delivered the blows to Ms. Henneman, that there were no injuries establishing that Ms. Henneman was raped or if there was a rape, whether it occurred before or after her death. Counsel also elicited that Ms. Henneman's hands could have been tied before or after her death, that there were no injuries to her neck, wrists, or ankles, that there was no evidence of defensive wounds, and there was no way to determine how long she suffered prior to dying. Based upon this cross-examination, Hall has failed to establish either deficient performance or prejudice, particularly in light of his attorneys' "overall performance," which was "active and capable advocacy." *Richter*, 562 U.S. at 111; *see also Abdullah*, 158 Idaho at 501–02, 348 P.3d at 116–117.

Hall's reliance upon Dr. Aiken's affidavit is also unavailing. First, Hall fails to cite exactly which portions of her affidavit upon which he relies; his argument consists only of a general complaint against Dr. Groben's reenactment testimony. Second, although Dr. Groben opined that Ms. Henneman died from ligature strangulation, he explained that other causes of death could not be ruled out. Because the State alleged that Ms. Henneman's murder was the result of "beating her on the head with some object and/or strangling her around her neck and/or drowning," Dr. Aiken's opinion that "the cause of death would have been listed most accurately as homicidal violence of unknown etiology" is of little value, particularly since she did not support her speculative conclusion with any evidence. Based on the information in her affidavit, which contained many speculative claims, Dr. Aiken's testimony would have done little to cast doubt on Dr. Groben's testimony. Hall's contention that Dr. Aiken's testimony could have diminished Dr. Groben's overall credibility similarly fails for a want of evidence. Because there is no evidence of deficient performance and prejudice, we affirm the district court's summary dismissal of this claim.

### d. The treatment of the DNA evidence did not amount to ineffective assistance of counsel.

Trial counsel testified that he retained a DNA expert at trial who assisted in preparing cross-examination questions for the State's expert witnesses. Trial counsel further explained that he had prepared to cross-examine the State's experts with focus on the possibility that the "13[th] allele might in fact be an indication of a third person who was there, . . . just to put some doubt in some juror's minds." Despite trial counsel's extensive cross-examination of the State's DNA experts, Hall contends that counsel was ineffective for failing to present his own DNA expert to challenge the State's DNA evidence.

However, as stated in the preceding section, *Strickland* does not require for every prosecution expert an equal and opposite expert from the defense. *Harrington v. Richter*, 562 U.S. 86, 111 (2011). "[C]ounsel's choice of witnesses . . . fall[s] within the area of tactical, or strategic, decisions." *Giles v. State*, 125 Idaho, 921, 924, 877 P.2d 365, 368 (1994). "[T]here is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 690 (1984)). "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations and citations omitted). Hall has failed to present evidence to

84

overcome this presumption. Counsel's decision not to call its own expert was a tactical decision that is not appropriately second-guessed by this Court.

Further, there is no evidence that DNA testimony from a defense expert would have altered the outcome of the trial. "[T]he defendant must show a reasonable probability that the outcome of trial would be different but for counsel's deficient performance." *McKay v. State*, 148 Idaho 567, 570, 225 P.3d 700, 703 (2010). An expert retained by defense in post-conviction opined that there was potential evidence of a second semen donor, but he conceded that Hall's DNA was found inside Ms. Henneman's vagina and that the evidence of a second donor could be an artifact, or DNA from a past encounter. The defense expert's opinion did not create a substantial likelihood of a different result had he testified. Thus, Hall has failed to prove ineffective assistance of counsel. We affirm the district court's summary dismissal of this claim.

### e. Counsel adequately investigated an alternate/co-perpetrator.

On May 5, 2004, law enforcement interviewed Lisa Lewis and Peggy Hill, two witnesses who reported they were together in the area between Bradley and 49th Street the day Ms. Henneman went missing, that Ms. Henneman asked them for directions, that Pat Hoffert came up in his pickup, and that Hall came up riding his bicycle. Hall "engaged [Ms. Henneman] in conversation again telling her how to get to the greenbelt and back to the Doubletree Inn." After the group parted ways, Lewis "saw Hall peddling fast in the same direction [Ms. Henneman] was walking." Hill reported that after Hall talked with Ms. Henneman he left with Ms. Henneman in an unknown direction. That night or the following morning, Hoffert committed suicide. Trial counsel's investigator, Glen Elam, interviewed Lewis about the incident. Elam asked Lewis why Hoffert committed suicide, and Lewis stated "From what I got from DeeDee [Deidre Muncie, Hoffert's live-in girlfriend] on the night that he did it, . . . something about raping some girl." The defense confirmed the information reported to law enforcement, and attempted to contact Muncie directly, but she subsequently denied making the statement to Lewis. Hall contends that counsel was ineffective for not adequately investigating Hoffert as an alternate perpetrator, and that the district court erred in summarily dismissing this claim.

When evidence has both positive and negative potential, counsel may reasonably decline to offer it. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003). Here, trial counsel investigated Hoffert and found that "there wasn't much there." Moreover, trial counsel chose not to use the information because he was worried about putting Hall at the murder scene. The allegation that

Hoffert stated he had raped "some girl" was vague and unsubstantiated, and the source of the information later denied providing it at all. There is also no indication that the evidence would have been admitted, whether or not it was helpful to Hall.

Hall also asserts that counsel was ineffective for failing to discover the Hoffert evidence and present it at sentencing. As indicated above, the admission of evidence in capital sentencing proceedings is governed by Idaho Code section 19-2515(6), which provides that "the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation." "Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable that it would be without the evidence." *State v. Sheldon*, 145 Idaho 225, 228, 178 P.3d 28, 31 (2008) (internal quotations omitted).

Because of the lack of information tying Hoffert's statement to Ms. Henneman or the events at issue in this proceeding, the statement is likely not relevant and would likely not have been admitted as evidence. Even if the information was relevant, Hall has failed to establish that this information would have resulted in a different result in either his trial or at sentencing. The district court did not err in summarily dismissing these claims because Hall did not establish deficient performance or prejudice arising from his counsel's conduct. We affirm the district court's summary dismissal of this claim.

### f. Shackling was not a violation of due process and counsel was not required to object.

Hall wore a restraining leg brace during both phases of the trial. It was worn under his clothing and would lock whenever he straightened his leg, requiring him to push a lever as he walked. The issue of shackling was first addressed on August 31, 2004, when the State asked the court whether it intended Hall to be in shackles during the course of the trial. The State then explained that the Sheriff's Office had a new leg brace that could be used underneath clothing and would not be seen by the jury. Hall wore the brace throughout the trial.

In post-conviction proceedings, Hall initially only raised a substantive claim regarding shackling. Later, however, he amended his post-conviction petition to include an ineffective assistance of counsel claim regarding shackling, which incorporated the argument from the substantive claim. The court concluded, based on deposition testimony from defense counsel, that there was no basis for objecting to Hall's shackling because the shackles were necessary for safety and were not visible to the jury. The court therefore concluded that counsel was not

ineffective for failing to object. On appeal, Hall raises two claims regarding shackling, the first is a substantive claim based on due process, and the second is an ineffective assistance of counsel claim because trial counsel did not object to the use of the leg brace**.**

Beginning with Hall's substantive claim, Hall's complaint is that the brace was allegedly noticeable or distracting to the jury because he had to push the lever as he walked, and the device made a clicking noise whenever he straightened his leg that he claims was loud enough for jurors to hear, and that the jurors would have seen him pressing the lever on the side of the device before sitting.

Hall did not object to the use of the leg brace at trial, so this contention is reviewed for fundamental error. For fundamental error to exist, "there must be an error that violates one or more of the defendant's unwaived constitutional rights; the error must plainly exist; and the error must not be harmless." *State v. Hall*, 161 Idaho 413, 422–23, 387 P.3d 81, 90–91 (2016).

In *Deck v. Missouri*, 544 U.S. 522, 622 (2005), the Supreme Court explained that the use of visible shackles during a trial does not violate due process if the district court determines they are "justified by a state interest specific to a particular trial," which includes "security problems and the risk of escape at trial." This principle was further extended to capital sentencing hearings before a jury. *Id*. at 632–33. The defendant must submit "admissible evidence showing that the jurors were aware of [defendant's] restraints." *State v. Dunlap*, 155 Idaho 345, 384, 313 P.3d 1, 40 (2013).

Here, Hall was in custody on suspicion of the brutal rape and murder of Ms. Henneman, the brutal rape and murder of Ms. Hanlon, and his criminal history included a prior conviction for felony escape. His restraint was most certainly justified by the State's interest in security and did not violate due process under *Deck*. Further, the leg brace he was required to wear was not visible to the jury and the court took care to seat Hall at the defense table before the jury entered the room each time and to keep his movement out of the view of the jury. For these reasons, the district court did not err in requiring Hall to wear the leg brace throughout the trial, nor were Hall's constitutional rights violated by that requirement.

Turning next to Hall's ineffective assistance of counsel claim, Hall argues that trial counsel was ineffective by failing to object at trial to the use of the restraint. Counsel's decision not to object likely falls within the realm of strategic decisions. Regardless of whether counsel's failure to object was deficient performance, Hall was not prejudiced by counsel's failure to

object. As indicated above, the leg brace was worn under the clothing and defense counsel testified that it did not make any noise when Hall walked. Additionally, the jury was not present for Hall's movements either in or out of the courtroom—so if it did make noise when he walked, the jurors would not have heard it. Because Hall was not prejudiced by his counsel's performance, his ineffective assistance of counsel claim fails. We affirm the district court's summary dismissal of Hall's claims regarding the restraint he was required to wear at trial.

### g. Counsel was not required to record or ensure Hall's presence at all proceedings.

Hall contends that counsel was ineffective in failing to ensure that all proceedings were recorded and that he was present for those proceedings. This claim is based on the arguments discussed in section 1 above. For the reasons outlined in section 1, Hall has failed to establish that counsels' performance was deficient or that the alleged deficiency was prejudicial, particularly since he must "allege that he is unable to raise a specific appealable issue due to the absence of recording" and that "the unrecorded [proceedings] probably dealt with appealable issues." *State v. Abdullah*, 158 Idaho 386, 448, 348 P.3d 1, 63 (2015) (emphasis, internal quotations, and citations omitted). He has failed to do so. The record gives sufficient guidance as to what occurred during the conferences and proceedings at trial, and Hall has failed to raise a specific appealable issue due to the absence of a recording. *See id.* We affirm the district court's summary dismissal of this argument.

### h. Trial counsel was not ineffective for failing to challenge Idaho's death penalty scheme.

Hall complains that trial counsel failed to adequately challenge Idaho's death penalty scheme by (1) failing to allege that the statutory aggravators were unconstitutionally vague, (2) failing to request a jury instruction telling jurors that they could not rely on the same evidence to find more than one aggravator, and (3) failing to object to the court's sentencing phase jury instruction regarding the governor's power to commute sentences or grant pardons.

With respect to the constitutionality of the statutory aggravators, the court determined, based on review of decisions from this Court, that these vagueness claims would not have been successful, even if raised. On this basis, it did not find counsel ineffective for failing to raise these claims at trial. The district court was correct. As indicated in section 13 above, the statutory aggravators are not unconstitutionally vague and have been determined so by this Court—in some instances repeatedly. Thus, counsel was not objectively unreasonable in failing to challenge the aggravators on this basis.

Hall's second contention also fails. As indicated in section 21 above, the trial court failed to instruct the jury that the same evidence could not be relied upon in finding more than one aggravator. But there is no evidence that had that instruction been given, the outcome of the trial would have been different. Hall was convicted of kidnapping Ms. Henneman, tearing her clothes off and using them to choke and restrain her; of brutally raping and killing her and dumping her body in the river. Given the presentation of evidence of the circumstances of the crime at trial, it is unlikely that the jury would not have found the presence of at least one of the four alleged statutory aggravators, which is all that is required by Idaho Code section 19-2515(3) for the imposition of the death penalty. Counsel was not ineffective for failing to request this instruction, because it would not have changed the outcome of the trial.

Hall's third contention also fails. As indicated above, Hall's trial counsel was involved in revising the State's initial proposed language for Instruction 49—the instruction at issue here. After its revision, he did not object to its presentation to the jury. As indicated above, Instruction 49 correctly characterized the law regarding commutations and pardons. Because it was an accurate statement of Idaho law and did not amount to burden-shifting of the kind condemned in *California v. Ramos*, 463 U.S. 992 (1983), it was not objectively unreasonable for counsel to allow its presentation without objection. Counsel was not ineffective for failing to object to Instruction 49.

### i. The court did not err in summarily dismissing Hall's claim that counsel was ineffective for failing to adequately investigate and present mitigating evidence.

#### (1) *Counsel was not ineffective for failing to conduct neurological testing on Hall.*

Hall asserts that trial counsel was ineffective for failing to adequately investigate brain damage, intellectual disability or mental illness, and for failing to have neurological testing done to present as mitigation evidence in the sentencing phase. Hall alleges that if neurological testing had been conducted, it would have shown injuries to and abnormalities in his brain in regions typically associated with sexual behavior and impulse control. He claims that counsel's failure to have this testing done amounted to ineffective assistance of counsel because this evidence could have provided a possible explanation of his criminal behavior and countered the State's argument that he made the "choice" to kill.

"Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance being measured against an objective standard of reasonableness, under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005) (internal

quotations and citations omitted). Counsel is not required to investigate a defendant's entire life in order to present constitutionally sufficient mitigation evidence. *State v. Row*, 131 Idaho 303, 313, 955 P.2d 1082, 1092 (1998). "Strategic decisions and judgments by counsel will not be second-guessed on appeal unless found to be objectively unsound." *Id.*

Here, in deposition testimony during post-conviction proceedings, counsel indicated that he decided to present Hall's family and social history because he felt that it was more powerful than evidence of mental illness and because he did not want to expose Hall to a mental health examination by the State should mental health be put at issue. This was a reasonable choice. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness cases, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). After consulting with a team of mental health experts, two of the three principal experts advised pursuing a mitigation strategy that emphasized Hall's traumatic childhood and abusive family. This professional recommendation, as well as counsel's experience on a prior capital case, formed the basis of counsel's decision to focus on Hall's life history rather than on neurological defects.

Trial counsel presented compelling mitigation evidence related to Hall's life and family history. Hall's sister, two half-sisters and cousin (who lived with Hall's family for a time) all testified about the horrendous living conditions in their family and Hall's traumatic childhood. They testified in emotional detail that as children, they were frequently hungry and lacked adequate clothing, basic hygiene, supervision, and care. They were also subjected to constant physical, emotional and sexual abuse—at the hands of their parents, other adults, siblings and even neighbors. The defense also presented the testimony of Dr. Pettis, a clinical psychiatrist, and Dr. Cunningham, a clinical psychologist. Together, these mental health experts spent nearly 400 compensable hours on Hall's case, and their testimony comprised nearly 200 pages of the sentencing hearing transcript. They discussed in detail the mental, social and emotional effects of the abuse suffered by Hall, both generally as well as discussing its effects on Hall specifically— incorporating his mental health evaluations, his school records, his juvenile record and correctional history. In the face of such extensive mitigation evidence, it cannot be said that counsel was ineffective for failing to conduct neurological testing for a theory he decided not to

pursue. "[D]ecisions regarding mental health . . . are strictly strategic and shall not be second-guessed by this Court." *Dunlap*, 155 Idaho at 388, 313 P.3d at 44. Hall's challenge fails the first prong of *Strickland*, as counsel's decision was a reasonable strategic determination regarding mitigation evidence and not deficient performance. Accordingly, we affirm the district court's dismissal of this claim.

### (2) *Counsel was not ineffective for failing to provide sufficient evidence of Hall's traumatic childhood.*

Hall next alleges that trial counsel was ineffective for failing to conduct an adequate investigation regarding the circumstances of his childhood, including failing to contact several of his family members. Specifically, he takes issue with the failure of the defense to seek out his older half-brother, former sister-in-law, another cousin, and his mother. He also alleges that the family witnesses that were called were inadequately interviewed and ill prepared to testify.

This challenge fails on both prongs of *Strickland*. First, Hall fails to show that trial counsel's failure to include other family members would have provided new or otherwise important information to the jury. The fact that defense counsel "could have presented more evidence or more persuasive evidence does not mean that" counsel was ineffective. *State v. Payne*, 146 Idaho 548, 578, 199 P.3d 123, 153 (2008). Second, Hall fails to show that he was prejudiced by counsel's failure to include other family members, or stated another way, that the inclusion of these witnesses would have changed the outcome. Hall urges the presentation of additional family witnesses to further establish the abysmal living conditions and horrific abuse Hall suffered. However, as indicated above, there was extensive testimony by family members and mental health professionals about the tragic family life of Hall. Any further testimony or additional details would likely have been cumulative. Additionally, even after hearing the extensive mitigation evidence presented, the jury sentenced Hall to death. It is very unlikely that the testimony of additional family members about their terrible upbringing would have changed this outcome. For these reasons, we affirm the district court's dismissal of this argument.

### (3) *Counsel was not ineffective for failing to provide mitigation evidence relating to Hall's placement in foster care.*

Hall alleges that counsel was ineffective for failing to conduct adequate investigation regarding his placements in foster care. This contention is without merit. As indicated above, counsel is not required to investigate a defendant's "entire life in order to reasonably and objectively present . . . mitigation evidence." *Row*, 131 Idaho at 313, 955 P.2d at 1092. At best,

the evidence relating to Hall's foster care placements would indicate that he was a deeply troubled individual, who had been the subject of continuous abuse. There is no evidence suggesting that counsel's failure to gather or present evidence relating to Hall's placements in foster care was objectively unreasonable. We affirm the district court's dismissal of this claim.

### **(4)** *Counsel was not ineffective for failing to present more evidence of Hall's good character as an adult.*

Hall claims that his trial counsel failed to investigate and present adequate evidence of Hall's positive relationships and good deeds as an adult in mitigation. This argument is unavailing. Several of the witnesses in the sentencing phase testified to Hall's positive qualities. Ms. Deen, a former girlfriend testified that Hall was initially very kind to her and that he helped her stay off drugs, including keeping her substance-abusing friends away from his home where she was staying. Ms. Dunaway, a former girlfriend, testified that Hall allowed her, her children and grandchildren to move in with him, even though there were other people already living there. Ms. Sebastian, an acquaintance, indicated that Hall was helpful to her and her family, including fixing her car and being kind to her children. There is nearly always more investigation that *could* have been done or more information that *could* have been found, but whether all avenues were exhausted is not the test. Courts ask only what the Sixth Amendment requires. *Dunlap*, 155 Idaho at 388, 313 P.3d at 44 (declaring that in analyzing whether the presentation of mitigation evidence was adequate "courts address not what is prudent or appropriate but only what is constitutionally compelled") (internal quotations omitted). Additionally, as noted by the State, additional evidence of Hall's good character as an adult may have diminished the defense's primary mitigation theme—that Hall had suffered so much abuse and trauma in his life that he was not capable of making rational choices. As discussed above, counsel's decision to focus on a traumatic life history theory in mitigation was a reasonable tactical decision that should not be second guessed. We affirm the district court's dismissal of this claim.

### **j. The court did not err in summarily dismissing Hall's claim that counsel was ineffective in failing to adequately investigate the state's evidence regarding N.O.**

Hall alleges that trial counsel was ineffective in failing to adequately investigate and challenge N.O.'s rape allegations, including interviewing her only a few hours prior to her testimony, failing to compile documentation of her mental health issues, failing to reveal her motive to lie, and failing to introduce evidence that her father was abusive and could have caused her injuries.

When questioned about his interview of N.O. trial counsel indicated that she "was a mess," "real fragile," and "confused." Trial counsel later testified that N.O. came across as "pathetic" and "pitiful" and that he did not want to be viewed as bullying her, so he did not push her in cross-examination. Nevertheless, evidence relating to her mental health was presented to the jury. N.O. testified that she had a "chemical imbalance" that prevented her from working. She also testified, by way of explaining her confusion, that "there's so many things [sic] that bounce around in my head that I'm not quite sure." To which counsel asked, "[i]s it sometimes hard to tell what is real and what isn't real?" She responded, "[n]o, not really because it's – a lot of it is pretty vivid and some of it is not." Counsel did inquire of N.O. whether she had been drinking the night of the rape, and inquired about the problems N.O. was experiencing at home. His tactical decision to not press her further was not objectively unreasonable. We affirm the district court's dismissal of this claim.

### k. The court did not err in summarily dismissing Hall's claim that counsel was ineffective for failing to adequately investigate the State's other aggravation evidence.

Hall alleges that counsel failed to adequately investigate the witnesses who provided aggravation evidence at sentencing. Specifically, he alleges that counsel failed to interview Ms. Dunaway prior to her testimony, that he failed to discover a second drug possession conviction for Ms. Deen, and that he failed to adequately investigate Ms. Sebastian. We address each of these claims.

Counsel's performance was not objectively unreasonable with regard to Ms. Dunaway. Although he did not interview her prior to her testimony, his cross-examination of her drew out important facts and indicated capable, active advocacy. With regard to Ms. Deen, the jury was made aware early on in her testimony that she had a drug problem and that she had been convicted of possession of methamphetamine around the time she knew Hall. It is unclear how evidence of a *second* conviction during this time would be helpful to Hall. Counsel's cross-examination of Ms. Deen indicated that he was familiar with Ms. Deen's relationship with Hall and took care to elicit testimony concerning Hall's positive attributes, such as that it was "in his nature to help people," that part of their relationship was that Hall was helping her to stay off drugs, and that Hall had started his own business mowing lawns. This too was active, capable advocacy that did not fall below the standard of reasonableness.

With regard to Ms. Sebastian, counsel was deficient in failing to identify the potential for conflict prior to the sentencing hearing. Counsel was given notice of the State's witnesses prior to the hearing and should have recognized the potential for conflict then. However, the defendant did not suffer any prejudice as a result of this failing. Counsel's cross-examination of Ms. Sebastian did not differ in any significant respect from other cross-examinations he conducted during the course of the trial. He was polite, but did not fail to elicit unfavorable facts from her, such as her history of theft. Thus, we affirm the district court's dismissal of these arguments.

**l. The court did not err in concluding counsel was not ineffective for failing to object to the alleged prosecutorial misconduct.**

Hall alleges that trial counsel failed to object to the prosecutorial misconduct identified by him in section 22 above. He alleges that had counsel timely objected, the court would have prevented the misconduct. When trial counsel was asked about his failure to object to error in the State's closing argument, counsel stated that "[a]s a general rule, I don't like to object in closing unless it's something really outrageous, like a comment on the defendant's right to re[main] silent or something like that." Then, when asked what he would do if something egregious did occur, counsel declared that he would "object and move for a mistrial." Counsel also cited several tactical reasons for not objecting to closing argument, including that he did not want to "turn the jury off," he did not want to draw attention to things that were being objected to, and that sometimes "if you don't interrupt them, they don't interrupt you." Counsel's statements indicate that counsel's decisions not to object to the portions of the State's evidence Hall now complains of were strategic decisions. Deficient performance cannot be found on the basis of strategic decisions. *Johnson v. State*, 156 Idaho 7, 11, 319 P.3d 491, 495 (2013) ("[T]actical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review.") (internal quotations omitted). We affirm the district court's dismissal of this argument.

**m. The court did not err in determining that counsel was not ineffective for failing to challenge Hall's convictions for kidnapping and rape.**

Hall argues that his counsel's failure to challenge his kidnapping and rape sentences as violating double jeopardy was ineffective assistance of counsel. As indicated in section 23 and as noted by the district court, Hall was charged with first-degree kidnapping, which is not a lesser included offense of felony murder. Hall's claim thus fails with regard to the kidnapping

conviction; any objection would have not been sustained. However, counsel may have been deficient with respect to the rape. There was a colorable argument to be made in 2004 when Hall was tried that rape—as a lesser included offense of felony murder—should merge with felony murder. Indeed, in ruling on this issue in post-conviction, the district court concluded that rape was a lesser included offense of felony murder and counsel's failure to argue merger or object constituted deficient performance. But this determination was made before in this Court's decision in *State v. McKinney*, 153 Idaho 837, 291 P.3d 1036 (2013). In *McKinney*, as indicated above, this Court held that when a defendant is convicted of first degree murder under both premeditation and felony murder theories, separate conviction of the felony underlying the felony murder does not violate double jeopardy because the underlying felony does not share elements with premeditated murder. *Id.* at 841, 291 P.3d at 1040. Therefore, counsel was likely deficient in failing to make this argument, but in light of our decision in *McKinney*, Hall was not prejudiced by counsel's deficiency. We affirm the district court's dismissal of this argument.

### n. The court did not err in determining that counsel was not ineffective in his cross-examination of Ms. Sebastian.

Hall contends that he raised a genuine issue of material fact in post-conviction as to whether trial counsel was ineffective in his cross-examination of Ms. Sebastian because she was also a client of his.

> Proceedings for post-conviction relief are civil in nature, rather than criminal, and the applicant must therefore prove the allegations in the request for relief by a preponderance of the evidence. Summary dismissal of a petition for post-conviction relief is the procedural equivalent of summary judgment under I.R.C.P. 56 and this Court must determine whether a genuine issue of material fact exists, with inference liberally construed in favor of the petitioner. When a genuine issue of material fact is shown to exist, an evidentiary hearing must be conducted.

*Dunlap*, 155 Idaho at 361, 313 P.3d at 17. "Counsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions, as does counsel's presentation of medical evidence." *State v. Abdullah*, 158 Idaho 386, 500, 348 P.3d 1, 115 (2015).

As discussed in section 16, the court repeatedly inquired about the extent of the conflict in counsel's representation of both Hall and Ms. Sebastian, and counsel indicated that he did not believe there was any actual conflict. Further, Hall's Sixth Amendment right to counsel was not abrogated because counsel's cross-examination of Ms. Sebastian did not differ in any important

respects from his cross-examination of other witnesses, as indicated above. He effectively cross-examined Ms. Sebastian, eliciting facts favorable to Hall and unfavorable to her. Additionally, counsel's manner of cross-examination falls squarely within the realm of strategic decisions. *Id.* Further, Hall was not prejudiced by the potential conflict. If there was any deficiency in counsel's cross-examination, it certainly was not the difference between a sentence of life or a sentence of death for Hall. "Under the second prong of *Strickland*, the defendant must show a reasonable probability that the outcome of the trial would be different but for counsel's deficient performance." *Id.* at 480, 348 P.3d at 95. Hall cannot establish the requisite prejudice. We affirm the district court's dismissal of this argument.

### o. The district court did not err in determining that counsel was not ineffective for failing to adequately challenge the admission of evidence relating to the rape of N.O.

Hall asserts that counsel was ineffective for failing to adequately challenge the admission of evidence relating to the rape of N.O. at sentencing. Specifically, he alleges that counsel was ineffective in failing to preserve the appropriate challenges, which he claims are (1) relevancy under Idaho Rules of Evidence 401 and 402, (2) unfair prejudice under Idaho Rule of Evidence 403, (3) a violation of the right to fairly defend himself pursuant to the Sixth and Fourteenth Amendments, (4) a violation of Idaho Code section 19-2515 and the Eighth and Fourteenth Amendments, and (5) a violation of his right to due process and a fair trial pursuant to the Sixth and Fourteenth Amendments.

These claims are without merit. As indicated above, counsel's failure to object is a tactical or strategic decision that is not appropriately second-guessed on appeal unless it rests on inadequate preparation, ignorance of the law or other shortcomings capable of objective review. *Johnson*, 156 Idaho at 11, 319 P.3d at 495; *Abdullah*, 158 Idaho at 500, 348 P.3d at 115. With regard to claims (1) and (2), as indicated above, the Rules of Evidence do not apply in sentencing hearings, so counsel was not required to make objections based on them. *State v. Jeppesen*, 138 Idaho 71, 75, 57 P.3d 782, 786 (2002). The other challenges regarding the N.O. evidence similarly fail on the basis that they fall within the realm of tactical or strategic decisions by counsel that are not objectively reviewable on appeal. We affirm the district court's dismissal of these claims.

**p. The district court did not err in concluding that trial counsel was not ineffective for its failure to adequately challenge the admission of bad act evidence to support the propensity aggravator.**

Hall alleges that trial counsel was ineffective for failing to adequately challenge sentencing evidence presented by the State. Specifically, Hall claims that counsel was ineffective for failing to object to the admission of his 1991 grand theft conviction, for failing to object to his 1994 escape conviction on the basis of Idaho Rules of Evidence 401 and 403 and the Eighth Amendment, and for failing to adequately object to admission of evidence of bad behavior with regard to former girlfriends Ms. Dunaway, Ms. Deen and former neighbor Ms. McCusker.

Idaho Code section 19-2515(6) provides that "the state and the defendant shall be entitled to present *all relevant* evidence in aggravation" (emphasis added). Hall's counsel was not ineffective for failing to object to the State's aggravation evidence presented at sentencing because the prior conviction evidence consisting of grand theft, rape and escape combined to create a picture of a violent person with a propensity for lawlessness, which made this evidence relevant to determining whether Hall had a propensity to murder. Thus, it was admissible in the sentencing hearing pursuant to Idaho Code section 19-2515. With regard to the post-crime evidence from Hall's former girlfriends, this evidence was appropriate as non-statutory aggravation evidence, as indicated above in section 17. Accordingly, the objections Hall claims counsel should have made would have been overruled or sustained in error. For these reasons, counsel's failure to object in the ways described by Hall was not objectively unreasonable and did not constitute deficient performance. We affirm the district court's dismissal of these claims.

**q. The district court did not err in dismissing Hall's claim that counsel was ineffective in failing to adequately challenge non-statutory aggravation evidence or request a non-statutory aggravator jury instruction.**

Hall claims that if the bad acts evidence discussed above was admissible, counsel was ineffective in failing to challenge its admission to prove non-statutory aggravators. Hall also alleges that to the extent the evidence was admitted to prove non-statutory aggravators, counsel was ineffective for failing to request a jury instruction regarding how that evidence fits into the jury's analysis and the burden of proof.

Prior to the State's presentation of evidence at the sentencing hearing, as indicated above, the court discussed with both parties the availability of non-statutory aggravation evidence and its ruling regarding post-crime evidence. Review of the transcript reveals that defense counsel registered an objection to the inclusion of non-statutory aggravation evidence and to the post-

97

crime evidence the State proposed to present. Because counsel objected to its inclusion, we cannot say that counsel's performance was deficient as to non-statutory aggravation evidence.

With regard to counsel's failure to request a jury instruction, we view counsel's failure to request such an instruction as objectively unreasonable, but "we do not believe this oversight alone so prejudiced appellant's case as to render what was in all other respects reasonably competent assistance of counsel, inadequate under the Sixth Amendment." *State v. Kraft*, 96 Idaho 901, 906 539 P.2d 254, 259 (1975). We affirm the district court's dismissal of this argument.

### r. The district court did not err in dismissing Hall's claim that counsel was ineffective in failing to request a jury instruction concerning victim impact statements.

Hall argues that his counsel was ineffective for failing to ask for a jury instruction explaining to the jury how the victim impact statements ("VIS") should be considered. At sentencing, after the State presented its aggravation evidence, the jury heard the victim impact statements of Ms. Henneman's brother and sister. After presentation of the mitigating evidence, they heard victim impact statements from Ms. Henneman's husband, her mother, and her father. Prior to the presentation of these statements, the court read the following instruction the jury:

> Victims or their families have the right to personally address you by making a victim impact statement, which is a statement concerning the victim's personal characteristics and the emotional impact of the crimes.

> A victim impact statement is not made under oath and is not subject to cross examination. A victim may not make any statements which are characterizations or opinions about the crime, about the defendant or the appropriate sentence, and if any are made you should disregard them.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court held that the Eighth Amendment does not prohibit the introduction or admission of victim impact statements. *Id.* at 826 ("We thus hold that if the State chooses to permit the admission of victim impact evidence . . . the Eighth Amendment erects no per se bar."). In Idaho, victims have a constitutional right to be heard at sentencing upon their request. Idaho Const. art. I, § 22, cl. 6.

Victim impact statements are permissible in capital cases per Idaho Code section 19-2515(5)(a) and in other cases per Idaho Code section 19-5306(1)(e). Section 19-2515(5)(a), while permitting the statements, provides that "[c]haracterizations and opinions about the crime, the defendant and the appropriate sentence shall not be permitted as part of any victim impact information."

98

Hall argues that Idaho's death penalty statutory scheme prohibits the jury's consideration of victim impact statements when determining whether to impose the death penalty. This argument is meritless and overlooks the import of section 19-2515(5)(a). Section 19-2515(5)(a) provides that after the defendant is convicted of first degree murder and the State has provided adequate notice of its intent to seek the death penalty, a "special sentencing hearing" shall be held promptly and conducted before a jury. It also declares that the purpose of the hearing is to "hear all relevant evidence and arguments of counsel in aggravation and mitigation of the offense" and that "[i]nformation concerning the victim and the impact that the death of the victim has had on the victim's family is relevant and admissible." I.C. § 19-2515(5)(a). Thus, section 19-2515(5)(a) details the procedure for conducting a capital sentencing hearing and indicates which evidence is properly admitted at such a hearing—of which information concerning the victim, or victim impact statements—is a prominent member. Clearly, victim impact statements have a carefully delineated place in capital sentencing proceedings. Section 19-2515(5)(a) contains no specification as to how impact statements should be considered by the jury, but does allow them to be presented to a jury. I.C. § 19-2515(5)(a). Current limitations surrounding victim impact statements seem to only concern content, length, and number of statements. *State v. Payne*, 146 Idaho 548, 573–74, 199 P.3d 123, 148–49 (2008) (holding the number of letters from family and friends attached to the PSI were "excessive" and that the full day of victim impact testimony contained many strongly worded "opinions about [defendant], his appropriate punishment and calls to religious authority as the basis for punishment" which rendered them admitted in error); *State v. Lovelace*, 140 Idaho 73, 80–81, 90 P.3d 298, 305–06 (2004) (holding that the admission of victim impact statements advocating the death penalty for the defendant was reversible error).

Because the law does not dictate the weight that victim impact statements should be given by the jury in capital sentencing, it cannot be said that counsel's failure to request a jury instruction was deficient performance. Similarly, given the brutal nature of the crime, it is unlikely that had an instruction been requested it would have altered the outcome. Thus, counsel was not ineffective. His performance was not deficient and Hall was not prejudiced by his failure to request a jury instruction concerning victim impact statements. We affirm the district court's dismissal of this argument.

**27. Hall has failed to establish a violation of due process based upon the summary dismissal of his claims without an evidentiary hearing.**

Hall argues that he was denied due process because the district court summarily dismissed his post-conviction claims without an evidentiary hearing. In general, the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The type of hearing or procedure required must be "appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). The United States Supreme Court provided a balancing test to determine if procedural safeguards are adequate:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–35.

Specifically, this Court has previously determined that Idaho Code section 19-2719—which does not mandate an evidentiary hearing in post-conviction capital cases—meets due process requirements. *State v. Rhoades*, 120 Idaho 795, 806, 820 P.2d 665, 676 (1991). This Court recognized that "the defendant's interest is in being afforded an adequate opportunity to present legal and factual issues in his defense." *Id*. But this Court also recognized the State's interest in "eliminating unnecessary delay in carrying out a valid death sentence." *Id*. The Court also determined that Idaho Code section 19-2719 provides an adequate process to prevent erroneous results:

> [I.C. § 19-2719] provides adequate notice to the defendant of exactly what is required of him, and sufficient opportunity for all challenges to be heard. In addition, it serves the purpose of the legislature by preventing the unnecessary delays that occur with so much frequency in capital cases.

*Id*.; *see also Rhoades v. Henry*, 611 F.3d 1133, 1144 (9th Cir. 2010) (rejecting due process and equal protection challenges to Idaho Code section 19-2719); *Hoffman v. Arave*, 236 F.3d 523, 530–36 (9th Cir. 2001) (same).

In Idaho, defendants are provided the opportunity to collaterally attack criminal convictions in a post-conviction petition, and an evidentiary hearing is afforded if a genuine issue of material fact, if resolved in the petitioner's favor, would result in post-conviction relief. *State v. Dunlap*, 155 Idaho 345, 383, 313 P.3d 1, 39 (2013). There is no constitutional basis for mandating an evidentiary hearing. *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990). Hall's due process rights were not violated by the district court's summary dismissal of his post-conviction petition. Accordingly, we affirm the district court's summary dismissal.

**28.     Hall has failed to establish that the State withheld exculpatory evidence.**

Hall claims that the State violated his due process rights by withholding exculpatory evidence regarding N.O. and Ms. Deen. Because Hall's claims were raised in the context of his post-conviction petition, they are governed by the standards detailed in the previous section.

The prosecution has a duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

"The duty of disclosure enunciated in *Brady* is an obligation of not just the individual prosecutor assigned to the case, but of all the government agents having a significant role in investigating and prosecuting the offense." *State v. Avelar*, 132 Idaho 775, 781, 979 P.2d 648, 654 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (stating "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"). However, "a prosecutor is not required to disclose evidence the prosecutor does not possess or evidence of which the prosecutor could not reasonably be imputed to have knowledge or control." *Avelar*, 132 Idaho at 781, 979 P.2d at 654.

Hall initially contends that the State withheld exculpatory evidence regarding N.O., including evidence about her mental health that could have been used to undermine her credibility and version of events that was contained in the 1991 grand jury transcript, N.O.'s mental health records, Hall's prior pre-sentence investigation (PSI), and N.O.'s "status alone."

Hall has failed to establish that his counsel did not have a copy of the grand jury transcript. When Hall's counsel was asked about the transcript, he merely responded, "Was there a grand jury?" Further, review of the grand jury transcript reveals that N.O. only made a passing reference to a "chemical imbalance" and denied that she was told that she was "crazy." There was no other mention of N.O.'s mental health in the grand jury transcript. "Showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more." *Kyles*, 514 U.S. at 437. "[T]he prosecution need volunteer evidence only when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *State v. Shackelford*, 150 Idaho 355, 380, 247 P.3d 582, 607 (2010) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). Here, N.O.'s passing references in the grand jury transcript do not amount to the "more" required in *Kyles*. Because N.O. testified at trial that she had a "chemical imbalance" that prevented her from working, this information was not withheld from Hall, nor was it "sufficiently significant" to deny Hall the right to a fair trial. *See Shackelford*, 150 Idaho at 380, 247 P.3d at 607. Additionally, no prejudice ensued because Hall had an opportunity to cross-examination N.O. at trial. Because Hall has not established that defense counsel did not have a copy of the grand jury transcript, and because the relevant evidence it contained was discussed at trial, there was no *Brady* violation.

Hall also contends that the State was required to disclose N.O.'s mental health records from Intermountain Hospital. However, there is no evidence that the State had the records. The record only contains evidence that the prosecutor in the N.O. case talked with a psychiatrist regarding N.O., but that conversation does not mean that the State obtained the records or retained them or that their content is automatically imputed to the State. Any potential knowledge the N.O. rape prosecutor had in the N.O. case is not imputed to the prosecuting attorney in the present case. Additionally, Hall has failed to explain what information the hospital reports contained that could have been used and would have resulted in a reasonable probability of a different result. Hall's *Brady* claim regarding N.O.'s mental health records fails.

The same is true with regard to Hall's 1991 PSI. Hall has failed to establish that the State had an obligation to provide it to him, and that there was any resulting prejudice. The standards associated with PSIs are contained in Idaho Criminal Rule 32. The applicable version of Idaho Criminal Rule 32(h)(1) mandates that "[a]fter use in the sentencing procedure, the presentence

102

report shall be sealed by court order, and thereafter cannot be opened without a court order authorizing release of the report." While the Idaho Department of Corrections is permitted to retain a copy of the PSI, neither the prosecution nor the defense is generally permitted to retain a copy after sentencing. *See* I.C.R. 32. Either party could have requested a copy of the PSI from the district court. As explained in *Raley v. Ylst*, 444 F.3d 1085, 1095 (9th Cir. 2006), when a defendant possesses "the salient facts regarding the existence of the [evidence] that he claims [was] withheld," there is no *Brady* violation. "When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). Because trial counsel was aware of the PSI, the State had no obligation to request a copy from the district court for the defense. The defense could have requested a copy for itself. Hall has failed to show that a suppression occurred or that any prejudice resulted thereof. There is no *Brady* violation with regard to the PSI.

Hall claims that N.O.'s "status alone" established that the State was aware of something that could be utilized for impeachment. He argues that "it is improbable that the prosecutor asked questions [including 'Are you taking any medication right now?' and 'Have you taken some in the past but you don't take it now?'] without knowing the answers." This argument is based upon speculation. A post-conviction proceeding is not an extension of the criminal case from which it arises. Rather, it is a separate civil action in which the applicant bears the burden of proof imposed upon a civil plaintiff. *Paradis v. State*, 110 Idaho 534, 536, 716 P.2d 1306, 1308 (1986). In the absence of an adequate record on appeal, an appellate court will not presume error. *State v. Sima*, 98 Idaho 643, 644, 570 P.2d 1333, 1334 (1977). Hall has failed to provide any support for the claim that evidence was suppressed. There is no favorable evidence that was suppressed, and certainly none that caused prejudice. It should be noted that the questions regarding N.O.'s medical and mental health were asked at trial, providing Hall the opportunity to cross-examine her. Hall's claim fails the *Brady* test.

Hall further contends that the district court applied an incorrect standard for summary dismissal because the court was required to draw "all reasonable inferences in [his] favor" and the materiality standard from *Brady* can only be applied after an evidentiary hearing. However, there is no support for Hall's contention that the district court is required to hold an evidentiary

hearing to determine materiality. *See Shackelford*, 150 Idaho at 380–81, 247 P.3d at 607–08. The district court applied the correct standard for summary dismissal.

Finally, Hall argues that the State withheld evidence regarding Ms. Deen's second drug conviction. There is no evidence suggesting that documentation of Ms. Deen's second drug conviction was not readily available as a public record and could not have been obtained by defense counsel at any time. There is no *Brady* violation in the State's failure to volunteer items of public record. Further, Hall has failed to explain how he was prejudiced by his lack of knowledge of the second conviction. We affirm the district court's summary dismissal of this claim.

### 29. Hall has failed to establish that the district court abused its discretion in denying his requests for discovery involving Ms. Sebastian, Ms. Deen, and Ms. Dunaway.

Hall filed an exhaustive thirty-one page Motion for Discovery. It included a request for documents related to Ms. Sebastian's testimony including: (1) prosecuting attorney notes, memoranda or recordings from interviews; (2) any incentives offered to Ms. Sebastian to testify against Hall; (3) the PSI in Case No. H0400335/M0401584 (involving Ms. Sebastian); (4) the PSI and any document regarding a "rider" recommendation in Case No. H0400228 (involving Ms. Sebastian); (5) all statements and summaries of statements to law enforcement attributed to Ms. Sebastian from March 1, 2003, to the present; (6) a complete NCIC criminal record check including juvenile criminal records; and (7) reports and notes from IDOC. It also included the following request for documents related to Ms. Deen's testimony: (1) prosecuting attorney documents; (2) documentation of initial contact between Ms. Deen and the prosecuting attorney's office; (3) all incentives offered to Ms. Deen or requests to testify against Hall; (4) all statements and summaries of statements to law enforcement attributed to Ms. Deen from March 2003, to the present; (5) complete NCIC criminal record check of Ms. Deen including juvenile criminal records; (6) police reports and other documents regarding a theft or burglary in July 2001; (7) documents related to Ada County Case No. H0200584 (involving Ms. Deen), including the PSI; (8) documents related to Ada County Case No. H0301398 (involving Ms. Deen), including the PSI and psychological report; and (9) all reports and notes from the Idaho Department of Corrections. Hall requested the following documents related to Ms. Dunaway's testimony: (1) prosecuting attorney documents; (2) all incentives offered to Ms. Dunaway or requests to testify against Hall; (3) all statements and summaries of statements to law enforcement attributed to Ms. Dunaway from March 1, 2003, to the present; (4) complete NCIC

104

criminal record check including juvenile criminal records; (5) police reports and other documents regarding a domestic dispute between Ms. Dunaway and Hall in March 2002; and (6) all reports and notes from the Idaho Department of Corrections.

Subsequently, Hall filed an Amended Petition for Post-Conviction Relief on April 17, 2006. The State, in response, filed a Partial Agreement on Discovery, but it did not include the requested information regarding Ms. Sebastian, Ms. Deen, or Ms. Dunaway. While the district court made oral rulings regarding each of Hall's discovery requests, a final order was entered on February 16, 2007. The order noted some of Hall's requests regarding Ms. Sebastian, Ms. Deen, and Ms. Dunaway had been withdrawn, and denied all the remaining requests regarding the three women, except Ms. Sebastian's PSI—which the court agreed to examine *in camera* and later released a redacted copy. On appeal, Hall contends that the district court abused its discretion by denying his discovery requests relating to Ms. Sebastian, Ms. Deen, and Ms. Dunaway because the information he was denied allegedly supported his claims regarding trial counsel's investigation of the three women and his *Brady* claim.

"[T]he provisions for discovery in the Idaho Rules of Civil Procedure shall not apply to [post-conviction] proceedings unless and only to the extent ordered by the trial court." I.C.R. 57(b) (2004). "The decision to authorize discovery during post-conviction relief is a matter left to the sound discretion of the district court." *Raudebaugh v. State*, 135 Idaho 602, 605, 21 P.3d 924, 927 (2001). "Unless discovery is necessary to protect an applicant's substantial rights, the district court is not required to order discovery." *Baldwin v. State*, 145 Idaho 148, 157, 177 P.3d 362, 371 (2008). "This Court has previously applied standard post-conviction discovery standards in capital proceedings." *Hall v. State*, 151 Idaho 42, 53, 253 P.3d 716, 727 (2011); *see also Fields v. State*, 135 Idaho 286, 291, 17 P.3d 230, 235 (2000).

With regard to the claims relating to Ms. Sebastian, during the discovery hearing, the State repeatedly explained that there were no incentives given to her to testify, and also asserted that the request did not involve a specific claim being raised by Hall. The district court agreed to review the PSI *in camera* and release any relevant information. Hall contends that the district court erred by relying upon the prosecuting attorney's assertions that there were no incentives and that the prosecuting attorney's response was insufficient. Hall contends that the PSI was insufficient to cover the other requests and, because he demonstrated good cause, the court erred

by denying those requests resulting in prejudice to his substantial rights. Hall's arguments are without merit.

The information regarding alleged incentives could be obtained from an alternative source—Ms. Sebastian. A considerable number of affidavits were acquired during post-conviction proceedings, including one from Ms. Dunaway. Thus, this information could have been gained from Ms. Sebastian by way of affidavit, similar to Ms. Dunaway's. The fact that there was an alternative source for this information suggests that Hall's motive in seeking the prosecuting attorney's file and other requested information was nothing more than a "fishing expedition," which is not permitted in post-conviction cases. *Abdullah*, 158 Idaho at 416, 348 P.3d at 31 ("While reasonable discovery may be permitted, the district court should not allow the petitioner to engage in a '[f]ishing expedition.'"). Because Hall was able to obtain this information from Ms. Sebastian herself, his discovery request was properly denied.

Turning next to Hall's claims regarding Ms. Deen, Hall contends that the district court erred in denying his discovery requests relating to Ms. Deen's additional drug conviction and the allegation that Hall's defense counsel represented Ms. Deen when she pled guilty. Regarding the allegation that defense counsel assisted Ms. Deen in entering a guilty plea—that information was readily available from defense counsel, Ms. Deen, and the relevant court files from that case, which could have been obtained from the clerk. Thus, the district court properly denied the discovery requests.

Finally, Hall argues that his counsel were ineffective for failing to investigate Ms. Dunaway and the relationship that Hall had with her. However, as explained above, extensive information was provided during Hall's sentencing that discussed his and Ms. Dunaway's relationship and the positive qualities that Hall possessed.

Thus, the district court did not abuse its discretion when it denied the discovery requests relating to Ms. Sebastian, Ms. Deen, and Ms. Dunaway.

**30.      Hall has failed to establish the district court abused its discretion by denying his post-conviction claim alleging prosecutorial misconduct.**

Hall moved for summary disposition on all post-conviction claims, arguing that he was entitled to judgment as a matter of law because there were no genuine issues of material fact. The State opposed this motion and sought summary dismissal. The district court denied Hall's motion, granted the State's request, and summarily dismissed all claims. On appeal, Hall

contends that the district court erred in denying his post-conviction allegations of prosecutorial misconduct. Most of these allegations relate to the State's sentencing phase closing arguments.

Hall did not object to the State's closing arguments at trial. In *Bias v. State*, 159 Idaho 696, 703, 365 P.3d 1050, 1057 (Ct. App. 2015), the Court of Appeals held that "the proper way for a defendant to challenge an unpreserved trial error is to assert ineffective assistance of trial counsel in a post-conviction proceeding." Here, Hall did raise these issues in his post-conviction petition, but, as indicated above, they were summarily dismissed. Pursuant to Idaho Code section 19-2719(6), his direct appeal and post-conviction appeal are consolidated in this case. Thus, on appeal, Hall raises both an ineffective assistance of counsel claim challenging his trial counsel's failure to object to the alleged misconduct and a substantive claim based on fundamental error.

First, ineffective assistance of counsel occurs where there is "inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review." *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000) (citations omitted). "To establish a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice." *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999). Choosing not to bring additional attention to statements made in closing arguments does not equate to inadequate preparation, ignorance of the law, or other shortcomings. There is no evidence that the decision was anything but a tactical decision, which "will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel." *Pratt*, 143 Idaho at 584, 6 P.3d at 834.

Second, "[w]here defense counsel does not object during closing, this Court will review the propriety of any comments made only if they constituted fundamental error." *Hairston*, 133 Idaho at 513, 988 P.2d at 1187. Hall claims that he was denied a right to due process under the Fourteenth Amendment. *See* U.S. Const. amend. XIV. "Error is fundamental when 'the comments were so egregious or inflammatory that any prejudice arising therefrom could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded.'" *Hairston*, 133 Idaho at 513, 988 P.2d at 1187 (quoting *State v. Smith*, 117 Idaho 891, 898, 792 P.2d 916, 923 (1990)). The prosecuting attorney's comments do not rise to the level of fundamental error. Hall has failed to demonstrate the violation of a constitutional right. For this reason, Hall has failed to establish that the district court erred.

107

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgments of conviction and sentences, and its order dismissing Hall's petition for post-conviction relief.


Chief Justice BURDICK and Justice JONES CONCUR.


HORTON, J., dissenting.

I join in the Court's decision to affirm Hall's convictions for first-degree murder, first-degree kidnapping and rape, although I have a slightly different view on two guilt phase issues that I will briefly discuss. Although I agree with much of the Court's discussion regarding the penalty phase and post-conviction relief proceedings, I respectfully dissent from the Court's decision to affirm the death penalty.

My analysis of the district court's denial of Hall's challenges to Jurors 1 and 60 for cause would be substantially shorter than the discussion in Part III(A)(3) of the Court's decision. Hall failed to persuade me that any of the jurors who sat on his case were biased. Thus, any error in failing to excuse Jurors 1 and 60, who did not sit on his case, was harmless. *State v. Ramos*, 119 Idaho 568, 569–70, 808 P.2d 1313, 1314–15 (1991); *State v. Wozniak,* 94 Idaho 312, 319, 486 P.2d 1025, 1032 (1971).

I also have a different view regarding the propriety of the admission of Detective Smith's testimony relating to the elimination of Chris Johnson as a suspect in Ms. Henneman's murder, addressed in Part III(A)(5) of the Court's decision. I do not view the introduction of a lead detective's opinion as to whether someone has or has not committed a crime as simple lay testimony. In my view, such testimony resembles the expert opinion testimony as to the identity of a perpetrator which this Court forbade in *State v. Hester*, 114 Idaho 688, 695–96, 760 P.2d 27, 34–35 (1988). For that reason, I believe that the district court erred by admitting the testimony. Nevertheless, the evidence of Hall's guilt was overwhelming and the introduction of this testimony was harmless error.

As to sentencing phase issues, I have a slightly different view regarding the return of the Indictment Part II by the same grand jury that received evidence regarding Hall's murder of Cheryl Hanlon, a subject discussed in Part III(B)(14) of the Court's opinion. I believe that any error in the grand jury proceedings was rendered irrelevant for appellate purposes by reason of

108

Hall having received a fair trial. *State v. Grazian*, 144 Idaho 510, 517, 164 P.3d 790, 797 (2007), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 265 P.3d 502 (2011). In *Grazian*, we held that "[a]lleged errors in a grand jury proceeding will not be examined on appeal where the defendant has been found guilty following a fair trial." *Id.* (citing *State v. Mitchell*, 104 Idaho 493, 500, 660 P.2d 1336, 1343 (1983) and *State v. Smith*, 135 Idaho 712, 716–17, 23 P.3d 786, 790–91 (Ct.App.2001)).

I dissent from Part III(B)(21)(E) of the Court's opinion holding that Instruction 49, relating to the governor's pardon and commutation authority, was not error. The Court correctly notes that the United States Supreme Court upheld the use of the Briggs Instruction in *California v. Ramos*, 463 U.S. 992 (1983). However, I think that the California Supreme Court correctly decided this issue on remand, when it held that the instruction violated the defendant's due process rights under the state constitution, *People v. Ramos*, 689 P.2d 430, 444 (Cal. 1984), because such an instruction "in reality serves no legitimate purpose." *Id.* at 443. Although the California court identified many problems with the use of the Briggs Instruction, I am particularly persuaded by its observation that:

> The first vice of such an instruction ... is that it may tend to diminish the jury's sense of responsibility for its action. As the Supreme Court of Delaware explained: "[K]nowledge on the part of the jury that there is possible review by other governmental authorities may cause that jury to avoid its responsibility.... [S]uch comment may imply to a jury that if it mistakenly convicts an innocent man, or mistakenly fails to recommend mercy, the error may be corrected by others; under such circumstances, a conviction is more likely and a recommendation of mercy less likely."

*Id.* (quoting *Smith v. State*, 317 A.2d 20, 25 (Del. 1974)).

I also dissent from the Court's decision to affirm Hall's death sentence because the jury received irrelevant and prejudicial evidence without any guidance from the trial court. At the outset, I should note that I concur with the Court's holding that:

> the admission of evidence in capital sentencing proceedings is governed by Idaho Code § 19-2515(6), which provides that "the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation." Thus, under both the plain language of the statute and this Court's prior decisions, the Idaho Rules of Evidence do not apply to capital sentencing proceedings. *State v. Dunlap*, 155 Idaho 345, 375, 313 P.3d 1, 31 (2013).

I also join in the Court's definition of relevant evidence in capital sentencing proceedings which adopts the definition found in Idaho Rule of Evidence 401. "Evidence is relevant if it has 'any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *State v. Sheldon*, 145 Idaho 225, 228, 178 P.3d 28, 31 (2008) (quoting I.R.E. 401).

My view is that Idaho Code section 19-2515(8) defines the "fact[s] that [are] of consequence to the determination of the action" in a capital sentencing proceeding. The jury is charged with the following responsibilities:

> Upon the conclusion of the evidence and arguments in mitigation and aggravation:
> (a) With regard to each statutory aggravating circumstance alleged by the state, the jury shall return a special verdict stating:
> (i) Whether the statutory aggravating circumstance has been proven beyond a reasonable doubt; and
> (ii) If the statutory aggravating circumstance has been proven beyond a reasonable doubt, whether all mitigating circumstances, when weighed against the aggravating circumstance, are sufficiently compelling that the death penalty would be unjust.

I.C. § 19-2515(8) (2004). Thus, the facts that are of consequence to the determination of a capital sentencing proceeding are: (1) the existence of one or more statutory aggravating circumstances as defined in I.C. § 19-2515(9); and (2) all mitigating circumstances. The jury then is tasked with the duty of weighing all mitigating circumstances it finds to exist against each individual statutory aggravating circumstance to determine whether such mitigating circumstances "are sufficiently compelling that the death penalty would be unjust."

Significantly, this statutory scheme does not recognize or contemplate the jury's consideration of "non-statutory" aggravating circumstances. Curiously, although Idaho Code section 19-2515(5)(a) specifically provides for the introduction of victim impact statements,[1] the jury is not asked to consider such statements when performing its duties under Idaho Code section 19-2515(8)(a). In short, the jury's statutory charge is not to weigh all mitigating

---

[1] The statute was amended, effective March 24, 2004, to provide that:
> Information concerning the victim and the impact that the death of the victim has had on the victim's family is relevant and admissible. Such information shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community by the victim's death. Characterizations and opinions about the crime, the defendant and the appropriate sentence shall not be permitted as part of any victim impact information.
I.C. § 19-2515(5)(a) (2004).

circumstances against each individual statutory aggravating circumstance ***plus other, non-statutory aggravating circumstances plus victim impact information.***

The Court responds to Hall's contention that the jury improperly received evidence of non-statutory aggravating circumstances with the observation that "[b]eginning in *State v. Creech*, 105 Idaho 362, 369–70, 670 P.2d 463, 470–71 (1983), this Court recognized the admissibility of non-statutory aggravating circumstances in death penalty cases." The Court then quotes from our holding in *Creech*. There, this Court stated:

> The court is not limited as to the circumstances it may find in aggravation to those listed under I.C. § 19-2515(f). Thus, that section of the court's findings denominated "5. Facts and Arguments Found in Aggravation," although including circumstances not statutorily listed and not expressly found beyond a reasonable doubt, is not error. I.C. § 19-2515(a) permits the court, upon the suggestion of either party that there are circumstances which might properly be considered in aggravation or mitigation, to hear those circumstances. That language strongly suggests that a judge should hear all relevant evidence which either party desires to set forth. Such an interpretation is not contradicted by I.C. § 19-2515(f), which merely lists the statutory aggravating circumstances, at least one of which must exist beyond a reasonable doubt if the ultimate sanction of death is to be imposed. As above stated, a wide scope of evidence of the personality and background of the accused must be available to the trial judge in order for the sentence to fit the individual defendant. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). We hold that the list of aggravating factors set forth in the statute is not exclusive, albeit one of those factors must necessarily be found to exist beyond a reasonable doubt for a sentence of death to be upheld. Where as here the sentencing judge formally finds, and his findings are substantiated, that there are statutory aggravating factors and those factors are not outweighed by mitigating circumstances, he has complied with the statutory directives. We find no error.

*Creech*, 105 Idaho at 369–70, 670 P.2d at 470–71. Subsequent to this decision, we have reiterated this holding on five occasions. *See State v. Creech*, 132 Idaho 1, 14, 966 P.2d 1, 14 (1998) ("[W]e have already held and reaffirm our holding that it was not error for the district court to weigh these non-statutory aggravating factors and that the list of statutory aggravating factors found in I.C. § 19-2515(h) is not exclusive. As long as the court finds at least one statutory aggravating factor beyond a reasonable doubt, it is free to consider and weigh other aggravating factors individually as well."); *State v. Porter*, 130 Idaho 772, 789, 948 P.2d 127, 144 (1997); *State v. Charboneau,* 116 Idaho 129, 150–51, 774 P.2d 299, 320–21 (1989); *Sivak v. State*, 112 Idaho 197, 210, 213, 731 P.2d 192, 205, 208 (1986); *State v. Sivak*, 105 Idaho 900, 906, 674 P.2d 396, 402 (1983).

111

The difficulty is that our more recent decisions reiterating the ruling in *Creech* fail to acknowledge that the statutory basis upon which that case was decided no longer exists. The version of Idaho Code section 19-2515(a) in effect at the time of the *Creech* decision provided:

> After a plea or verdict of guilty, where a discretion is conferred upon the court as to the extent of the punishment, the court, upon the oral or written suggestion of either party that there are circumstances which may be properly taken into view either in aggravation or mitigation of the punishment, may, in its discretion, hear the same summarily, at a specified time, and upon such notice to the adverse party as it may direct.

I.C. § 19-2515(a) (1977).

By the time Hall's sentencing proceeding took place, the language of Idaho Code section 19-2515(a) upon which the *Creech* court relied had been repealed. The amended statute simply authorized the parties "to present all relevant evidence in aggravation and mitigation." 19-2515(6) (2004). Again, the relevance of evidence turns on the questions the jury is asked to answer. Those questions do not include weighing non-statutory aggravating circumstances or victim impact information.

At this point, I must emphasize that my views are based upon the structure of Idaho's capital sentencing statute, not on constitutional grounds. Clearly, it would not be unconstitutional for our statutory scheme to explicitly authorize consideration of non-statutory aggravating circumstances. *Zant v. Stephens*, 462 U.S. 862, 878 (1983) ("statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.") Likewise, there would be no constitutional violation if the statutory scheme provided that the jury was to weigh victim impact information in reaching its decision whether imposition of the death penalty was unjust:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth*, 482 U.S. [496 (1991)], at 517, 107 S.Ct. at 2540 (WHITE, J., dissenting) (citation omitted). By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Gathers*,

490 U.S., at 821, 109 S.Ct. at 2216 (O'CONNOR, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

*Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

As I do not believe that non-statutory aggravating evidence is relevant under the statutory scheme, I believe that admission of evidence of his prior felony convictions for grand theft and escape prior to this murder and his post-murder involvement in robberies, thefts, and acts of violence against women was error. I further believe that admission of the evidence relating to Hall's rape of N.O. was error. Although it clearly demonstrates that Hall had a propensity to commit rape through the use of force and fear, in the absence of evidence that he actually attempted to kill N.O., I do not believe that it tended to show that he had a propensity to commit murder as the Court holds.

The introduction of such evidence was not harmless. I have no doubt but that the jury viewed the evidence in the same fashion as the Court, i.e., that it showed Hall's "escalation in general lawlessness."

Because the jury received inadmissible evidence and an erroneous instruction in the penalty phase, I respectfully dissent from the decision to affirm Hall's death sentence.


KIDWELL, J. Pro Tem, dissenting.

I concur with the majority opinion and Justice Horton's dissent that Hall is guilty of the crimes charged.

However, this case also clearly raises the issue of whether Idaho's death penalty statute is unconstitutional, specifically if the aggravator provisions and limiting construction are unconstitutionally vague. Or to put it more simply, do the words "exceptional depravity" constitutionally limit the words "especially heinous, atrocious and cruel" when being interpreted by a jury. I respectfully suggest that this is just word salad. Vague words remain vague when more vague words are added.

Hall's briefing raises the issue of unconstitutional vagueness of the aggravating factors at issue in his case, as well as how that vagueness has been amplified by the transition from judge sentencing to jury sentencing. Specifically, Hall challenges the "heinous, atrocious or cruel, manifesting exceptional depravity" (HAC) aggravator and the "utter disregard" aggravator as

unconstitutionally vague. Moreover, Hall argues that the limiting construction, "exceptional depravity" does not save the HAC aggravator from unconstitutional vagueness because it does not meaningfully narrow the class of people eligible for the death penalty. The majority found the aggravators and limiting construction constitutional. I respectfully disagree with the majority's analysis and find the aggravators and limiting construction unconstitutionally vague under the Eighth Amendment.

The sentence of death is reserved only for those convicted of first degree murder under special circumstances, and even then the death sentence is subject to close scrutiny. I.C. § 19-2515. Arguably, every person convicted of murder has committed a crime one would consider horrible, atrocious, and deserving of punishment. How do we decide, then, which convicted persons we will sentence to death? Over time, courts have considered "aggravating circumstances" which are factors a judge or jury consider when deciding whether someone should be sentenced to death. I.C. § 19-2515. "The purpose of the statutory aggravating circumstances is to limit to a large degree, but not completely, the fact finder's discretion." *Walton v. Arizona*, 497 U.S. 639, 718 (1990), *overruled on other ground by Ring v. Arizona*, 536 U.S. 584, 585 (2002). Unfortunately the "aggravating circumstances" that were originally developed to help guide a sentencer are often vague and provide more confusion than clarity.

The Supreme Court of the United States succinctly summed up the dilemma facing courts considering language that would impose the death penalty: "Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty." *Maynard v. Cartwright*, 486 U.S. 356, 361–62 (1988). "[C]hanneling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Id.* at 362. "[T]he proper analysis of a vagueness claim focuses on whether the challenged aggravating circumstance adequately informs the jury as to what it must find in order to impose the death penalty, or whether it leaves the jury with unchanneled discretion to make an arbitrary and capricious decision." *Id.* at 356.

"[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Arave v. Creech*, 507 U.S. 463, 479

114

(1993). The Idaho aggravators at issue here provide, "[t]he murder was especially heinous, atrocious or cruel, manifesting exceptional depravity" and "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." I.C. §§ 19-2515(e), (f).

The Supreme Court, in *Maynard*, held that the aggravator "especially heinous, atrocious, or cruel" is unconstitutionally vague, as the word "especially" does not guide the jury. *Maynard*, 486 U.S. at 364. "To say that something is 'especially heinous' merely suggests that the individual jurors should determine that the murder is more than just 'heinous,' whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Id.* (citing *Godfrey v. Georgia*, 446 U.S. 420, 428–29 (1980)).

In this case, Hall argues that Idaho's HAC aggravator is unconstitutionally vague. Indeed, like *Maynard*, where the use of the word "especially" before the word "heinous" did not save the HAC aggravator from unconstitutional vagueness, here, the aggravator contains no initial limiting words, and states only that the murder be "heinous, atrocious or cruel . . . " I.C. § 19-2515(e). If the aggravator contained nothing more, it would seem under the *Maynard* line of reasoning that the HAC aggravator is clearly unconstitutionally vague.

However, the Idaho HAC aggravator goes on to add "[t]he murder was especially heinous, atrocious or cruel, *manifesting exceptional depravity*." *Id.* (emphasis added). When an aggravator's language is unconstitutionally vague, it can still be upheld in the presence of a limiting construction. *State v. Card*, 121 Idaho 425, 435, 825 P.2d 1081, 1091 (1991). Here, the limiting construction is "manifesting exceptional depravity." I.C. § 19-2515(e). This has been defined as "to offend all standards of morality and intelligence." *State v. Osborn*, 102 Idaho 405, 418, 631 P.2d 187, 200 (1981). As discussed in the majority opinion, this limiting construction has been found to allow the entire aggravator to pass constitutional muster. "In *Osborn*, we adopted and applied limiting language applicable to the 'exceptional depravity' language in I.C. § 19-2515(g)(5) to ensure this particular aggravating circumstance would be 'sufficiently definite and limited to guide the sentencing court's discretion in imposing the death penalty.' " *State v. Leavitt*, 121 Idaho 4, 5, 822 P.2d 523, 524 (1991).

The addition of these three words, "manifesting exceptional depravity," has resulted in several Idaho cases upholding the constitutionality of the HAC aggravator, finding the final three

115

words a limiting construction, saving the HAC aggravator from unconstitutional vagueness. *Osborn*, 102 Idaho at 405, 631 P.2d at 200. However, the cases finding that the limiting construction saves the HAC aggravator from unconstitutionality are misguided, as *Maynard* forecloses such an argument. How is the addition of "manifesting exceptional depravity" different than "especially heinous" that was found unconstitutionally vague in *Maynard*? Here, as in *Maynard*, one could say, "[t]o say that something is '[manifesting exceptional depravity]' merely suggests that the individual jurors should determine that the murder is more than just '[depraved],' whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life '[manifests exceptional depravity]' " *Maynard*, 486 U.S. at 364 (citing *Godfrey*, 446 U.S. at 428–29). The limiting construction here is no less vague than the one struck down in *Maynard.*

In *Moore v. Clarke*, the Eighth Circuit recognized this, and found that "exceptional depravity" is unconstitutionally vague. 904 F.2d 1226, 1233 (8th Cir. 1990).

> The phrase 'exceptional,' which modifies 'depravity' in the challenged statute, is equally unhelpful to a sentencing body seeking objective standards to guide its discretion. 'Exceptional' carries vagueness and subjectivity to the same extent as 'especially,' a standard rejected by the Supreme Court when examining an Oklahoma aggravating circumstances statute similar to the one in issue here.

*Id.* at 1230.

Therefore, because the HAC aggravator is unconstitutionally vague, and the limiting construction of "exceptional depravity" is also unconstitutionally vague, I would hold the HAC aggravator is unconstitutional under the Eighth Amendment. Moreover, the "utter disregard" aggravator does not even contain the "exceptional depravity" limitation. It is difficult to see how the language could guide any sentencer, or limit the class eligible to receive the death penalty, as most consider any murder an "utter disregard" for human life. Therefore, I would also find the "utter disregard" aggravator unconstitutional, as it is vague and contains no limiting construction.

The majority's approach understates the magnitude of the transition from the judge as a sentencer, to the jury as a sentencer, and provides no legal basis for declining to reconsider case law that relied on judge sentencing as opposed to jury sentencing. Following the Supreme Court's decision in *Ring*, Idaho changed its capital sentencing approach to have a jury, rather than a judge, determine if aggravating circumstances warrant a punishment of death. 536 U.S. at 584; I.C. § 19-2515(3)(b). "A state court's limiting construction can save a flawed statute from unconstitutional vagueness, and *where the sentencer is a judge* there is nothing wrong with

presum[ing] that the judge knew and applied any existing narrowing construction." *Arave*, 507 U.S. at 480 (emphasis added). When Idaho transitioned from having a judge do capital sentencing, to having a jury do capital sentencing, new policy implications arose that require us to revisit, and possibly overrule, prior decisions upholding the constitutionality of the aggravators with the limiting construction.

Case law upholding Idaho's death penalty scheme was premised on an experienced judge, rather than an inexperienced lay-person jury, doing the sentencing. One concern raised by the transition from judge to jury is the general lack of experience juries have with regard to sentencing, as compared to judges. Many jury members have not been involved in sentencing before, and are unfamiliar with the law and its implications. As the Supreme Court noted, "the members of a jury will have had little, if any, previous experience in sentencing, [and] they are unlikely to be skilled in dealing with the information they are given." *Gregg v. Georgia*, 428 U.S. 153, 192 (1976). Because of the lack of experience, jurors need specific and detailed guidance on which murderers should receive the death penalty as opposed to only life in prison. The aggravators in Idaho do not provide such guidance, and result in the arbitrary, capricious and unconstitutional imposition of the death penalty.

In a capital case, sentencing is a matter of life or death. Requiring a lay-person jury with no experience in sentencing to weigh aggravating and mitigating circumstances will lead to unpredictable and inconsistent results. In *Proffitt v. Florida*, the Supreme Court stated, "judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases." 428 U.S. 242, 252 (1976). A judge as a sentencer will have more consistent results, as they are more familiar with the law and sentencing procedures. Because our prior case law upholding Idaho's aggravating circumstances primarily relied on judge sentencing, and Idaho now utilizes jury sentencing, those prior cases no longer support upholding Idaho's aggravating circumstances.

In sum, because the United States Supreme Court has held HAC aggravators to be unconstitutionally vague, and the limiting construction of "exceptional depravity" does not meaningfully narrow the class eligible for the death penalty, this provision in Idaho's death penalty scheme is unconstitutionally vague.

Therefore I would leave the sentence intact except for the imposition of the death penalty.

117